IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MARTIN J. WALSH,                      )
SECRETARY OF LABOR,                   )
U.S. DEPARTMENT OF LABOR,             )
                                      )
                      Plaintiff,      )      CIVIL ACTION FILE
                                      )      NO. 4:22-cv-3246
        v.                            )
                                      )
PACKERS SANITATION SERVICES,          )
INC., LTD.,                           )
                                      )
                      Defendant.      )

**SECRETARY OF LABOR'S BRIEF IN SUPPORT OF**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

SEEMA NANDA
Solicitor of Labor

CHRISTINE Z. HERI
Regional Solicitor

EVERT H. VAN WIJK
Associate Regional Solicitor

AMBRIEL RENN-SCANLAN
TRACI MARTIN
LAURA O'REILLY
Trial Attorneys

U.S. Department of Labor
Office of the Solicitor
2300 Main, Suite 10100
Kansas City, MO 64108
(816) 285-7260

*Attorneys for Plaintiff Martin J. Walsh*
*Secretary of Labor*

1

**TABLE OF CONTENTS**

# Table of Contents

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

FACTS ............................................................................................................................... 2

      I.    Background ...................................................................................................... 2

      II.   Wage and Hour Investigation ....................................................................... 3

      III.    The JBS Facilities ...................................................................................... 5

      IV.  Interference During the Warrant Execution........................................... 9

      V.   Minor Children Interviews......................................................................... 11

      VI.  Corporate Documents ............................................................................. 26

STANDARD OF REVIEW ............................................................................................. 27

ARGUMENT ................................................................................................................... 27

      I.    THE COURT MUST ENJOIN DEFENDANT FROM   EMPLOYING OPPRESSIVE CHILD LABOR AND OBSTRUCTING THE SECRETARY'S INVESTIGATION ........................................................................................... 27

      II.   THE COURT MUST EXPAND THE INJUNCTION AGAINST CHILD LABOR AND INVESTIGATORY INTERFERENCE TO DEFENDANT'S OPERATIONS ACROSS THE COUNTRY ........................................................ 37

CONCLUSION................................................................................................................. 38

## **TABLE OF AUTHORITIES**

### **Cases**

Baker Elec. Co-op., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) ....................................31

Brennan v. Correa, 513 F.2d 161, 163 (8th Cir. 1975) ................................................27, 29, 37

Brennan v. J. M. Fields, Inc., 488 F.2d 443, 449-50 (5th Cir. 1974)........................................37

Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706-07 n.18 (1945) ..............................................2

Bryant v. Nationwide Anesthesia Servs., Inc., No. 8:21-CV-335, 2021 WL 3912264, at *6 (D. Neb. Sept. 1, 2021) ...............................................................................................................................31

Burlington Northern R. Co. v. Bair, 957 F.2d 599, 601 (8th Cir. 1992)....................................29

Califano v. Yamasaki, 442 U.S. 682, 702 (1979) ......................................................................38

Chao v. Continental Express, Inc., No. 4:07CV00852, 2007 WL 3309266, at *1 (E.D. Ark. Nov. 6, 2007) ..........................................................................................................................................29

Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) ....................27

Dole v. Stanek, Inc., No. 88-4118, 1990 WL 123994, at *3 (N.D. Iowa July 6, 1990)..............34

Frazier v. Kelley, 460 F. Supp. 3d 799, 828 (E.D. Ark. 2020) ..................................................27

Gemsco, Inc. v. Walling, 324 U.S. 244, 261-62 (1945)................................................................1

Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009).........................29

Grasso Ents., LLC v. Express Scripts, Inc., 809 F.3d 1033, 1040 (8th Cir. 2016) ....................29

Grove v. Meltech, Inc., No. 8:20CV193, 2020 WL 7126554, at *3 (D. Neb. Dec. 3, 2020) ..............30

Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 11 (2011) ..............................30

Lenroot v. Interstate Bakeries Corp., 146 F.2d 325, 327 (8th Cir. 1945)........................29, 35, 36

Marshall v. Georgia Southwestern College, 489 F. Supp. 1322, 1331 (D.C. Ga. 1980) ............37

Marshall v. Lane Processing, Inc., 606 F.2d 518 (8th Cir. 1979).........................................31, 32

Mullins v. City of New York, 626 F.3d 47, 55 (2d Cir. 2010)......................................................30

Prince v. Mass., 321 U.S. 158, 168 (1944) ...................................................................29, 32, 37

Reich v. Bede Aircraft Corp., No. 4:96CV592 DJS, 1996 WL 276382, at *3 (E.D. Mo. Mar. 26, 1996) .32

Reich v. IBP, Inc., No. 88-2171-EEO, 1996 WL 445072, at *1 (D. Kan. July 30, 1996) ................... 37, 38

Rodgers v. Bryant, 942 F.3d 451, 458 (8th Cir. 2019) .............................................................. 38

S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir. 1989) .................... 27

**Statutes**

29 U.S.C. § 201 et seq. ......................................................................................... passim

29 U.S.C. § 202(a) ................................................................................................... 2

29 U.S.C. § 203(e)(1) ............................................................................................. 33

29 U.S.C. § 203(g) ................................................................................................. 33

29 U.S.C. § 203(l) ............................................................................................. 33, 35

29 U.S.C. § 206 ....................................................................................................... 2

29 U.S.C. § 212(c) ......................................................................................... 1, 33, 35

29 U.S.C. § 215(a)(4) ......................................................................................... 1, 35

**Rules**

Fed. R. Civ. Proc. 65 ................................................................................................ 2

**Regulations**

29 C.F.R. § 507.32 ................................................................................................. 33

29 C.F.R. § 570.33 ............................................................................................. 34, 35

29 C.F.R. § 570.35 ......................................................................................... 1, 33, 35

29 C.F.R. § 570.35(a)(4) .......................................................................................... 33

29 C.F.R. § 570.61 ......................................................................................... 1, 34, 35

Plaintiff Martin J. Walsh, Secretary of Labor, U.S. Department of Labor ("Secretary"), respectfully submits this memorandum of law in support of his motion for a temporary restraining order and order to show cause for a preliminary injunction enjoining Packers Sanitation Services, Inc. LTD. ("PSSI"), from its unlawful use of oppressive child labor, in violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("Act" or "FLSA").

## INTRODUCTION

Defendant violated the FLSA's oppressive child labor provisions by illegally employing at least thirty-one (31) children, ages 13 to 17, to clean dangerous power-driven equipment at multiple slaughtering and meatpacking facilities overnight in clear violation of FLSA's prohibition on oppressive child labor. See 29 U.S.C. §§ 212(c), 215(a)(4); 29 C.F.R. §§ 570.35, 570.61 (DOL's child labor regulations on employing 14- and 15-year-olds, and employing 16- to 18-year-olds in occupations that are "particularly hazardous" and/or "detrimental to their health or well-being").[1]  Additionally, Defendant has engaged in actions meant to impede the Department's investigation of its violations.

Defendant's unlawful conduct directly harms the very minors the child labor provisions of the FLSA are meant to protect.  See Gemsco, Inc. v. Walling, 324 U.S. 244, 261-62 (1945) (recognizing that "the child labor provisions are themselves independent prohibitions, not limited to operation in situations where child labor has harmful effects on maintaining the minimum wage rate but working entirely independently of such consequences").  Congress enacted the FLSA to protect workers by establishing prohibitions on child labor, as well as setting federal minimum

---

[1]As detailed below, PSSI has employed each of these minors. For several minors (such as Minor Child Y and Z), the Department is still investigating in which areas of the meat processing facility they worked to determine what types of equipment they cleaned.  However, based on the Department's review of records provided by JBS, as well as tours of the facilities, it is clear nearly all areas of plant cleaned by PSSI workers contained "meat and bone cutting saws" or other dangerous power-driven machines.  (Alcantara Declaration ¶¶ 45-46, Ex. 1)

wage and overtime guarantees, to protect law-abiding employers from unfair competition from employers who fail to comply with the Act's requirements.  See id.; Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706-07 n.18 (1945); 29 U.S.C. §§ 202(a), 206-207.  Illegally employing minors – and then putting up roadblocks to investigating the illegal behavior – perpetuates oppressive child labor, deters employees from asserting their rights, precludes the government from vindicating those rights, and undermines the public's interest in effective enforcement of the Act.  As such, the Secretary's current and future enforcement efforts are threatened with irreparable harm absent immediate action to enjoin Defendant's unlawful conduct.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Secretary moves the court for:  (1) a temporary restraining order, to be in effect until a hearing is held concerning a preliminary injunction; and (2) a preliminary injunction.  This requested relief is sought to enjoin Defendant and its agents under section 17 from continuing to violate sections 12(c), and 15(a)(4) of the FLSA in the manner described above.

## FACTS

PSSI employs or has employed at least thirty-one (31) minor male and female children, as young as thirteen, to clean dangerous power-driven equipment with corrosive cleaners during overnight shifts at three (3) separate slaughtering and meat packing facilities in Nebraska and Minnesota.  The Secretary's initial evidence review indicates PSSI may employ minor children under similar conditions at its other 400 operations across the country.

## I.   Background

Packers Sanitation Services, Inc., Ltd.,[2] is a cleaning and sanitation company supplying workers to clean industrial spaces across the country, including meat processing facilities.

---

[2]Packers Sanitation Services, LLC is registered as a foreign limited liability company in Nebraska and references Ohio as its qualifying state. Upon information and belief, there is no Packers Sanitation Services, LLC

(Alcantara Dec. ¶ 6, Ex. 1)  Per its website, PSSI employs "a team of 17,000 employees across more than 700 locations[.]"   See https://www.pssi.com/sanitation-solution/.   PSSI operates storefront facilities that hire local workers to clean nearby meat processing facilities, including at facilities operated by JBS USA or one of its affiliates ("JBS") in Grand Island, Nebraska, and Worthington, Minnesota.  (Rebolledo Dec. ¶ 4, Ex. 2; Latuff Dec. ¶ 4, Ex. 3).  PSSI also performs cleaning services at a Turkey Valley Farms operation in Marshall, Minnesota. (Latuff Dec. ¶ 5, Ex. 3)

PSSI's employee handbook warns employees that they may use "hazardous or toxic materials[.]" (Ex. 4, PSSI's Team Member Handbook at p. 72/56)  A video publicly available on PSSI's YouTube channel states employees "work with and around dangerous machinery" and "use strong chemicals[.]"   (Lopez Dec. ¶ 45, Ex. 5, quoting New Applicant Video at 2:34, https://www.youtube.com/watch?v=9qBQiZSLlNw)  Indeed, PSSI employees wore harnesses and carried equipment lock out tags (Lopez Dec. ¶ 47, Ex. 5), indicating employees worked at elevated areas and needed to ensure machinery did not accidentally start during servicing and cleaning.

## II.   **Wage and Hour Investigation**

The Wage and Hour Division of the Department of Labor ("WHD") received a referral from a law enforcement agency about possible child labor violations by PSSI at its operation in Grand Island.  (Rebolledo Dec. ¶ 6, Ex. 2)  As a result, WHD opened an investigation into PSSI's compliance with the FLSA, including the Act's child labor provisions, on August 24, 2022. (Rebolledo Dec. ¶ 5, Ex. 2)  As part of its investigation, WHD conducted surveillance, subpoenaed

---

registered with the State of Ohio. While the company is registered as a foreign limited liability company in Nebraska under the name Packers Sanitation Services, LLC, at least one Nebraska Secretary of State filing for this company listed the company as Packers Sanitation Services, Inc., Ltd. d/b/a Packers Sanitation Services, LLC.

school records, and interviewed confidential sources about minors working overnight shifts to clean the meat processing facility.  (Rebolledo Dec. ¶¶ 7-11, Ex. 2; Latuff Dec. ¶¶ 8-10, Ex. 3)

On September 2, 2022, WHD witnessed multiple workers entering the JBS facility in Grand Island, Nebraska, during the PSSI overnight cleaning shift who appeared to be minors based on their stature and appearance.  (Rebolledo Dec. ¶ 8, Ex. 2)  On October 3, 2022, WHD also conducted overnight surveillance outside the JBS facility in Worthington, Minnesota, again observing workers entering the facility who appeared to be minors.  (Latuff Dec. ¶ 8, Ex. 3)  WHD subpoenaed and received school records from the Grand Island, Nebraska, and Worthington, Minnesota, school districts for middle school and high school students at risk of working overnight at the local meat processing facilities.  (Rebolledo Dec. ¶ 7, Ex. 2; Latuff Dec. ¶ 10, Ex. 3)  WHD also subpoenaed records and interviewed two minors in Marshall, Minnesota, who worked for PSSI at a Turkey Valley Farms meat processing facility.  (Mejia Dec. ¶¶ 31, 37, Ex. 6)

By using the subpoenaed school records and talking to confidential sources, WHD determined three minors had worked overnight shifts for PSSI at the Grand Island JBS facility, (Rebolledo Dec. ¶ 9, Ex. 2), including a thirteen-year-old (Minor Child A) who suffered a serious chemical burn from PSSI's chemical cleaners (Rebolledo Dec. ¶¶ 9, 25, Ex. 2), and two minors had worked overnight shifts at the Turkey Valley Farm facility.  (Mejia Dec. ¶¶ 31-32, 37, Ex. 6)

On October 13, 2022, WHD executed warrants for: (1) PSSI's operations at the JBS facilities in Grand Island, Nebraska and Worthington, Minnesota; (2) PSSI's Grand Island and Worthington storefront locations that recruited and supplied workers to the plants; and (3) PSSI's corporate office in Keiler, Wisconsin.[3]  (Rebolledo Dec. ¶ 10, Ex. 2; Latuff Dec. ¶ 11, Ex. 3; Uphold Dec. ¶ 6, Ex. 7; see also Ex. 8, Warrants)  Pursuant to the warrants, WHD Investigators

---

[3]WHD also obtained and executed a warrant for PSSI's storefront and workplace at a Tyson Foods, Inc. meat processing facility in Sedalia, Missouri.  That investigation is ongoing. (Alcantara Dec. ¶¶ 13, 47, Ex. 1)

toured parts of the JBS Grand Island and Worthington facilities during the PSSI overnight shift, documented working conditions with photographs and video, obtained documents, and interviewed PSSI employees, including many minor children. At the PSSI storefronts and corporate office, WHD Investigators obtained additional documents. (Alcantara Dec. ¶¶ 31-34, Ex. 1; Latuff Dec. ¶¶ 13-14, Ex. 3)

### III.   The JBS Facilities

The JBS Grand Island facility is divided into two main departments: Harvesting – also known as the killing floor or the kill floor, where the cattle are killed and initial processing is carried out (Rebolledo Dec. ¶ 13 , Ex. 2) – and Fabrication, with specific areas in each. (Alcantara Dec. ¶ 5, Ex 1)  The JBS facility in Worthington processes pork, but is similarly divided. (Latuff Dec. ¶ 21, Ex. 3)  At the Grand Island JBS facility, PSSI employs about one hundred and ninety (190) total workers, including sixty-four (64) on the kill floor and one hundred and twenty-six (126) on the harvesting side.  (Alcantara Dec. ¶ 19, Ex 1)  At Worthington, PSSI employs one hundred and ten (110).  (Azocar Dec. ¶ 13, Ex. 9)

PSSI employees clock-in and out of their shifts by entering an ID number into a biometric time clock.  The timeclock then takes a picture of the employee's face.  (Lopez Dec. ¶ 61, Ex. 5; see also Ex. 4, PSSI's Team Member Handbook at p. 35/19 ("PSSI utilizes facial recognition technology software to clock an employee in and out with a 'face scan' or a photograph")).  Workers are dressed in normal street wear when clocking-in. (Lopez Dec. ¶ 61, Ex. 5)  PSSI workers wore JBS badges with their name and photograph, raincoats, waterproof overalls or pants, goggles, gloves, ear plugs, and hard hats.



*Photo showing attire of PSSI employee working in Ground Beef room of the Grand Island JBS plant (taken by WHI Lopez)*

5

(Alcantara Dec. ¶ 25, Ex. 1; Lopez Dec. ¶ 47, Ex. 5; Latuff Dec. ¶ 21, Ex. 3)  At Grand Island, some PSSI workers also wore orange harnesses.  (Lopez Dec. ¶ 47, Ex. 5)

PSSI managers/supervisors track employees closely.  At Grand Island, supervisors checked workers wearing their personal protective equipment twenty times per employee/per shift and logged the exact number of scrub pads, nozzles, flashlights, scrapers, buckets, picks, and brushes provided to and returned by each individual worker twice a shift.  Supervisors also conduct a daily meeting with employees and log any employees who failed to show for their shift.  (Lopez Dec. ¶ 61, Ex. 5)  Every night, PSSI employees must clean all the machinery in each room of the JBS facility.  A PSSI employee assigned to clean an area cleans all of the machines in that area. (Alcantara Dec. ¶ 5, Ex. 1)

### A.   Cleaning and Conditions



*Photo showing limited visibility and condition of the floor at the Worthington JBS plant (taken by WHI Latuff)*

WHD Investigators toured areas on both sides of meat processing facilities – the kill floor and the fabrication side – at the Grand Island and Worthington facilities. During the tour at the Grand Island facility, one PSSI manager said: "I have nothing to hide, whatever happened before I started working with the company, I do not know…" (Martinez Dec. ¶ 12, Ex. 10)  During their tours, the running of machines made the area extremely noisy, with steam from hot water limiting visibility.  (Mejia Dec. ¶ 14, Ex. 6; Lopez Dec. ¶ 23 Ex. 5; Cardenas Dec. ¶¶ 15-16, Ex. 11; Azocar Dec. ¶ 12, Ex. 9 ("[I]t was steamy, loud, and wet."))  Scrap meats, fats, and oils covered handrails and the floor (Lopez Dec. ¶ 24 Ex. 5), making surfaces slippery. (Cardenas Dec. ¶ 17, Ex. 11)  WHD Investigators saw PSSI employees working in standing water

in a mixture of floating meat parts and soap. (Cardenas Dec. ¶ 17, Ex. 11)  One area of the Grand Island kill floor appeared to have cow fat all over the ground.  (Martinez Dec. ¶ 15, Ex. 10)

WHD documented PSSI employees using high-pressure washers, nozzles, detergents, scrub pads, and buckets to clean. (Lopez Dec. ¶ 25, Ex. 5; Latuff Dec. ¶ 20, Ex. 3)  At the Grand Island facility, the WHD Investigators observed employees pouring heavy-duty highly caustic cleaner KC-568, containing 12.5% of Sodium Hypochlorite, into large containers (Alcantara Dec. ¶ 22, Ex. 1) and cleaning the preslaughter handling, stunning, and slaughtering equipment with hoses, steaming hot water, and cleaning liquids numbered 568, 262, 615, 400, and 4610.  (Martinez Dec. ¶ 20, Ex. 10)  Interviews confirmed PSSI employees, including minors, suffered serious chemical burns from using these cleaners. (Lopez Dec. ¶ 30, Ex. 5 (interviewed worker suffered chemical burns on their face); Rebolledo Dec. ¶¶ 25-26, Ex. 2 (Minor Child A, a 13-year-old PSSI employee, suffered serious burns)).



*Photo showing PSSI employee using a hose to clean the "New Fab" area of the Grand Island JBS plant (taken by WHI Lopez)*

### B.    Kill Floor

JBS provided WHD with documents listing the types of machines cleaned by PSSI workers in each area.  (Phalen Dec ¶ 13, Ex. 12)  Per WHD's review, PSSI employees on the kill floor at the Worthington facility clean back saws, brisket saws, and a lard grinder. (Latuff Dec.   ¶ 36, Ex. 3)  At the JBS Grand Island facility, documents show PSSI employees on the kill floor clean:[4]

---

[4]These are just a sampling of the machines PSSI employees clean on the kill floor.

- Millard Heavy Duty Head Splitter, which according to the manufacturer's website, is "designed with a hydraulically powered cylinder to enable" an operator to "swiftly and cleanly drive the blade through the cradled head" of an animal.

- Jarvis Buster IV electrically powered bandsaw, a 190-pound saw used to split cow carcasses in half length-wise.

- Jarvis Hydraulic Brisket Saw, which according to the manufacturer's website, the 5-horsepower, forty-pound saw "[c]uts fat cattle briskets in 3 seconds per carcass".

- IMS Side Puller and Down Puller, which rip the hides from the carcasses.

- Jarvis Hock Cutter/Dehorner, described on the manufacturer's website as "[u]sed for front and hind beef hock cutting through the bone or joint.  Also an effective beef dehorner."

(Phalen Dec. ¶ 13, Ex. 12)

WHD Investigators at the Grand Island facility toured the kill floor section where animals are hung by the legs and the skin and head is removed, including the "the blood dropper", which, as one PSSI manager explained, is "where the blood is released from the cow."  (Martinez Dec. ¶ 13, Ex. 10)

### C.    Fabrication Side

All except two areas on Fabrication side of the Grand Island facility contained machines that constitute meat and bone cutting saws, meat slicers, knives, or grinding, machines.  (Alcantara Dec. ¶ 46, Ex. 1)  Per WHD's review, PSSI employees on the Fabrication side (which includes "Old Fab 1 & 2", "Loin Room", "Meat Master" area, and "Ground Beef" area) clean: [5]

- Rose meat puller – This machine pulls meat cut from a muscle that spans from the chuck to the flank of the carcasses.

---

[5] These are just a sampling of the machines PSSI employees clean on the Fabrication side.

- Grasselli skinners – This machine skins fat from the carcass.

- Kidney fat puller – This machine pulls fat away from the kidneys.

- Jarvis Buster V – This 196-pound saw is used for "splitting fat cattle, bulls, oxen, and horses" (per the manufacturer's website)

- Various meat bandsaws manufactured by Butcher Boy, including several that cut "4000 FPM" (feet per minute) and have 7.5 horsepower motors.

- Cozzini Prime Mix Mixer/Blender, which can grind up to 15,000 pounds of raw meat.

- Weiler Dominator Mixer/Grinder, which has 125 horsepower grander motor and has a grind rate of 36,000 pounds per hour.

(Phalen Dec. ¶ 13, Ex. 12)

The Fabrication side's Cooler Department includes the Jarvis Wellsaw, an electric reciprocating saw "for the toughest jobs cutting through meat and bone" can be used for "a variety of applications ranging from cutting forequarters, shank bones, primal cuts, aitch bones, brisket opening and splitting." (Phalen Dec. ¶ 13, Ex. 12) At the Grand Island facility, WHD Investigators also observed employees on the Fabrication side cleaning floors, the conveyor belts, and large grinding machines that turned meat into ground beef. (Lopez Dec. ¶ 50, Ex. 5).[6]

## IV.  **Interference During the Warrant Execution**

The warrants allowed WHD Investigators to tour the facilities, document their observations with photographs and videos, obtain documents, including electronic documents, and take private interviews. (Ex. 8, Warrants) However, PSSI managers/supervisors attempted to thwart or tamper the collection of evidence in multiple ways. During the tour of the Grand Island facility, PSSI

---

[6]At the Grand Island facility, in the pack off area, the WHD observed 22 workers cleaning 9 machines that seal bags of meat and about 150 conveyor belts. In "New Fab.", WHD observed 17 workers cleaning 4 tables and 5 saws used to cut the meat. In the "Ground Beef" room, WHD saw 11 workers cleaning machines that grind meat, referred to as blenders and augers. (Lopez Dec. ¶ 40, Ex. 5)

managers repeatedly instructed WHD Investigators not to take pictures and videos and to delete any photos or video collected, despite the warrant giving WHD Investigators express authority to collect such evidence.  (Alcantara Dec ¶ 24, Ex. 1; Rebolledo Dec. ¶ 14, Ex. 2)

PSSI managers also attempted to obstruct employee interviews.  At the Grand Island facility, WHD Investigators observed a PSSI manager talking to a group of young employees seated in the cafeteria.  Based on stature and appearance, these workers appeared to be teenagers. The WHD Investigator could not hear the PSSI manager's conversation with them but approached the group after the manager left.  The group alleged they had already been interviewed and declined to provide their names.  (Lopez Dec. ¶¶ 34-36, Ex. 5)  During the confidential interviews in the cafeteria, a PSSI supervisor sat directly across the table from the WHD Investigator conducting an interview of a worker later identified as a minor.  The Investigator politely instructed the PSSI supervisor to leave the area as the interview was confidential.  The PSSI supervisor eventually agreed to move after lingering for a few minutes.  Other supervisors remained in the area within view of the employees throughout the interviews, circling the cafeteria. WHD Investigators repeatedly asked them to leave the area as the warrant allowed "questioning privately of any employee or agent of PSSI[]", but they declined.  (Rebolledo Dec. ¶ 17, Ex. 2)

At the Worthington facility, WHD Investigators discovered ten young-looking employees gathered in a locker room during their work shift.  (Latuff Dec. ¶ 23, Ex. 3)  During the interviews at the Worthington facility, one worker who appeared to be younger than 18 stood up mid-interview to talk to a man in a green hat who identified himself as "Pedro."  Later that worker ended the interview and yelled at the WHD Investigator, stating they did not want to talk to people they did not know and walked away.  (Mejia Dec. ¶ 16, Ex. 6)  Also at Worthington, one worker who claimed to be 22-years-old, stated "someone" sent them to the breakroom to be interviewed

but instructed them to only "stay for five minutes."  This worker spent the interview sending and receiving text messages.  The worker declined to name the individual who told them to only stay for five minutes and claimed a "friend" was texting.  The worker then walked out in the middle of the interview.  (Mejia Dec. ¶ 18, Ex. 6)

Finally, PSSI managers appeared to try and hide or delete documents.  At Grand Island, PSSI managers denied WHD Investigators access to the incident/accident reports at the facility. (Lopez Dec. ¶ 44, Ex. 5)  Additionally, after a PSSI supervisor confirmed their telephone was used for PSSI-related work matters, the WHD Investigator observed the same supervisor "archiving and deleting WhatsApp[7] messages" on their phone.  (Alcantara Dec. ¶ 28, Ex. 1)  At Worthington, the PSSI In-House Safety Specialist agreed to give WHD access to his PSSI laptop, so the Investigator could download the accessible files.  However, as the WHD Investigator approached, she witnessed him "dragging items with his mouse into the recycle bin before giving me access to sit down at the computer."  The WHD Investigator directed the PSSI supervisor not to move items, though he claimed he "was just getting things organized[.]"  (Christopoulos Dec. ¶ 9, Ex. 13)

## V.    Minor Children Interviews

WHD Investigators interviewed minor children before, during, and after the execution of the warrants on October 13, 2022.  WHD Investigators conducted all interviews in Spanish, with Spanish-speaking investigators, as the minor children spoke Spanish.  (Rebolledo Dec. ¶ 22, Ex. 2; Lopez Dec. ¶ 49, Ex. 5; Latuff Dec. ¶ 26, Ex. 3)  As detailed below, for minor children working at both Grand Island and Worthington locations, WHD Investigators cross-referenced documents and photographs obtained from PSSI and JBS with photographs and records subpoenaed from the school districts to verify the minors' age and work areas at the facilities.

---

[7]WhatsApp is a platform which allows voice calls and has messaging capabilities.  (Alcantara Dec. ¶ 28, Ex. 1)

**Minor Child A** (*Grand Island*)

Minor Child A reported they had worked for PSSI at age fourteen (14) at the JBS facility from 11 p.m. to 5:00 a.m. or 7:00 a.m. cleaning machines with chemicals that gave them a burn injury. Minor Child A's student profile photograph matched the photos from their JBS badge, and the address for both Minor Child A's PSSI job application and student profile also matched. Similarly, Minor Child A listed the same person as their Emergency Contact for school and on their PSSI job application. A review of documents confirmed that PSSI first employed Minor Child A at age <u>13 years and 11 months old</u> to clean machinery on the kill floor overnight (including on school days for more than three hours on such days and for more than eighteen hours during a week in which school was in session) at the JBS facility. (Rebolledo Dec. ¶¶ 25-26, Ex. 2)[8]

**Minor Child B** (*Grand Island*)

Minor Child B reported they worked for PSSI at age fourteen (14) at the JBS facility from 11:00 p.m. until 5:00 a.m., five to six days a week, from December 2021 to April 2022, cleaning machines "used to cut meat" while attending Walnut Middle School in Grand Island. WHD reviewed a report detailing Minor Child B's overnight work for PSSI and Minor Child B falling asleep in class and missing class as a result and suffering injuries from chemical burns. A review of relevant documents showed Minor Child B's pictures from their student profile matched the facial scan time records and confirmed Minor Child B began cleaning on an overnight shift (including on school days for more than three hours on such days and for more than eighteen hours

---

[8]WHD reviewed a birth certificate showing Minor Child A to be 14-years-old at the time of the interview, a photo of JBS badge with Minor Child A's picture, a police report detailing Minor Child A's injuries from chemical burns from working that facility, State of Nebraska documents regarding a child abuse investigation, copies of Minor Child A's school registration and student profile with a photo of Minor Child A, and Minor Child A's PSSI application.

during a week in which school was in session) for PSSI at the facility when Minor Child B was <u>14 years and 3 months old</u>. (Rebolledo Dec. ¶¶ 27-28, Ex. 2)[9]

**<u>Minor Child C</u>** (*Grand Island*)

Minor Child C reported they worked the night shift for PSSI at the JBS facility for two to three months while age seventeen (17) cleaning machines used to cut meat, including electric knives.  A review of Minor Child C's student profile and birth certificate, and a report showed Minor Child C worked for PSSI at <u>17 years and 4 months old</u>.  (Rebolledo Dec. ¶¶ 29-30, Ex. 2)

**<u>Minor Child D</u>** (*Grand Island*)

Minor Child D reported they were 17-years-old when they began cleaning Area 2 on the kill floor in early 2022, from 11:30 p.m. to 6:00 a.m., six to seven days per week.  WHD reviewed a photo of a JBS badge with Minor Child D's picture, a schedule listing Minor Child D's assigned area, Minor Child D's PSSI application, and time records with facial scans with Minor Child D's picture. From those documents, the WHD determined Minor Child D cleaned overnight on the kill floor at <u>17-years-old</u>.  (Rebolledo Dec. ¶¶ 31-32, Ex. 2)

**<u>Minor Child E</u>** (*Grand Island*)

WHD Investigators interviewed Minor Child E at the facility.  Minor Child E reported their date of birth, a early 2022 hire date, hours of work of 11:00 p.m. to 7:00 a.m., five or six days per week where they cleaned conveyor belts. Minor E also reported receiving chemical burns which PSSI treated at the plant.  WHD reviewed a photo of a JBS badge Minor Child E's picture, a work

---

[9]WHD reviewed a birth certificate verified Minor Child B as being 14-years-old at the time of the interview. Documents reviewed by the WHD included a photo of a JBS badge with Minor Child B's picture, a Nebraska State Patrol report detailing Minor Child B's overnight work for PSSI at the plant and Minor Child B falling asleep in class and/or missing class as a result, injuries from chemical burns, and copies of Minor Child B's school registration and student profile with a photo of Minor Child B, a copy of a State of Nebraska Department of Health and Human Services Child Abuse and Neglect Intake Sheet and copies of Minor Child B's clock in and out reports from PSSI with Minor Child B's picture.

assignment sheet with Minor Child E's name and area assignment of Old Fab 1 & 2, a new hire email with Minor Child E's name, time records with facial scans with Minor Child E's picture. From those documents, WHD determined Minor Child E's period of employment and job assignments, including the kill floor. Minor Child E verbally verified their date of birth, and WHD determined Minor Child E was <u>16 years 10 months old</u> (Rebolledo Dec. ¶¶ 33-34, Ex. 2) and cleaned machines that included meat pullers, skinners, and bandsaws on Old Fab 1 & 2.  (Phalen Dec. ¶ 13, Ex. 12)

**Minor Child F** (*Grand Island*)

WHD Investigators interviewed Minor Child F at the facility.  Minor Child F reported their date of birth, and current age (17-years-old), and schedule (11:30 p.m. to 7:00 a.m., five to seven days a week), where they cleaned Area 3 of the kill floor, specifically the chest splitter, with a hose, hot water and chemicals.  WHD reviewed Minor Child F's JBS badge with their picture on it, a schedule of work assignments listing Minor Child F's work area, time records that show Minor Child F's picture, along with Minor Child F's picture taken at the facility by WHD Investigator after the interview.  From those documents and Minor Child F's verbal verification of their date of birth, WHD determined Minor Child F was <u>16 years 11 months old</u> when they began working on the kill floor.  (Rebolledo Dec. ¶¶ 35-36, Ex. 2)

**Minor Child G** (*Grand Island*)

Minor Child G reported they always worked in the same area, Table 7 of the New Fab part of the JBS plant cleaning the conveyor belt where meat is cut.  (Martinez Dec. ¶¶ 24-26, Ex. 10) Wage and Hour reviewed JBS machinery for this area, which included various meat bandsaws. (Phelan Dec. ¶ 13, Ex. 12)  WHD reviewed a picture of Minor Child G's JBS badge with Minor Child G's school picture, a schedule of work assigned listing Minor Child G's name and work

area, time in and out records with Minor Child G's photo.  From those documents, WHD could determine Minor Child G began work at the facility at 16-years-old.  (Rebolledo Dec. ¶¶ 37-38, Ex. 2)

**Minor Child H** (*Grand Island*)

WHD Investigators interviewed Minor Child H at the facility.  Minor Child H provided their birthname, date of birth, and home address.  Hired at PSSI before COVID in 2020, Minor Child H worked on the New Fab side cleaning with chemical 568, which Minor Child H said can "burn the skin", from 11:00 p.m. to 6:30 a.m., Monday through Friday and some weekends.  Minor Child H admitted they attend the local high school. WHD determined Minor Child H, who was nineteen (19) when interviewed, began working at PSSI at 17-years-old (Martinez Dec. ¶¶ 27-31, Ex. 10), cleaning machines that include a paddle bone puller, fat skinners, and meat bandsaws. (Phalen Dec. ¶ 13, Ex. 12)

**Minor Child I** (*Grand Island*)

WHD Investigators interviewed Minor Child I at the facility.  Minor Child I reported they clean in Area 3 of the kill floor.  Minor Child I recently quit high school because they are "working and was tired."  WHD reviewed a birth certificate for Minor Child I, a student profile that shows Minor Child I's picture and address that matches the address presented at the time of interview, a picture of the JBS badge with Minor Child I's picture, a schedule with work assignments listing Minor Child I's name and work area, and a picture of Minor Child I at the plant taken by WHD following the interview.  From those documents, WHD determine Minor Child I began working at PSSI on the kill floor at 17 years and 9 months old.  (Rebolledo Dec. ¶¶ 39-40, Ex. 2)

**Minor Child J** (*Grand Island*)

WHD Investigators interviewed Minor Child J at the facility.  Minor Child J gave their date of birth, reporting they worked in the Freezer/Cooler area cleaning machines that cut meat.  Minor Child J reported their current age as eighteen (18), but admitted they began working for PSSI at age sixteen (16) in 2020.  WHD reviewed a picture of the JBS badge with Minor Child J's picture, Minor Child J's picture taken by WHD Investigators after their interview, and a schedule of work assignments listing Minor Child J's name and work area.  From those documents, and Minor Child J's interview, WHD determined PSSI began employing Minor Child J at age 16 years and 4 months old cleaning machines that cut meat, such as the Jarvis Wellsaw.  (Rebolledo Dec. ¶¶ 41-42, Ex.2 ; Phalen Dec. ¶ 13, Ex. 12)

**Minor Child K** (*Grand Island*)

WHD Investigators interviewed Minor Child K at the facility.  Minor Child K admitted to attending Grand Island High School, stated they work in the fabrication area cleaning the conveyor belts and some conveyor belts are high up and others at the floor level.  Minor Child K reported they use a hose, water, and chemicals to clean the areas, working 11:00 p.m. to 7:00 a.m., five days per week and occasionally on Saturday.  WHD reviewed a JBS record with Minor Child K's picture on it and PSSI time record facial scans, both of which match the Minor Child K's student profile photograph.  Minor Child K's PSSI application lists the same address and phone number as their student profile.  From those documents, WHD determined Minor Child K was 16 years and 5 months old when hired by PSSI in late 2021 to work in the New Fab area (Cardenas Dec. at ¶ 30, Ex. 11; Rebolledo Dec. ¶¶ 43-44, Ex. 2), cleaning around machines that include a paddle bone puller, fat skinners, and meat bandsaws.  (Phalen Dec. ¶ 13, Ex. 12)

**Minor Child L** *(Grand Island)*

WHD Investigators sought an interview with Minor Child L, as they appeared to be a minor based on appearance.  The WHD Investigator asked Minor Child L for their contact information, including their name and email address, and Minor Child L provided a phone number and an email address. Minor Child L denied being enrolled in school and left the interview claiming their ride was waiting.  WHD reviewed checklists and other documents showing Minor Child L worked in the Loin Room, which includes machines such as Buster saws to cut product, a kidney fat puller to pull meat off sides, and various meat bandsaws to cut product.  (Phalen Dec. ¶ 13, Ex. 12)  WHD also reviewed school records, matching Minor Child L's phone number and email address to Minor Child L's information to a student at Grand Island Senior High School. Based on school records, including Minor Child L's birth certificate, WHD determined Minor Child L was <u>17-years-old</u> when they worked the third shift at the JBS facility on October 13, 2022, cleaning various saws and other machinery.  (Lopez Dec. ¶¶ 52-60, Ex. 5)

**Minor Child M** (*Grand Island*)

WHD Investigators interviewed Minor Child M at the facility and outside the high school the following day.  Minor Child M gave their age as 17-years-old, stating they had worked for a few weeks at PSSI, cleaning on the kill floor.  Minor Child M also admitted "many other" students also work for PSSI at the JBS facility.  WHD reviewed Minor Child M's birth certificate and student profile, and an email from a confidential source.  From those documents and Minor Child M's interviews, WHD could determine Minor Child M was <u>17 years and 5 months old</u> at time of employment working on the kill floor.  (Rebolledo Dec. ¶¶ 45-46, Ex. 2)

**Minor Child N** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child N.  However, WHD reviewed Minor Child N's birth certificate that showed they were 16-years-old at time of hire by PSSI, a student profile with Minor Child N's picture, a picture of a JBS badge with Minor Child N's picture, and termination paperwork from PSSI that showed the last day worked by Minor Child N. From those documents, WHD could determine Minor Child was <u>16 years and 2 months old</u> when they worked at PSSI.  Wage and Hour is still reviewing documents to determine where in the facility Minor Child N worked.  However, it appears each area of the facility PSSI workers cleaned contained "meat and bone cutting saws."  (Rebolledo Dec. ¶¶ 47-49, Ex. 2)

**Minor Child O** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child O yet.  However, WHD reviewed Minor Child O's the birth certificate, the student profile with Minor Child O's picture, a picture of the JBS badge with the minor's picture that matches Minor Child O's student profile picture, as well as a pay statement and W-2.  From those documents, WHD determined Minor Child O was <u>17 years and 10 months old</u> when they began employment with PSSI in late 2019.  WHD is working to identify Minor Child O's work assignment in the facility.  However, it appears each area of the facility PSSI workers cleaned contained "meat and bone cutting saws." (Rebolledo Dec. ¶¶ 50-52, Ex. 2)

**Minor Child P** (*Worthington*)

WHD Investigators interviewed Minor Child P at the Worthington facility.  Minor Child P disclosed they used a different name for work and admitted attending the local high school as a ninth grader.  Minor Child P declined to say how old they were but provided a birth date that would make Minor Child P 18-years-old.  Throughout the interview, Minor Child P kept sending and

receiving text messages.  Minor Child P received a phone call and said they had to go as they had to "go home and get ready for school."  Minor Child P stated they work on the kill floor and cleaning the "conveyer belt, machines that process the meat," using a pressure hose and "pick[ed] up meat from the floor[.]"  (Mejia Dec ¶¶ 23-28, Ex. 6)  Via cross referencing subpoenaed school records, including Minor Child P's photographs, legal name, and date of birth, Wage and Hour confirmed Minor Child P was actually 17- years-old on October 13, 2022.  A review of PSSI's records showed PSSI had employed Minor Child P to work overnight at the JBS facility since Minor Child P was <u>15-years-old</u>, and Minor Child P works on the kill floor.  (Latuff Dec. ¶¶ 29, 31, 36, Ex. 3)

**Minor Child Q** *(Worthington)*

WHD Investigators interviewed Minor Child Q at the Worthington facility.  Minor Child Q disclosed using two names, one at work and Minor Child Q's legal name.  Minor Child Q admitted to being 16-years-old and attending the local high school, along with other PSSI workers. Minor Child Q cleaned the machines and conveyer belts in the cold rooms.  Minor Child Q did not know the names of the machines or their purpose, but cleans all of machines in the assigned area. Cross-referencing Minor Child Q's subpoenaed school records with JBS and PSSI provided records, WHD confirmed Minor Child Q's age as <u>16-years-old</u> when they worked 12:00 a.m. to 7:00 a.m. at the JBS facility.  (Azocar Dec. ¶¶ 16-20, Ex. 9)  Based on PSS and JBS records, WHD determined Minor Child Q cleaned in the Ham Department around machines such as the JBT's MEPSCO UltraCAT Injector, which injects water into the product, and "combo dumper" that could lift up to 3,000 pounds of meat.  (Latuff Dec. ¶¶ 28, 31, 35, Ex. 3)

**Minor Child R** *(Worthington)*

WHD Investigators have not been able to interview Minor Child R yet.  However, via subpoenaed school records, Wage and Hour identified Minor Child R as a former student.  Cross-referencing Minor Child R's school photo, address, and the employee roster provided by PSSI, WHD identified one PSSI worker residing at that address.  Searching the clock-in records, which included pictures of the employee, WHD identified Minor Child R as the same person.  The clock-in records and photographs show PSSI employed Minor Child R to work the PSSI shift (12:00 a.m. to 7:00 a.m.) at the JBS facility when Minor Child R was <u>17-years-old</u>.  Minor Child R cleaned in the Trim Department around equipment including a "hindfoot saw", skinner, and "split rib saw". (Latuff Dec. ¶¶ 33, 37, Ex.3)

**Minor Child S** *(Marshall)*

WHD Investigators spoke to Minor Child S during a visit to Marshall Senior High School. Minor Child S provided their date of birth and admitted they worked for PSSI for eight months. Per Minor Child S, PSSI hired them when they were <u>16-years-old</u> to work at the Turkey Valley Farms meat processing facility in Marshall, Minnesota.  Minor Child S worked from 10:00 p.m. to 4:00 a.m. during the school year and 8:00 p.m. to 4:00 a.m. during the summer cleaning the meat grinders with a pressure hose.  Minor Child S stated that Minor Child T also worked at PSSI. WHD verified Minor Child S's age by subpoenaed school records reflecting their photo, legal name, and date of birth.  (Mejia Dec. ¶¶ 29-34, Ex. 6)  WHD is still gathering and reviewing documents regarding PSSI's operation at Turkey Valley Farms.

**Minor Child T** *(Marshall)*

WHD Investigators spoke to Minor Child T during a school visit to Marshall Senior High School.  Minor Child T provided their date of birth and admitted PSSI hired them when they were

<u>17-years-old</u> to work at Turkey Valley Farms in Marshall, Minnesota. Minor Child T confirmed that Minor Child S also worked for PSSI as a minor. Minor Child T used a pressure hose to clean the conveyer belts and other machines.  According to Minor Child T, "everyone knew" Minor Child T was a minor.  WHD verified Minor Child T's age by the subpoenaed school records reflecting their photo, legal name, and date of birth.  (Mejia Dec. ¶ 35-40, Ex. 6)  WHD is still gathering and reviewing documents regarding PSSI's operation at Turkey Valley Farms.

**<u>Minor Child U</u>** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child U yet.  However, a review of documents indicates Minor Child U is 16-years-old and has worked for PSSI since early 2022 in the Old Fabrication area of the JBS Grand Island plant.  WHD reviewed Minor Child U's student profile with Minor Child U's picture, a picture of the JBS badge with the minor's picture that matches the student profile picture, as well as a work assignment schedule indicating that Minor Child U would work in Old Fab 1 & 2.  Minor Child U's phone number, address, and emergency contact from the PSSI application match their student profile information.  From those documents, WHD determined Minor Child U was <u>16 years and 2 months old</u> (Rebolledo Dec. ¶¶ 53-55, Ex. 2) while cleaning meat pullers, skinners, and various meat bandsaws.  (Phalen Dec. ¶ 13, Ex. 12)

**<u>Minor Child V</u>** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child V yet.  On their tour of the Grand Island facility, a WHD Investigator noted that this minor looked young, asked Minor Child V for their name, but when requesting an interview with Minor Child V at the facility, PSSI management claimed PSSI did not employ anyone by that name.  WHD reviewed Minor Child V's student profile with picture, birth certificate, a picture of a JBS badge with Minor Child V's picture, Minor Child V's PSSI application information, and a job task sheet listing Minor Child

V's name and assignment to work on the kill floor.  The address and phone number listed on the PSSI application matched those listed in the student profile.  From these documents, WHD determined Minor Child V is 16-years-old and assigned to clean on the kill floor.  (Rebolledo Dec. ¶¶ 56-58, Ex. 2)

**Minor Child W** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child W yet.  However, WHD reviewed a student profile with Minor Child W's picture, a JBS Badge picture of Minor Child W, time-in and out records with pictures of Minor Child W, Minor Child W's PSSI application, and a job task sheet listing Minor Child W's assignment to clean on the kill floor.  Minor Child W's address, phone number and emergency contact listed in the PSSI application match the student profile information, and the pictures on the student profile also match the badge and time-in and out facial scans.  From those documents, WHD determine that Minor Child W began working at 15-years-old for PSSI at the Grand Island JBS facility and works on the kill floor.  (Rebolledo Dec. ¶¶ 59-60, Ex. 2)

**Minor Child X** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child X yet.  However, documentation shows PSSI hired Minor Child X at age 16 and rehired Minor Child X in mid-2022 at age 18, both times to work at the JBS Grand Island facility.  WHD reviewed Minor Child X's student profile, a JBS Badge picture of Minor Child X, time-in and out records with pictures of Minor Child X, Minor Child X's PSSI application information, and school registration documents. The e-mail address on Minor Child X's application and emergency contact information shows Minor Child X's parent's name and phone number, which matches Minor Child X's parent's name and phone number listed on the student profile.  The PSSI application information for the 2022

hire lists Minor Child X's previous work experience on the kill floor for PSSI operation at the same location.  From those documents, WHD determined Minor Child X began working at 16-years-old for PSSI at the JBS facility on the kill floor.  (Rebolledo Dec. ¶¶ 61-62, Ex. 2)

**Minor Child Y** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child Y yet.  However, WHD reviewed Minor Child Y's student profile with picture, a JBS Badge picture of Minor Child Y, time-in and out records with pictures of Minor Child Y, Minor Child Y's PSSI application, and Minor Child Y's birth certificate.  Minor Child Y's address listed in the PSSI application matched the student profile, and the pictures on the student profile matched the JBS badge and time-in and out facial scans.  From these documents, WHD determined Minor Child Y is eighteen (18) years old, but PSSI hired Minor Child Y at 16-years-old to work at the JBS Grand Island plant.  (Rebolledo Dec. ¶¶ 63-64, Ex. 2).

**Minor Child Z** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child Z yet.  However, WHD reviewed a student profile with Minor Child Z's picture, a JBS Badge picture of Minor Child Z, time-in and out records with pictures of Minor Child Z, Minor Child Z's PSSI application, and a copy of Minor Child Z's birth certificate.  The address and phone number listed on Minor Child Z's application matched the information in their student profile, and the pictures on the student profile matched the badge and time in and out facial scans.  From these documents, WHD determined Minor Child Z is currently twenty years old, but began working at the JBS Grand Island facility at 17-years-old.  (Rebolledo Dec. ¶¶ 65-55, Ex. 2)

**Minor Child AA** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child AA yet. However, WHD reviewed a student profile for Minor Child AA, a JBS Badge picture of Minor Child AA, time-in and out records with pictures of Minor Child AA, Talent Reef application info for Minor Child AA, a job assignment sheet showing Minor Child AA assigned to clean on the kill floor, and a copy of a birth certificate for Minor Child AA. The address and emergency contact listed in the PSSI application matched the student profile. From these documents, WHD determined Minor Child AA is 17-years-old and began working for PSSI at the JBS plant at <u>15-years-old</u> and is currently assigned to the kill floor. (Rebolledo Dec. ¶¶ 67-68, Ex. 2)

**Minor Child BB** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child BB yet. However, WHD reviewed a student profile with Minor Child BB, Minor Child BB's birth certificate, a JBS Badge picture of Minor Child BB, time-in and out records with pictures of Minor Child BB, Minor Child BB's PSSI application info, and a job assignment sheet listing Minor Child BB cleaning the "Meat Master" at age seventeen. The address on the PSSI application matches two other minors that work or worked at PSSI. From these documents, WHD determined that Minor Child BB began working at the JBS facility for PSSI at <u>16-years-old</u> (Rebolledo Dec. ¶¶ 69-70, Ex. 2), cleaning machines such as the Cozzini Prime Mix Mixer/Blender, which can grind up to 15,000 pounds of raw meat. (Phelan Dec. ¶ 13, Ex. 12)

**Minor Child CC** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child CC yet. However, WHD reviewed a student profile with Minor Child CC's picture, a JBS Badge picture of Minor Child CC, a birth certificate for Minor Child CC, and a job assignment sheet listing Minor Child CC

assigned to clean the Ground Beef Area.  Minor Child CC's student profile matched the pictures

on the JBS badge.  From these documents, WHD determined Minor Child CC began working at

17-years-old cleaning the Ground Beef Area at the JBS Grand Island facility (Rebolledo Dec.

¶¶ 71-72, Ex. 2), around machines such as the Weiler Dominator Mixer/Grinder, which has a 125

horsepower motor and a grind rate of 36,000 pounds per hour.  (Phelan Dec. ¶ 13, Ex. 12)

**Minor Child DD** (*Grand Island*)

WHD Investigators have not been able to interview Minor Child DD yet.   However, WHD

reviewed Minor Child DD's student profile with Minor Child DD's picture, a JBS Badge picture

of Minor Child DD, time-in and out records with pictures of Minor Child DD, Minor Child DD's

PSSI application, and a birth certificate for Minor Child DD.  The pictures on the student profile

match the badge and time in and out facial scans.  From those documents, WHD determined Minor

Child DD began working for PSSI at the JBS facility at 16-years-old.  (Rebolledo Dec. ¶¶ 73-74,

Ex. 2)

**Minor Child EE** *(Worthington)*

WHD briefly interviewed Minor Child EE at the Worthington facility; they provided their

name, date of birth, and work department.  By cross-referencing the name provided in Minor Child

EE's interview statement, and the clock-in records, WHD determined PSSI employed 17-year-old

Minor Child EE to work in the New Loin Department.  The equipment located in the New Loin

Department includes the west sirloin saw, west loin bone grinder, west loin smoking saw, and band

saw.  (Mejia Dec. ¶¶ 20-22, Ex. 6; Latuff Dec. ¶¶ 30, 34, 38, Ex. 3).

In summary, PSSI is employing, or has employed, **at least twelve 17-year-olds, fourteen**

**16-year-olds, three 15-year-olds, one 14-year-old, and one 13-year old across three**

**slaughterhouses/meat processing facilities**.  WHD's investigations have established that many

if not all of these children were employed in violation of the Fair Labor Standards Act.

## VI.   **Corporate Documents**

After executing the warrant on PSSI's Corporate Office, Wage and Hour and PSSI negotiated an initial document production to review fifty facilities where PSSI is contracted to provide cleaning services, a smaller portion of the records subject to the warrant.[10]  (Uphold Dec. ¶ 8, Ex. 7)  On October 17, 2022, WHD Investigators started a review of the records provided by the corporate office of all fifty facilities.  PSSI agreed to provide the records electronically, via a secured Dropbox folder.[11]  PSSI uploaded several gigabytes of electronic records including personnel files with duplicative and unsigned documents.  Reviewing the documents requires extensive manual review, as employee files were over 500 pages.  It will take WHD extensive time and effort to cross reference the voluminous records for the remaining forty-seven (47) establishments, including cross referencing with any subpoenaed school records WHD might obtain.  (Uphold Dec. ¶ 12, Ex. 7)  For these fifty locations, WHD received over 225 GBs of total documentation from PSSI.  A document such as the employee personnel file is generally around 500 pages long and about 150 MB of data.  To estimate the total volume of pages of records to be reviewed, of just the fifty facilities, using the personnel files as a metric, Wage and Hour will need to review the digital equivalent of approximately 100,000,000 pages of records in the 225 GBs of records.  (Uphold Dec. ¶ 13, Ex. 7)

On October 19, 2022, WHD began a cursory review of the forty-seven other locations. WHD has concerns that PSSI might be employing minors at other locations. For example, WHD reviewed photographs from clock in records at eight plants.  Based on the appearance of some of

---

[10]This number includes the already outstanding documents  productions for the Sedalia, Worthington, and Grand Island facilities.

[11]Dropbox is a cloud-based storage solution used to share large amounts of data via the internet.

these workers, WHD has concerns that some of these workers are minors.  WHD will need to subpoena records from local school districts near these plants or conduct extensive interviews with these workers to determine if these workers are minors.  Additionally, WHD reviewed hiring documents for employees at eight plants in which birth dates seemed inconsistent. While spot checking records, WHD noticed one employee's listed age was 129-years-old.  (Uphold Dec. ¶ 14, Ex. 7)

## STANDARD OF REVIEW

The standard for entry of a temporary restraining order in this Circuit is the same as for a preliminary injunction.  Frazier v. Kelley, 460 F. Supp. 3d 799, 828 (E.D. Ark. 2020) (citing S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir. 1989)).  "Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981).  A temporary restraining order "is remedial in nature, i.e., intended to prevent future violations; it is not imposed as punishment for past violations."  Brennan v. Correa, 513 F.2d 161, 163 (8th Cir. 1975) (reversing district court's denial of injunction for child labor violations).

## ARGUMENT

I.   **THE COURT MUST ENJOIN DEFENDANT FROM  EMPLOYING OPPRESSIVE CHILD LABOR AND OBSTRUCTING THE SECRETARY'S INVESTIGATION**

Defendant unlawfully employed minor children to clean industrial power-driven slaughtering and meat processing equipment in at least three different facilities in violation of

federal child labor law.  These children, some of which were too young to be lawfully employed, were employed by Defendant to perform hazardous work cleaning industrial power-driven slaughtering and meat processing equipment on the kill floors of meatpacking and slaughtering facilities in the middle of the night. Oppressively employing minors threatens the health and welfare of vulnerable children.  Additionally, Defendant engaged in actions meant to hinder the DOL's investigation of these violations.  Accordingly, the Secretary seeks a temporary restraining order against Defendant to enjoin its unlawful conduct.

As discussed below, the Secretary plainly meets all the requirements for issuance of a temporary restraining order and preliminary injunction.  First, Defendant's continued use of oppressive child labor causes irreparable harm to minors.  The FLSA aims to protect such vulnerable children, as well as the public in whose interest the Secretary performs his lawful duties.   Second, the balance of any possible hardships tips in the Secretary's favor, as he is asking only that Defendant follows the law.  Third, the Secretary is likely to succeed on the merits to show Defendant unlawfully employed and continues to employ numerous minor children.  And fourth, the public's interest in protecting children and ensuring the efficient investigation of FLSA violations and enforcement of the FLSA will be served by the Court's entry of a temporary restraining order and preliminary injunction.

### A.    Defendant's Employees, the Department of Labor, and the Public Will Suffer Irreparable Harm Absent a Temporary Restraining Order.

A temporary restraining order is crucial to prevent irreparable harm to Defendant's employees – including minor children – the Secretary, and the public. [12]  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully

---

[12]The Secretary will discuss the impact of the proposed injunction on the public in section D, *supra*.

compensated through an award of damages." Grasso Ents., LLC v. Express Scripts, Inc., 809 F.3d

1033, 1040 (8th Cir. 2016) (quoting Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312,

319 (8th Cir. 2009)).   Here, a temporary restraining order is central to preventing irreparable

harm.

> 1.   Defendant's employment of multiple minors in oppressive child labor
>       inherently causes irreparable harm to the minors.

Defendant's unlawful employment of oppressive child labor, in and of itself, causes

irreparable harm.   "It is a well-established rule that where Congress expressly provides for

injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate

irreparable harm to secure an injunction."   Burlington Northern R. Co. v. Bair, 957 F.2d 599, 601

(8th Cir. 1992).   If Congress has already determined via statute that an injunction should issue to

prevent an employer from engaging in activity prevented by the statute, "then it is not the role of

the courts to balance the equities between the parties."   Chao v. Continental Express, Inc., No.

4:07CV00852, 2007 WL 3309266, at *1 (E.D. Ark. Nov. 6, 2007) (citing Burlington Northern,

957 F.2d at 601-02).

Even without such a presumption, a temporary restraining order is necessary here to

prevent irreparable harm to the thirty-one (31) minor employees.   Indeed, the Supreme Court has

long recognized the employment of oppressive child labor in violation of the FLSA results in

"crippling effects" that interfere with the "well-rounded growth of young people into full maturity

as citizens." Prince v. Mass., 321 U.S. 158, 168 (1944).   As the Eighth Circuit admonished in an

early child labor case in which the DOL requested an injunction, the FLSA's injunctive provisions

should not be administered "grudgingly" by courts.   Lenroot v. Interstate Bakeries Corp., 146

F.2d 325, 327 (8th Cir. 1945) (reversing district court's denial of injunction for child labor

violations); see also Correa, 513 F.2d at 163 ("An important tool available to the Secretary for

compelling compliance with the Act is an action for injunctive relief under § 17.").  Should Defendant be allowed to employ minors in violation of section 12(c), the very behavior that the FLSA's child labor prohibitions were meant to correct will go unabated, causing irreparable harm to the minor children.  As such, this Court should grant a temporary restraining order enjoining Defendant from continuing to employ minor children in violation of the FLSA.

2.    Defendant's interference with the Secretary's investigation causes irreparable harm to the Secretary.

The Secretary relies heavily on cooperation from employees (and employers) to carry out his investigative and enforcement duties provided under the Act.  Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 11 (2011).  In turn, interference with employees' freedom to speak with the Secretary's representatives directly threatens the Secretary's ability to enforce national labor policy.  See Grove v. Meltech, Inc., No. 8:20CV193, 2020 WL 7126554, at *3 (D. Neb. Dec. 3, 2020) (quoting Mullins v. City of New York, 626 F.3d 47, 55 (2d Cir. 2010) (recognizing that "the resulting weakened enforcement of federal law can *itself* be irreparable harm") (emphasis in original).

Here, Defendant's conduct has already prevented the Department from conducting a full and complete investigation.  At the Grand Island facility, PSSI Supervisor Pedro Montanez attempted to prevent Wage and Hour from speaking with an employee who previously provided their alias to a Wage and Hour representative by claiming there was no one there by that name. When the Department later received records from Defendant, the records showed not only that an employee with that name worked at the facility, but that he was a minor.  Additionally, as Wage and Hour interviewed employees, Supervisor Montanez sat down to listen, and then circled the room making eye contact with the interviewees.  Later, when asked to provide specific records, Supervisor Montanez refused to do so.  At the Worthington facility, a young employee

being interviewed claimed he had been told he could only speak to the Department for five minutes.  He repeatedly received text messages throughout the interview, and every time he received one, he claimed he had to end the interview.  Finally, he walked out of the interview before it had ended.

This obstructionist conduct has already caused harm and will continue to do so if Defendant is permitted to continue to interfere with the Secretary's ongoing investigation.  Thus, the Court must restrain Defendant's conduct from further compromising the ability of the Secretary to enforce the rights of all employees under the FLSA.

**B.      The Balance of Hardships Strongly Favors Issuing a Temporary Restraining Order.**

Here, the balance of hardships tips decidedly in favor of the Secretary and his request for relief.  "To determine the harms that must be weighed, the Eighth Circuit has looked at the threat to each of the parties' rights that would result from granting or denying the injunction." Bryant v. Nationwide Anesthesia Servs., Inc., No. 8:21-CV-335, 2021 WL 3912264, at *6 (D. Neb. Sept. 1, 2021) (citing Baker Elec. Co-op., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994)).  Absent an injunction, the harm that would result to thirty-one (31) minors, the Department, and the public outweighs any harm that Defendant might suffer from an injunction.

Defendant has no right to employ minors, nor does it have a right to interfere in the Department's investigation.  "An injunction under the Act merely orders the employer to do what the law requires him to do." Marshall v. Lane Processing, Inc., 606 F.2d 518 (8th Cir. 1979) (reversing district court's denial of injunction for child labor violations).  Therefore, even if Defendant could somehow prove it did not engage in child labor, it will not be prejudiced by an injunction that merely obligates it to follow the FLSA.  "This is not a case in which there exists a substantial question as to whether the conduct to be enjoined is wrongful.  Here the conduct as to

which plaintiff seeks an injunction is clearly wrongful, and the question is whether the conduct has occurred as alleged.  In these circumstances, it appears that defendant suffers little harm from the issuance of the TRO if the allegations are false, because the TRO will then forbid only conduct in which defendant is not and has not been engaged." Reich v. Bede Aircraft Corp., No. 4:96CV592 DJS, 1996 WL 276382, at *3 (E.D. Mo. Mar. 26, 1996) (granting the Secretary's request for an injunction under the FLSA).  Simply put, Defendant will suffer no cognizable harm if the injunction is granted.  See, e.g., Lane Processing, 606 F.2d at 520 ("Defendant urged upon the district court . . . that an injunction will damage its public image and create financial hardship by making it difficult to obtain loans.  These are not factors to be weighed in considering whether injunctive relief should issue.").

In contrast, a temporary restraining order, as set forth in the proposed order, will ensure that Defendant cannot continue to violate the Act's prohibition of employing a minor in oppressive child labor, nor will it be allowed to continue obstructing the Department's investigation. Employees and the public will feel free to contact the Department, report perceived violations, and provide helpful information to the Secretary's representatives in their investigation of potential FLSA violations.  Accordingly, the balance of hardships tips in favor of the Secretary and strongly supports the issuance of a temporary restraining order.

### C.      The Secretary is Likely to Succeed on the Merits.

The Secretary is likely to prevail in establishing that Defendant's employment of minors violated the FLSA's oppressive child labor provisions, sections 12(c) and 15(a)(4).  These provisions, as the Supreme Court has long recognized, serve to protect minors from the evils of the "crippling effects of child employment." Prince, 321 U.S. at 168. There is no question that "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." Id.

1.     <u>The FLSA's prohibits oppressive child labor.</u>

The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and an entity "employs" an individual if it "suffer[s] or permit[s]" that individual to work, 29 U.S.C. § 203(g).  In particular, section 12(c) of the Act provides that no employer shall employ minors in work that constitute "oppressive child labor." 29 U.S.C. § 212(c).  Section 15(a)(4) of the Act, in turn, expressly makes it unlawful for any person to violate the provisions of section 12.  "Oppressive child labor" is defined, in relevant part and as applied to nonagricultural work, as: "a condition of employment under which (1) any employee under the age of sixteen years is employed by an employer (other than a parent . . .) in any occupation" or (2) "any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Secretary of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being."

Employment of 14-and 15-year old children is prohibited unless expressly permitted by regulation of the Secretary.  29 U.S.C. § 203(l); 29 C.F.R. § 507.32.  Under the Department's regulation, 14- or 15-year-olds in nonagricultural occupations are only allowed to work at certain times of the day based on the time of year:  when school is in session, they may work outside of school hours between 7:00 a.m. and 7:00 p.m., while they may work until 9:00 p.m. during the summer.[13]   29 C.F.R. § 570.35(a).  Additionally, 14 or 15-year-olds may only work eight hours/day when school is not in session and cannot work more than three hours a day when school is in session.  29 C.F.R. § 570.35(a)(4) and (5).  Furthermore, 14- or 15-year-olds may not work in any occupation that constitutes oppressive child labor, including (i) those occupations declared

---

[13]The regulations define "summer" as June 1 through Labor Day.  29 C.F.R. § 570.35(a)(6).

by the Secretary "to be hazardous for the employment of minors between 16 and 18 years of age or detrimental to their health or well-being" or (ii) any occupation that involves cleaning "power driven machinery", which includes "food slicers, food grinders, food choppers, food processors, food cutters, and food mixers."  29 C.F.R. § 570.33(b) and (e).

Regarding the employment of 16- and 17-year-olds, section 570.61 of the Department's child labor regulations (often referred to a "Hazardous Order 10" or "H.O. 10") designates several occupations as "particularly hazardous" and therefore not allowed for anyone under 18 years of age, including most work being performed at slaughtering and meat packing establishments.  29 C.F.R. § 570.61.  Specifically, minors are prohibited from doing any work "on the killing floor"[14] or cleaning "power-driven machines" such as "meat patty forming machines, meat and bone cutting saws, poultry scissors or shears; meat slicers, knives (except bacon-slicing machines), headsplitters, and guillotine cutters; snoutpullers and jawpullers; skinning machines; horizontal rotary washing machines; casing-cleaning machines such as crushing, stripping, and finishing machines; grinding, mixing, chopping, and hashing machines; and presses (except belly-rolling machines)."  29 C.F.R. § 570.61(a)(1) and (a)(4).  H.O. 10 is due a "liberal construction".  Dole v. Stanek, Inc., No. 88-4118, 1990 WL 123994, at *3 (N.D. Iowa July 6, 1990) (granting the Secretary's request for injunction against restaurant under H.O. 10 where two minors were allowed to operate a meat slicer).

2.   The Secretary will be successful in showing Defendant engaged in oppressive child labor.

The Secretary establishes a violation of the FLSA's child labor prohibition by showing:

---

[14]The "killing floor" is defined as "workplace where such animals as cattle . . . are immobilized, shackled, or killed, and the carcasses are dressed prior to chilling."  29 C.F.R. § 570.61(b).  There are a narrow list of tasks a minor may perform on the killing floor, which require limited time on the floor and which do not apply to work being done by the minors at issue.

(1) the minor employee's age; (2) that the minor performed work for an employer, other than a parent; and (3) that the work constituted "oppressive child labor".  29 U.S.C. §§ 203(l), 212(c). For children ages 14 or 15, being allowed to work after 7:00 p.m. constitutes "oppressive child labor", 29 C.F.R. § 570.35, while for all children under 18, work in "particularly hazardous" industries that is "detrimental to their health or well-being" – such as work in slaughterhouse and meat packing facilities where children are on the kill floor or work with power-driven machines – is considered "oppressive child labor".  29 C.F.R. § 570.33(b) and (e); §570.61(a)(1) and (a)(4).

Notably, the Eighth Circuit has long held "corporations must be held strictly accountable for [their] child labor violations", and the Secretary is not required to show an employer gained "special profit or advantage through its violation".  Interstate Bakeries, 146 F.3d at 328.  Nor is it a defense that the number of violations in relation to the overall workforce is small.  Id. ("Although a plant like the Kansas City plant, employing some 450 persons, is large and important, its personnel is not to be thought of as a confused mass of people among whom a stray or two may be unnoted.").

Here, the undisputed evidence will show Defendant employed oppressive child labor by suffering or permitting minors to work in the middle of the night, using hazardous chemicals to clean the power-driven slaughterhouse machines and otherwise working on the kill floor in violation of sections 212(c) and 215(a)(4) of the FLSA as well as the Department's regulations. The Secretary will be able to show a child as young as 13-years-old – so young they are not lawfully permitted to work for this employer – worked on the kill floor.  Additionally, there were four other children under the age of 16 who worked the overnight shift; again, on its face, these are violations of the Department's regulations.  As for the twenty-six (26) children ages 16 and 17-years-old, the Secretary has ample evidence to show they worked on the kill floor and/or

around power-driven machines, as prohibited by H.O. 10.  Yet, to prevail on our complaint, the Secretary need only prove *one* instance of oppressive child labor to demonstrate a violation of section 12(c) and 15(a).  Thus, the aforementioned facts alone suffice to establish a violation of FLSA sections 12(c) and 15(a)(4).

In short, the evidence demonstrates that Defendant employed oppressive child labor within the meaning of section 3(l) of the Act.  Therefore, the Secretary is likely to succeed on his claims that Defendant violated sections 12(c) and 15(a)(4) of the FLSA.

### D.     The Public Interest Will be Served by Granting a TRO.

As discussed, the public has an undeniable interest in protecting children and ensuring they are not employed in oppressive child labor in violation of the FLSA.  Section 3(l) of the FLSA recognizes the importance of keeping children safe at work by prohibiting their employment in hazardous occupations, and for younger children, acknowledging that any work opportunities must be balanced by the need for their employment to be "confined to periods which will not interfere with their schooling and to conditions which will not interfere with their health and well-being."  In passing the child labor provision of the FLSA, Congress determined oppressive child labor is detrimental to the public interest, as "[t]hat which the Act declares to be unlawful is against the public interest and is injurious to the public interest", and Congress' "determination is binding on the courts."  Interstate Bakeries, 146 F.3d at 327-28.  In that vein, the public's interest is best served by the Secretary's ability to fulfill his lawful duties to investigate potential child labor violations and enforce the FLSA's prohibition against oppressive child labor. Here, PSSI is directly imperiling the health and well-being of minors who went from their overnight shifts cleaning dangerous machines with caustic cleaners straight to their *middle school*.  Minor Child B, fourteen, fell asleep in class, while Minor Child P, fifteen, left their

36

interview with WHD Investigators because they had to "go home and get ready for school." Issuing a temporary restraining order here would undoubtedly serve the public interest by enabling the Secretary to protect children, on whose well-rounded growth our society rests.   See Prince, 321 U.S. at 168.

## II.   THE COURT MUST EXPAND THE INJUNCTION AGAINST CHILD LABOR AND INVESTIGATORY INTERFERENCE TO DEFENDANT'S OPERATIONS ACROSS THE COUNTRY

Defendant operates in approximately 400 locations across the country.  Given that Wage and Hour's investigations revealed at least thirty-one (31) minors in three facilities, there is reason to believe Defendant's practice of employing child labor is occurring throughout the country. While Wage and Hour is continuing to pour over records to identify such children, it is slow, painstaking work.  Yet, the children working overnight on the kill floor of these slaughterhouses cannot wait.  As such, the Secretary asks that, should this Court grant his request for a temporary restraining order and preliminary injunction, it be applied on a nationwide basis to all facilities in which Defendant's employees work.

The application of injunctive relief to all of Defendant's operations is appropriate in cases such as this, as "[i]t would frustrate the broad purposes of the FLSA in suits involving large corporate defendants with extensive branch operations to require the Secretary to investigate and prove violations in all or substantially all of the defendant's branches to justify the issuance of a chain-wide injunction."  Brennan v. J. M. Fields, Inc., 488 F.2d 443, 449-50 (5th Cir. 1974); see also Reich v. IBP, Inc., No. 88-2171-EEO, 1996 WL 445072, at *1 (D. Kan. July 30, 1996) ("IBP continues by arguing that the Secretary should, nonetheless, be required to separately investigate and prove violations in each of defendant's other plants. This approach is highly inefficient and antithetical to the spirit of the FLSA."); Marshall v. Georgia Southwestern College, 489 F. Supp. 1322, 1331 (D.C. Ga. 1980) ("[S]ince there is evidence that equal pay violations extend beyond

Georgia Southwestern College to other institutions in the system, the court is inclined to apply injunctive relief system wide in order that complete justice can be served.").

Given the seriousness of the violations – involving children as young as 13 years-old being seen cleaning machines with names such as a Heavy Duty Head Splitter, a Hock Cutter/Dehorner, or a Dominator Mixer/Grinder, a 125 horsepower behemoth that can grind 36,000 pounds of meat per hour – it is critical that the injunction be applied to all of Defendant's operations and employees, regardless of where they are located.  See Rodgers v. Bryant, 942 F.3d 451, 458 (8th Cir. 2019) ("But the Supreme Court also wrote in Califano that one of the 'principles of equity jurisprudence' is that 'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'") (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979)).  "As we have noted previously, an injunction does nothing more than require defendant to comply with the law, as it is already obligated to do.  A company-wide injunction simply insures compliance with the law by placing the burden of policing compliance on [Defendant], rather than the Secretary. . . . If [Defendant's] . . . practices at its other plants are presently in compliance, then the injunction is of little practical consequence and [Defendant] is not prejudiced.  If, on the other hand, [Defendant] is not in compliance, the Secretary should not be required to undertake separate actions with respect to each other plant to force [Defendant] to obey the law."  IBP, Inc., 1996 WL 445072, at *1.

## CONCLUSION

For the foregoing reasons, the Secretary respectfully asks the Court to enter the following temporary restraining order prohibiting Defendant from any further use of oppressive child labor and interference with the Secretary's investigation in violation of the FLSA.  Specifically, the Secretary requests that the Court immediately issue an order restraining all Defendant locations

and its agents, and all those in active concert and participation with them, as follows:

1.  Defendant and its agents are enjoined from violating sections 12(c) and 15(a)(4) of the Fair Labor Standards Act by employing oppressive child labor as defined in section 3(l) of the FLSA at each of its workplaces throughout the United States of America;

2.  Defendant and its agents are enjoined from refusing to provide information to the Department of Labor to aid in its investigation;

3.  Defendant and its agents are enjoined from instructing employees not to speak to the Department of Labor, or otherwise preventing, discouraging, surveilling, or threatening employees from cooperating with the Department of Labor, and from retaliating against any employees who participate in the investigation;

4.  Order all such other relief as may be appropriate, just, and proper.

DATED:       November 9, 2022
             Lincoln, Nebraska


SEEMA NANDA
Solicitor of Labor

CHRISTINE Z. HERI
Regional Solicitor

EVERT H. VAN WIJK
Associate Regional Solicitor

*/s/ Traci Martin*
AMBRIEL RENN-SCANLAN
TRACI MARTIN
LAURA O'REILLY
Trial Attorneys

U.S. Department of Labor
Office of the Solicitor
2300 Main, Suite 10100
Kansas City, MO 64108
(816) 285-7260

*Attorneys for Plaintiff Martin J. Walsh*
*Secretary of Labor*