**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

MARTIN J. WALSH,
SECRETARY OF LABOR
U.S. DEPARTMENT OF LABOR,

             Plaintiff,

    v.

PACKERS SANITATION SERVICES, INC.,
LTD.,

             Defendant.

No. CV: 4:22-CV-03246

**DEFENDANT'S BRIEF IN OPPOSITION
TO THE SECRETARY OF
LABOR'S MOTION FOR PRELIMINARY
INJUNCTION ORDER**

## I. INTRODUCTION

The Secretary of Labor (Secretary), acting on behalf of U.S. Department of Labor (DOL), brought suit against Defendant Packer Sanitation Services, LLC (PSSI) for alleged child-labor violations and filed a motion for a *nationwide* preliminary injunction (PI) that seeks to enjoin over 400 PSSI facilities across the entire country against the alleged use of oppressive child labor. The requested injunction is not justified and, respectfully, should not be issued.

PSSI already has in place strong policies and practices, including government-mandated or sanctioned processes (*e.g.*, I-9s and E-Verify, which, as case law and experts recognize, is the gold standard of employee identity verification), to prevent child labor and is eager to comply with the law. PSSI has a strict prohibition on employing anyone under 18 years of age. PSSI was previously audited on numerous occasions by both DOL and the U.S. Department of Homeland Security, and there were no citations or violations of either child labor or I-9 compliance obligations. Prior to the underlying lawsuit, the DOL has never accused PSSI of violating child labor laws, and, as the

1

Secretary's online DOL enforcement website shows, PSSI's overall record of compliance is exemplary.

The Secretary is focused on a limited number of instances in which individuals under 18, to obtain employment, used falsified I-9 paperwork, documentation that was approved through the federal government's E-Verify process. As soon as PSSI learned from the Secretary's suit that it was purportedly employing underage workers, PSSI acted quickly with its own robust response including instituting additional (but not legally required) steps to ensure compliance with the Court's *ex parte* temporary restraining order (TRO). When the Secretary eventually identified two handfuls of alleged minors by name in response to PSSI's request for such information, PSSI promptly terminated the employment of any such named individuals still working at PSSI. Contrary to the picture DOL paints, PSSI's child-labor track record is one of broad-based and effective compliance supported with prompt remedial action as warranted.

The Secretary's portrayal of PSSI is inaccurate. DOL has pursued headline grabbing, unsubstantiated, and misleading "gotcha" claims.[1] By way of example, in his brief, the Secretary prominently placed a photograph of an employee in her thirties, leaving the impression that the diminutive woman cloaked in personal protective equipment (PPE) was an unlawfully-employed minor. The fact is – and as the Secretary knew – the pictured employee is 34 years old. [*See* Section II (B) (1) (a) "A Picture Is Not Always Worth 1,000 Words" below; *see also* Declaration Hernandez]. The Secretary has never fixed the untrue and misleading implications he created,

---

[1]    Upon suing, the Secretary issued a damning press release [https://www.dol.gov/newsroom/releases/whd/whd20221109] and later allowed subordinates to make inflammatory accusations [*See, e.g.*, https://nypost.com/2022/11/12/packers-sanitation-services-accused-of-employing-children-for-graveyard-shifts/].

misperceptions that have been picked up by the press and plastered all over the print, television, and online media.

In addition to the evidentiary shortcomings with the Secretary's factual representations, the Secretary also argues for "strict accountability" when, under the facts and circumstances of this case, the requisite inquiry is whether PSSI knew or should have known of the alleged minor employment, a standard found in decisions of various circuit courts and decades of the DOL's own Administrative Law Judges (ALJ) decisions. Although the Secretary bears all burdens in connection with his requested PI relief, the competent evidence including that advanced by PSSI shows PSSI met its reasonable duty to comply with child-labor laws. In addition to its strict no-minor hiring policy, PSSI uses strong employee identification procedures and screening mechanisms, specific hiring-related training, federal-government created processes, and a number of additional checks and balances (*e.g.*, Compliance Department audits and external law-firm audits).

The record fails to support that PSSI knew or should have known about an alleged child labor problem. The Secretary's own declarations reveal that he only identified some minors by using evidence wholly inaccessible to PSSI or *any* employer, such as interviews with parents and at homes, meetings with school officials, subpoenaed school records, and other documentation available only to the federal government, and that some minors admitted to using false names and information to obtain employment. Implicitly, the Secretary rejects the use of I-9s and E-Verify by an employer to satisfy its legal obligations regarding the child-labor laws. PSSI followed best practices, and if the Secretary wants to mandate other procedures, then he needs Congressional action or an authorized agency regulation. He cannot legally accomplish the objective through this lawsuit.

3

The PI motion falls far short of meeting the demanding standards for the extraordinary and drastic relief of imposing a *nationwide* preliminary injunction against PSSI at over 400 facilities. There is no justification for such an overreaching response, as confirmed by the Secretary's own actions. Before filing these litigation claims, the Secretary waited three inexplicable months from commencing its child-labor investigation and never communicated with PSSI in the interim about ending the employment of the suspected children. Then, the Secretary brought suit and immediately sought injunctive relief. [Filing #2, p.2 (*"specifically, the Secretary requests that the Court immediately issue an order restraining" PSSI)*] The Secretary has not carried his *sole and heavy* burden of presenting admissible and competent evidence making a *clear* showing of an *immediate* need for imposition of this *extraordinary* and *drastic* remedy. Rather, the pleadings advanced speculation and bald allegations with no competent underlying documentation and, to this day, the Secretary refuses to provide *any* underlying data. Instead, the Secretary overstates the informants' privilege to deny disclosure of *all* of his purported evidence. The law does not permit such an outcome, nor is the government entitled to nationwide judicial relief based on its own assertions and conclusions.

Moreover, the requested overbroad relief is unnecessary. PSSI's hiring procedures and experience demonstrate a high degree of FLSA compliance. PSSI has terminated the employment of identified minors and further implored the Secretary to identify any other alleged minors by name so it may remove them from employment. With PSSI confirming it has and will follow the law, there is nothing to enjoin. Indeed, courts have long recognized that, in deciding whether to grant the extraordinary relief of a PI for an alleged FLSA violation, factors to be considered include the facts of the very case, the employer's past and present compliance (or noncompliance), the employer's "moral and business responsibility," the "dependability" of the employer's promises

4

of future compliance, and whether the employer "acted on reasonable grounds" upon learning of the alleged violation.[2] These factors and the long-standing four factors necessary to obtain PI relief highly favor PSSI and warrant denial of the Secretary's motion.

Finally, regarding alleged investigation interference by PSSI, this is not a claim in the Complaint and cannot therefore procedurally be a basis for requested relief. But more importantly, the Secretary only speculates about purported interference, including supposed failure to provide evidence and destruction of evidence, while never proffering actual forensic or other evidence of destruction or identifying evidence PSSI withheld. Pursuant to the *ex parte* warrants, the Secretary confiscated cell phones (including personal phones), copied information and removed binders upon binders of documents, and got 225 gigabytes (GBs) of information from PSSI's headquarters.

Despite this robust evidence of cooperation, the Secretary mischaracterizes normal human reactions (*e.g.*, questions) of managerial staff encountered in investigations conducted when the rest of the country was sleeping as evidence of interference. His assertions concerning body language, supposed managerial text messages[3] allegedly received during employee interviews, unheard cafeteria conversation, and alleged handling of electronics (a personal cell phone and computer for which the Secretary provides no forensic analysis) amount to nothing but rank speculation of unlawful interference. The record refutes any destruction of evidence and

---

[2] *See Brennan v. Inglewood, Inc.*, 412 F. Supp. 362, 365 (S.D. Miss. 1975) (decide each case on its own facts); *Metzler v. IBP, Inc.*, 127 F.3d 959, 963-64 (10th Cir. 1997) (past compliance history); *Reich v. Petroleum Sales, Inc.*, 30 F.2d 654, 657 (6th Cir. 1994) (present conduct); *Herman v. Fashion Headquarters, Inc.*, 992 F. Supp. 677, 679 (S.D.N.Y. 1998) (moral and business responsibility); *Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir. 1992) (dependability); *Wirtz v. Charleston Coca-Cola Bottling Co.*, 237 F. Supp. 857, 867 (E.D.S.C. 1965), *rev'd on other grounds*, 356 F.2d 428 (4th Cir. 1966) (acted on reasonable grounds).

[3] If employees were receiving interfering texts from supervisors, the Secretary should have produced this evidence because he has access to the supervisors' phones and this evidence is not covered by any informant's privilege.

demonstrates PSSI's cooperation, not its interference. This is nothing new. PSSI has had a long-standing history of cooperation with the DOL.

In short, no legitimate basis for imposition of a PI exists. Rather than pursuing an unwarranted and futile motion, it is time for the Secretary to work with a very-willing-and-ready PSSI to eradicate any noncompliance. The Secretary has failed to meet the high burden for issuance a nationwide injunction, including but not limited to the absence of irreparable harm and interests that when properly balanced show there would be significant material harm to PSSI if PI were issued. For the reasons stated below, respectfully, the Court must deny the requested injunctive relief.

## II. FACTUAL ANALYSIS OF THE RECORD

### A.   THE RECORD ACCORDING TO THE SECRETARY

#### 1.   *The Secretary's Overview of the Secretary's Investigation*

The Secretary's investigation started on August, 24, 2022 following a referral of possible child-labor violations in Grand Island, NE. [*See, e.g.*, Filing #3-1, p.3, ¶¶6-7] Seven weeks passed before the Secretary obtained and executed the warrants. [Filing #3-1 (Grand Island), p.4-5, ¶¶12, 13; Filing#3-3 (Worthington), p. 3, ¶11; Filing #3-1, p.4-5, ¶13 (Sedalia); Filing #3-7, p.2, ¶6 (PSSI's headquarters)] Eleven weeks after commencing investigation, the Secretary sued seeking a "nationwide injunction" to stop the alleged employment of dozens of minors as the Secretary continues his "investigation of [PSSI's] labor practices." [Filing #1; https://www.dol.gov/newsroom/releases/whd/whd20221109] During the 11 weeks to suit, as the Secretary's silence in his submission shows, he never met with PSSI to seek termination of the suspected minors' employment, even though he contends children were working in dangerous conditions.

2.      *Pre-Warrant Work Only Started One Week After Commencing Investigation*

Following the August 24 commencement of investigation, the Secretary's Wage and Hour Division (WHD) engaged in investigatory work including surveilling facilities, meeting with school personnel and obtaining school records, and interviewing some suspected minors. [Grand Island: Filing #3-1, pp.3-4, ¶¶ 8-11 & pp.10-11, ¶¶ 36-37, and Filing #3-2, pp.9-11, ¶¶25-30; Worthington: Filing #3-3, p.3, ¶¶8, 10; Filing #3-6, pp.2-3, ¶¶7, 9; Sedalia: no information about any minor employment finding in Filing #3-1 through #3-13]

3.      *Three Site Warrants and The Headquarters' Warrant*

The Secretary ultimately obtained warrants to inspect, investigate, and collect records at three facility sites and PSSI's headquarters. [Filing #3-1 (Grand Island), p.4-5, ¶¶12, 13; Filing#3-3 (Worthington), p. 3, ¶11; Filing #3-1, p.4-5, ¶13 (Sedalia); Filing #3-7, p.2, ¶6 (PSSI's headquarters)] As shown below, the Secretary executed on these warrants *seven* weeks after commencing investigation.

4.      *Grand Island*

Execution of the Grand Island warrant began on October 13, 2022 with investigators inspecting, investigating, and collecting information. [Filing #3-1, pp.5 et seq., ¶¶14 et seq; Filing #3-5, p.2-3, ¶7.] Approximately 190 PSSI employees worked on the warrant-execution night. [Filing #3-1, p.6, ¶19] Despite the darkness of night, investigators claimed to see workers believed to be minors entering and exiting the facility. [Filing #3-2, p.5, ¶14; Filing 3-5] They took pictures and videos.[4] [Filing #3-5, p.4, ¶17] They observed the facility and obtained information from various workers. [*See, e.g.*, Filing #3-5, pp.3-6, ¶¶10-29] They interviewed a paucity of employees

---

[4] The Secretary has not, however, put any photographs or videos into the record, nor has he shown this evidence to PSSI. In fact, only unauthenticated, inadmissible photographs appear and only in the Secretary's brief.

purportedly minors or adults who previously worked as minors, but there is no underlying evidentiary support for this allegation. Much of the Secretary's purported confirmatory work came through extraneous efforts outside the normal hiring process such as: interviews at the individuals' homes and/or with a parent present; school interviews; and examination of birth certificates, student profiles, school registration, other high school records, and state health and human services records.[5] [Filing #3-1, pp.10-11, ¶¶37, 38, 40, 42; Filing #3-2, pp.9-13, 15, ¶¶25, 26, 28, 30, 31, 39, 40, 46] Despite the claimed urgency, investigators were mysteriously unable to interview 12 alleged minors as of November 7, 2022. [Filing #3-2, pp.15-20, ¶¶47, 50, 53, 56, 59, 62, 63, 65, 67, 69, 71,& 73] The Secretary has not and cannot now supplement the record.

### 5. *Worthington*

Execution of the Worthington warrant transpired on October 13, 2022 and investigators inspected, investigated, and collected information. [Filing #3-3, p.4, ¶¶11-12 & pp.5 et seq., ¶¶15 et seq.; Filing #3-6, p.3, ¶11]. Before execution and in the dark of night, investigators observed workers entering the worksite, speculating that many workers were underage. [Filing #3-3, p.3, ¶¶8-9]; Filing #3-6, p.3, ¶8] On the warrant-execution night, 110 PSSI employees worked at the facility. [Filing #3-9, p.4, ¶13] PSSI showed investigators where employees were working and gave access to company records. [Filing #3-9, pp.4-5, ¶¶12, 14] During the site visit, although investigators interviewed a number of employees, they only interviewed two allegedly confirmed minors and one person who claimed to be 18 but was later allegedly known to be a minor (and again the Secretary provided no underlying documentary support for the assertion). [Filing #3-3, pp.7-8, ¶¶25-31; Filing #3-6, p.4, ¶14] As with Grand Island, a good deal of the purported

---

[5] These are neither employment documents required by law nor documents any employer could realistically obtain.

confirmatory work for Worthington occurred through investigation of third-party sources, including extensive home and school interviews and examination of high- school records and student profiles. [Filing #3-3, pp.8-9, ¶¶31-33; Filing #3-6, pp.6, ¶¶28, 30, 36; Filing #3-9, p.6, ¶20]

### 6.   *Sedalia: Nothing*

The Secretary's record submission contains zero evidentiary information regarding execution of the Sedalia facility warrant, other than that, as of November 7, 2022, investigators continue to review evidence gathered from Sedalia. [Filing #3-1, p.13, ¶ 47; see the absence of any other information in Filing #3-1 through #3-13] This notable evidentiary absence supports only one conclusion, *i.e.*, the Secretary found no evidence or conduct of concern in Sedalia. Fundamental fairness actually compelled the Secretary's explicit disclosure to the Court and PSSI of this exculpatory evidence.

### 7.   *PSSI's Headquarters: Cooperation & No Analysis For the Record by the Secretary of the Information PSSI Produced*

On October 13, 2022, the Secretary executed a warrant on PSSI's headquarters. [Filing #3-7, p.2, ¶6] Thereafter, the Secretary and PSSI negotiated document production for 50 facilities. [Filing #3-7, p.3, ¶8] PSSI produced 225 GBs of documents. [Filing #3-7, pp.3-4, ¶¶11, 13] As of November 7, 2002, the Secretary had only begun a "cursory review" of these records and advanced nothing more than unsubstantiated concerns that PSSI may be employing minors at other locations based on alleged inconsistent birthdates and photographic appearances. [Filing #3-7, p.4-5, ¶¶12, 14] This is not competent, persuasive evidence.

The Secretary also states in his brief that when one investigator was "spot checking records, WHD noticed one employee's listed age was 129-years-old." [Filing #3, p.31, citing the Uphold decl. at ¶14] This is disingenuous, implying that PSSI's records show the employee's age as 129 years old.

The actual declaration never claims some anomaly in PSSI's records, never identifies the individual by name so PSSI can check, and never reveals specifically what PSSI's records show for the individual; rather, the declarant states that when searching in CLEAR, the individual's SSN returned an age of 129. [Filing #3-7, p.5, ¶14(c)] This is vastly different than PSSI's own records reflecting that age. The Secretary's advancement of his argument regarding a 129-year-old employee highlights the absurdity and desperation in his submission and further shows the inherent difficulty in various clearing systems. CLEAR is a third-party information aggregator published by Thomson Reuters Corporation; it is not a government-mandated resource and it has made major errors. *See, e.g.*, *Kidd v. Thomson Reuters Corp.*, 925 F.3d, 102-03 (2d Cir. 2018) (candidate who lost job sued because CLEAR reported she had a theft conviction when she did not). And again, if the Secretary wants to mandate that CLEAR be used – as opposed to the federal government's own and superior E-Verify system – that is a subject for Congressional action or appropriate rulemaking and not something to be achieved in this litigation.

As for the Secretary's claim that he is still investigating, that is problematic for the Secretary because post-suit, the proper procedure for seeking information is discovery under the Fed. R. Civ. P. 26.

### 8. *PSSI's Strict No-Minor Hiring Policy and Its Team Member Handbook Requiring Employee Confirmation of Being 18 or Older*

The Secretary submitted PSSI's Team Member Handbook (Handbook), but the Handbook belies the motion, revealing PSSI's strict no-minor hiring policy. [Filing #3-4, pp.2, 3, 7, 21] This probation against employing minors is stricter than the FLSA's requirements. Not only does the Handbook contain explicit statements about PSSI's policy ***not*** to employ any person under the age of 18, but also, it requires employees' signed representations that they agree to abide by the company work rules, which include the age-hiring requirement, and further that they attest to being

10

18 years or older. [Filing #3-4, pp. 3, 7 (*"I represent that I am over the age of eighteen (18)"*), 21 (*"It is the policy of the Company not to employ Minors for any position. In no event, will the Company employ any person under the age of eighteen (18).")*] As the next Section demonstrates, PSSI also employed a significant number of checks and balances (*e.g.*, internal and external audits, I-9s, and E-Verify)].

## B.      THE RECORD NOT PROVIDED BY THE SECRETARY

### 1.      *Misleading Assertions and Implications, Erroneous Public Perceptions, or New Facts Showing PSSI's Eradication of Minor Employment and PSSI's Cooperation*

Based on the Secretary's briefings, egregious misperceptions of PSSI's practices and policies exist, and competent evidence that the Secretary never advanced shows a picture wholly different from the Secretary's depiction of the company.[6]

The very day of suit, PSSI made clear that: (1) "PSSI prohibits the unlawful employment of minors and has multiple procedures and controls in place to prevent that from occurring[,]" including "mandatory use of the federal government's E-[V]erify system in all states, even where not required by state law[;]" (2) "PSSI must accept documents that reasonably appear to be genuine . . . or risk committing unfair discriminatory practices[;]" and (3) "If [] employees have misrepresented their identity and/or age, PSSI will promptly remedy the matter[,] noting that "[p]articularly with regard to minors, it is of the utmost importance to PSSI that it remove any such employee from the workplace." [Dalin Decl., Ex. A.] PSSI even stated that there is no need for a Court order, because, if the Secretary would provide the "names of minors" discussed in his motion and the "evidence collected from third parties" that establishes they are minors, "PSSI will

---

[6] The Secretary's submission stands as filed on November 9, 2022; fundamental fairness and due process preclude any last-minute supplementation.

terminate their employment immediately." [*Id.*] PSSI even noted that, if the Secretary would identify other workers in the future about which age concerns existed, PSSI would cooperate by providing personnel documents (if the government did not already have them), would arrange for employee interviews, and would immediately terminate the employment of any person found by DOL to be a minor. " [*Id.*]

As the facts show, PSSI cooperated with the Secretary. It even advised the industry of its strict no-minors prohibition and its zero tolerance for violations. [*See, e.g.,* https://www.meatpoultry.com/articles/27574-pssi-under-investigation-by-dol-for-possible-child-labor-violations] It publicly noted its mandatory use of the US government's E-Verify system and its extensive training, document verification, biometrics, and multiple layers of audits. [*Id.*]

The majority of the important facts about PSSI's policies and practices never appear in the Secretary's submission. Additionally, in numerous instances, the Secretary makes assertions that are inaccurate or misleading.

### (a) A Picture Is <u>Not</u> Always Worth 1,000 Words

By way of egregious example, in his brief, the Secretary submitted a photograph of a person under a conveyer belt [Filing 3, p.5], which left the distinct impression with the media, the public, and likely the Court, that the subject in the photograph was a cowering minor employee working under dangerous equipment. [*See, e.g.*, https://nypost.com/2022/11/12/packers-sanitation-services-accused-of-employing-children, depicting a picture of an employee under a machine included in the Secretary's brief, with the media's labeling underneath the picture stating "more than 30 children cleaned dangerous equipment during graveyard shifts. U.S. Department of Labor"; see also, https://globalnews.ca/news/9276291/child-labour-slaughterhouse-pssi-nebraska-minnesota/, depicting two pictures with the media's labeling underneath the pictures asserting

"the individuals who appears to be a minor working in the 'Ground Beef room' of a meat packing plant in Nebraska (L) and another employee who appears to be a minor hosing off equipment in the same plant (R). **U.S. Department of Labor**" (emphasis in original)] These impressions are far from the truth. The Secretary's investigators interviewed this employee and knew she is in her mid-30's, and not a minor as the Secretary's submission implies. [Magdalena Garcia Hernandez Decl. ¶9] This is just one of many erroneous misperceptions and wrongful insinuations fostered by the Secretary's submission.

### (b) Erroneous Conclusion: No Wrongful Investigation Interference

In his brief, the Secretary notes that the warrants allowed facility tours, documentation with photos, and receipt of documents including electronic documents, and private interviews. [Filing 3, p.13] The Secretary's declarations claim PSSI wrongfully interfered with the Secretary's execution of the warrants. [*See, e.g.*, Filing #3, p.9-10] Untrue. A fair review of the Secretary's own declarations fails to support that unreasonable and untrue conclusion. The declarations show PSSI: (1) provided the requested facility tours; (2) permitted investigators to take pictures and videos; (3) allowed records review including log in/out sheets; (4) willingly provided documents (*e.g.*, 112 spreadsheets, binders, electronic records) and even allowed documents to be removed from the premises; and (5) facilitated confidential employee interviews. [Filing #3-1, pp.5-12, ¶¶16, 17, 21, 22, 23, 26, 30, 33, 42; Filing #3-2, p. 5-8, ¶¶ 12, 13, 14, 16, 17 (supervisor "agreed" to move from the area), 19, 20; Filing #3-3, p.5, ¶16; Filing #3-5, pp.3-9, ¶¶10, 12, 14, 17, 18, 21-23, 26, 28, 29-31, 43; Filing #3-9, pp-6.5, ¶¶14 ("access to all records"), 21; Filing #3-10, p. p.4, ¶11, 13; Filing #3-11, pp.3, 6, ¶¶13, 32; Filing #3-12, p.4, ¶12] PSSI headquarters also willingly entered into a negotiated production of records for 50 facilities involving over *225 GBs* of

documentation with the digital equivalent of approximately 100 million pages. [Filing #3-7, pp.3, 5, ¶¶8, 11, 13] This is far from non-cooperation let alone active interference.

The Secretary's flimsy insinuation of interference rests essentially only a handful of numerous interactions: (1) some PSSI supervisors asked questions about the government's authority and requested there be no pictures and videos; (2) one PSSI manager did not want to provide accident records believing it was another manager's role; (3) one PSSI manager was slow to move from the interview area but agreed and did move; (4) some employees "appeared nervous" when interviewed or reported already being interviewed; (5) one supervisor talked to employees in the cafeteria (but the Secretary never heard what was said); and (6) one employee allegedly dragged documents "into the recycle bin" and another employee supposedly (from a "peeking over" observation) was allegedly seen deleting WhatsApp messages despite denying doing so (and the Secretary submits no forensic proof for either instance). [Filing #3-1, pp.5-6, 9, ¶¶13, 16, 17, 28; Filing #3-2, p. 7, ¶17, Filing #3-5, pp.7, 9-10, ¶ 34, ¶44; Filing 3-13, p.3, ¶9]

These examples: (1) are limited in number, involving but a handful of people not acting under PSSI's direction; (2) involve human-nature conduct understandable under the circumstances; (3) belie numerous facts showing PSSI's overarching cooperation by many at PSSI, including, most notably, PSSI's upper-level employees; and (4) are refuted by competent evidence. For example, no destruction of information transpired. [Kalat Decl. ¶23] It is far from unusual for a few people to: (1) wonder about the government's authority (especially when warrants transpire after midnight); (2) be confused about the whole process; (3) be nervous about talking to the government, and (4) be generally protective of the workforce. The Secretary's inferences amount to nothing more than unproven speculation involving but a few and yet seeking to damn the entire company.

14

The Secretary focuses heavily on the alleged conduct of *one* supervisor, claiming that supervisor "sat down to listen" to interviews in the cafeteria and "circled the room" to make eye contact with employees. [Doc. 3, p. 34 of 43] The Secretary, however, never explains to the Court that his staff arranged with PSSI for this supervisor (Pedro Montanez) to bring the selected employees to the cafeteria for interviews at the investigators' demand. [Montanez Decl. ¶10] Naturally, this required him to be in the cafeteria area (to being walking to and from). The Secretary also never explains that Mr. Montanez sat in the cafeteria to do paperwork because that is his normal workspace as he does not have an office. [*Id.* at ¶11] Additionally, regarding documents, this supervisor told the investigators the information they sought was stored electronically, identified the storage system to them, and advised them that certain managers would need to give them access because he did not have access to the system. [*Id.* at ¶9]

Further, in addition to the Secretary's own declarations showing PSSI's cooperation with the warrants, PSSI's submission shows: (1) PSSI spent an "extraordinary number of hours" gathering and producing requested documents; (2) PSSI produced all request accident/injury reports; (3) the Secretary never timely complained about any interference with employee interviews and had he sone so, PSSI would have made the necessary arrangements for interviews/follow-up interviews; and (4) as admitted by the Secretary's attorney, Julia Napier, "in fact, no PSSI employee denied access to any such records." [Dalin Decl., Ex. A] All of this cooperative activity, coupled with PSSI's commitment to cooperate and "terminate the employment of any minors . . . consistent with its strict prohibition against employing" minors, [*Id.*], compels the conclusion that PSSI never interfered with the Secretary's investigation.

**2.      *The Secretary's Silence Regarding PSSI's No-Minor Hiring Policy and Its Use of Government Processes and the Paucity of Its Alleged Findings in Comparison to the Workforce Size and Large Number of Sites***

PSSI's competent record demonstrates that no employer – not even the Secretary – achieves perfection and that PSSI's hiring experience demonstrates a high degree of FLSA compliance. [DeCamp Decl. ¶¶15, 16, 20] [7]

*(a) Strict Prohibition and Robust Hiring Process, including Audits*

Not only does PSSI prohibit the employment of minors, but also it employs robust controls during its hiring process to verify the identity and age of all new hires: (1) Every applicant completes an on-line application requiring the applicant to answer the question, "[A]re you 18 years of age or older?" [Stacey Decl. ¶ 11, Exhibit A, Sample Redacted Application]; (2) PSSI maintains a written hiring and employment eligibility verification policy [Stacey Decl. ¶23, Exhibit B, I-9 Employment Eligibility Verification Policy and Procedure Manual]; and (3) as noted below, PSSI uses detailed procedures to ferret out ineligible applicants based on age and other factors. [*Id*. at ¶¶10-33]

For each new hire, PSSI's managers at each location are responsible for hiring employees and collecting the I-9 information and an acceptable photo identification that includes a date of birth. [Stacey Decl. ¶¶6, 14; Ramirez Decl. ¶13] Once collected, an H.R. Coordinator from PSSI's On-Boarding Department at company headquarters promptly conducts an audit of the I-9 and identification documentation to confirm the applicant is at least 18 years and further looks for concerning items (*e.g.*, misspellings). [Stacey Decl. ¶15 ] PSSI's Compliance Department also conducts daily audits of approximately 65-70% of regular H.R. Coordinator's reviews and 100%

---

[7] It is noteworthy that PSSI's Sanitation Division employs approximately 15,200 employees at over 400 locations throughout the country [Decl. of Stacey] and that PSSI has no history of prior child labor citations or violations. [Decl. of DeCamp]

of new H.R. Coordinator's reviews. [*Id.* at ¶16] Its Compliance Department *now* audits 100% of all H.R. Coordinator's reviews. [*Id.*]

### (b) More: Verification Through the U.S. Government's E-Verify System

Importantly, once the I-9 is completed and audited, the H.R. Coordinator from the On-Boarding Department runs new hires and rehires through federal government's E-Verify system (www.e-verify.gov), even in states not requiring E-Verify.[8] [Stacey Decl. ¶17; Rodriguez Decl. ¶8.] If E-Verify returns a result of "Tentative Nonconfirmation" (TNC) (*i.e.,* a "mismatch"), PSSI requires the employee to timely produce to USCIS documentation to correct the TNC status. *See https://www.e-verify.gov/employees/e-verify-overview* (explaining the system reporting: "Employment Authorized" (a "match") or as TNC (a "mismatch")). [Stacey Decl. ¶17] PSSI terminates the employment of any person failing to resolve the mismatch or is ultimately determined by USCIS to be a "Final Nonconfirmation." [*Id.*] Even with an "Employment Authorized" designation in E-Verify, PSSI's Compliance Department conducts a second I-9 audit the following day. [Stacey Decl. ¶18; Quijano Decl. ¶¶5-10; Miller Decl. ¶¶5-16]

Although E-Verify is not a fail-safe detection method against identity theft or the use of fake documents, E-Verify is the "gold standard" of employee identity verification. [Oldenburg Decl. ¶16] Using E-Verify demonstrates that an employer takes I-9 compliance above and beyond what is legally required. [*Id.* at ¶17]. Furthermore, PSSI's policies and procedures for employee verification track with the Immigration and Customs Enforcement's IMAGE "Best Employment Practices," which are considered the "platinum standard" for employee verification. [*Id.* at ¶18]

---

[8] E-Verify is an internet-based system that compares information from the Form I-9 to the records of Department of Homeland Security ("DHS") and the Social Security Administration ("SSA"). *See* https://www.e-verify.gov/employees/e-verify-overview.

### (c) Still More: Another Check and Balance with the Biometric Timeclock System

Upon hiring, PSSI takes employee photographs from multiple angles and downloads them into its biometric timeclock system. [Stacey Decl. ¶19] The biometric timeclock system then compares employee photographs every time the person punches in or out with the system-stored, on-boarding photographs, flagging discrepancies. [*Id.*] PSSI's Compliance Coordinators investigate the discrepancies and PSSI terminates people determined to be impersonating the originally-hired employee. [*Id.*] Still further, PSSI's Payroll Department reviews the photo identification submitted by the new hire and compares it to that employee's photograph in the Asure timeclock system to further confirm they match. [*Id.* at ¶20]

### (d) Still More: Random I-9 and Identification Audits

Additionally, PSSI's Compliance Department conducts random I-9 and identification document audits (including reviewing age) throughout the year typically in response to information from PSSI's internal anonymous 1-800 report line, employee reports, and inquiries from government agencies (*e.g.*, Social Security Administration (SSA) inquiry regarding a possible duplicate Social Security Number (SSN)). [*Id.* at ¶¶21-22][9]

### (e) Still More: Law-Firm Mandatory Training and Audits and PSSI Training

For years, PSSI has used the Fragomen, Del Rey, Bernsen & Loewy LLP law firm to periodically provide mandatory I-9 compliance and document review training to H.R. Coordinators and Compliance Coordinators and to conduct annual I-9 audits of a sample of its sites. [Stacey Decl. ¶27] PSSI also has a dedicated trainer who trains the H.R. Coordinators and

---

[9] In approximately fifty locations, PSSI also uses the "Social Security Number Verification System" (SSNVS), a tool provided by the SSA. [Stacey Decl. ¶22] PSSI has found the SSNVS largely duplicates the E-Verify results. [*Id.*]

Compliance Lead who trains Compliance Coordinators on PSSI's procedures to verify age, identity, and authorization to work. [*Id.* at ¶25] Training also occurs for on-site hiring personnel, Area Managers, and Division Managers on I-9 compliance and how to spot fraudulent identification documents. [*Id. at* ¶26; Exhibit C, I-9 Compliance-Completing the Form I-9; Exhibit D, I-9 Compliance-Spotting Fraudulent Documents.]

### *(f) Action by PSSI: Employment Terminated Where Warranted*

Since January 1, 2020, through its biometric timeclocks process, E-Verify verification process, Compliance Department's work, and efforts in response to federal or state government agencies indicating identification discrepancies, PSSI has terminated the employment of over 7,800 employees had an uncorrected identity verification, issue, sought employment with fraudulent documents, or otherwise made representations inconsistent with PSSI's lawful hiring/employment practices. [*Id.* at ¶31-33] Moreover, since 2010, ICE has audited 18 PSSI locations, including 13 locations in Nebraska, and has issued no fines to PSSI for violations of any kind. [*Id.* ¶34]

### 3.    *PSSI's Longstanding, Successful DOL Online History, Known Previous Cooperation, Lack of Any Prior Child Labor Citations or Violations, and Practices that Exceed the DOL's Seven Best Practices Concerning Child Labor*

Although totally absent from the Secretary's voluminous submission, PSSI's longstanding online DOL database history paints a totally different picture of PSSI – a picture of a compliant and cooperative company with ***no prior child-labor citations or violations***. [DeCamp Decl. ¶20 (emphasis added)] Analysis of the DOL's enforcement website shows that: (1) For its size, PSSI's enforcement history is "very unusual" having few WHD interactions and few findings of violations, with only five investigations over a 12-year period resulting in FLSA back-wages payments to only 56 workers, totaling under $7,200, and with no civil money penalties,

demonstrating a very high degree of FLSA compliance; (2) Employing "a categorical rule of not hiring individuals under age 18 is the best, strongest prophylactic policy to avoid child labor violations" and "far more conservative than, and goes well beyond, [WHD's] own published "Seven Child Labor Best Practices for Employers" *See* https://www.dol.gov/agencies/whd/child-labor/seven-child-labor-best-practices-for-employers; (3) employers seeking "to skirt the law in practice do not generally use measures such as E-Verify[;]" (4) by all objective measures, PSSI "seems to be substantially in compliance with the FLSA, including its child labor provisions[;]" (5) that WHD has "uncovered no child labor violations in any of the previous investigations shows that there is in no sense a broad practice at the company of hiring minors or allowing them to perform prohibited work[;]" and (6) in the experience of former Administrator of the WHD, "it is virtually unheard-of for an employer with 15,000-plus workers at 400-plus facilities to have multiple no-violation investigations . . . without having devoted substantial time and effort to ensuring compliance with the FLSA. That type of favorable enforcement record does not happen by accident." [*Id.*].

### 4.     The Secretary's Failure to Identify Any Troublesome Company-Wide Policy or Practice

Notably, the Secretary never identifies a troublesome company-wide policy or practice that would justify a nationwide injunction. [*See* Filing ##3-1 to 3-13] This is not surprising given PSSI's policy prohibiting minor employment and its robust practices designed to ensure FLSA compliance. The absence of a company-wide policy or practice shows a nationwide injunction is not in order.

**5.** ***PSSI's Response, the Secretary's Knowledge of PSSI's Intended Responses to Eradicate Any Claimed Noncompliance with the Law, and the Secretary's Failure to Identify a Single Thing More that PSSI Could Do***

Upon receipt of the Secretary's lawsuit, PSSI promptly engaged with the Secretary to ascertain what the Secretary believed were the underlying problems with PSSI's employment processes and the names of the alleged minors so PSSI could remove them from its workforce. [Dalin Decl., Ex. A] PSSI persisted in its request for the identity of the purported minors, but the Secretary eventually provided only 10 names and refused to provide any documentation [Dalin Decl., Exs. B, C (*"we will not provide underlying documentation about any of the minors"*)]. The Secretary knows full well it had third-party information and records (*e.g.*, the school information and records) to which PSSI had and has no access. Upon receiving the 10 names, PSSI, nevertheless, quickly reacted by terminating the employment of those identified who were on PSSI's workforce at the time. [*Id.*]

Moreover, PSSI informed the Secretary that it had instituted additional procedures to ensure compliance with the TRO; they include: (1) informing all management employees of the TRO and its provisions; (2) instituting an immediate identification check at each worksite warrant location to ferret out individuals not appearing to be at least 18 and requiring valid identification before such people can return to work; and (3) engaging in an expedited review of employee photos and other documentation to identify any employee who appears even to possibly be under the age of 18 and requiring additional follow-up and verification, beginning with the facilities subject to the warrants, then moving to the 47 additional facilities covered by the Secretary and PSSI's agreed-upon data collection, and then finally transpiring for the remaining PSSI facilities. [*Id.*]

Notably, PSSI also asked the Secretary to identify any other steps PSSI should employ, but the Secretary never responded with even a single additional proposed measure. [*Id.*] The Secretary's silence, in the face of PSSI's employment terminations and identification of additional

procedures and checks and balances, supports only one conclusion – *i.e.,* PSSI has taken all reasonable steps to cure any purported problem and no nationwide injunction is warranted.

### III. THE PROPER STANDARD OF REVIEW

"A **preliminary injunction** is an '***extraordinary and drastic remedy***.'" *Munaf v. Geren*, 553 U.S. 674, 128 S. Ct. 2207, 2210 (2008) (emphasis added). It is "***never awarded as of right***." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) (emphasis added).

Fed. R. Civ. P. 65 enables a court to issue a TRO and ultimately a PI, but the moving party bears the entire and "***heavy burden***" of establishing the four required bases for relief, each of which must exist, before the Court can grant the requested relief. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (emphasis added). Because it is an extraordinary remedy, the Court may only award it "upon a ***clear showing*** that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis and italics added). Indeed, the law reserves the requested relief for situations where the moving party will suffer *irreparable harm* if the Court does not intervene and stop the opposing party's conduct *immediately. See Michigan Coalition v. Griepentrog,* 945 F.2d. 150, 154 (6th Cir. 1991) (to merit a preliminary injunction, an injury "must be both certain and immediate," not "speculative or theoretical").

In this Circuit, in order to grant a PI, the Court must weigh four factors in determining whether a party is entitled to PI relief, specifically: (1) The threat of irreparable harm to the movant absent the injunction; (2) the balance between the threatened harm to the movant and the harm the injunction would inflict on other interested parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Barrett v. Claycomb,* 705 F.3d 315, 320 (8th Cir.2013) (*quoting Dataphase Sys., Inc. v. C L Syst., Inc.,* 640F.2d 109, 114 (8th Cir.1981) (en banc)). The Eighth Circuit now calls the *Dataphase* factors the *Winter* factors, *see Tumey v. Mycroft AI, Inc*.

27 F.4th 657, 664-665 (8th Cir. 2022) (discussing *Winter*), and the Eighth Circuit and district courts in this jurisdiction deny PI motions when one of the four *Winter* factors is missing including when there is delay. *See, e.g.*, *Adventist Health System/Sunbelt, Inc. v. U.S. Dept. of Health and Human Svcs.*, 17 F.4th 793, 806-08 (8th Cir. 2021) (affirming the PI denial because of delay and insufficient showing of prevailing on the merits); *Roth v. Austin*, 2022 WL 1568830, *28-31 (D. Neb. 2022) (PI denied because insufficient showing of irreparable harm in addition to the balance of equities and public interest factors favoring non-movant).

In weighing these four factors, "[n]o single factor is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). Although a district court has broad discretion when ruling on requests for temporary restraining orders and preliminary injunctions, *see Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1028 (N.D. Iowa 2010), "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. . . ." *Dataphase*, 640 F.2d at 113.

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is **certain and great and of such imminence** that there is a clear and present need for equitable relief.'" *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (citation omitted) (emphasis added). All four factors matter, but notably, as *Dataphase* made clear, "a failure to demonstrate irreparable harm, standing alone, may be a sufficient basis to deny preliminary injunctive relief." *Id.* (citation omitted). Moreover, the "speculative nature of the threatened harm" can support denial of the PI. *See, e.g., Minn. Ass'n of Health Care Facilities, Inc.*

*v. Minn. Dep't of Pub. Welfare,* 602 F.2d 150, 154 (8th Cir.1979) (state policy and speculative nature supported PI denial).

When examining the Secretary's brief, declarations, and claimed bases for relief, PSSI entreats the Court to examine that record carefully, rejecting the Secretary's assertions lacking any record support whatsoever [*e.g.,* Filing 3, p.6 ("The Secretary's initial evidence review indicates PSSI may employ minor children . . .at its other 400 operations across the country")], ignoring speculation, disallowing the Secretary's reliance on inadmissible evidence cloaked in a claimed informant's privilege, dismissing conclusory allegations lacking in documentary support, and only examining the extremely thin admissible evidentiary record with respect to the four factors, holding the Secretary to its heavy burden regarding such factors. When this is done, the Secretary's motion must be denied in its entirety.

## IV. LEGAL ARGUMENT

The legal analysis below establishes, independently and as a whole, that no PI should issue.

## A.     NO THREAT OF IRREPARABLE HARM: PSSI PROHIBITS EMPLOYMENT OF MINORS, EMPLOYS ROBUST PRACTICES, AND IS FULLY COOPERATING WITH THE SECRETARY

The Secretary suggests that, because he is seeking an injunction pursuant to an express Congressional provision for injunctive relief to prevent a statutory violation, he does not need to show irreparable injury. This position is contrary to the Court's TRO ruling, as well as Supreme Court precedent, Eighth Circuit precedent, and application by district courts. In its November 10, 2022 Order, the Court stated, "A preliminary injunction cannot issue without a showing of irreparable harm." [Filing #8, p.4 (citing *Dataphase*)] The Court's statement is consistent with Eighth Circuit appellate and district court precedent. *See, e.g., Sharp v. Parents in Community Action, Inc.*, 172 F.3d. 1034, 1039 (8th Cir. 1999) (*Dataphase* factors apply in action brought by government to enforce statute; fn. 3, rejecting, as *dicta*, the analysis in the *Burlington* case upon

24

which the Secretary relies); *Reich v. Bede Aircraft Corp*., No. 4:96CV592 DJS, 1996 WL 276382, *1 (E.D.Mo. Mar. 26, 1996) (in case involving DOL seeking injunction under FLSA, court required showing of irreparable injury, stating "The factors for the Court's consideration in determining whether or not to issue a TRO or a preliminary injunction are found in *Dataphase* …"). Moreover, a federal statute violation simply does *not* require a federal court to issue an injunction. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies[;]" "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to [enjoin the conduct] under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.")

Notably, the irreparable harm factor is indispensable. "[T]he existence of an irreparable injury is mandatory." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (citation omitted). If the Secretary fails to demonstrate irreparable harm, that alone may be fatal to his motion. *S.J.W.*, 696 F.3d at 778. "Speculative harm does not support a preliminary injunction." *S.J.W.*, 696 F.3d at 779, citing *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare,* 602 F.2d 150, 154 (8th Cir.1979) ("[T]he speculative nature of the threatened harm support[s] the denial of injunctive relief."). To issue a preliminary injunction authorized by statute, the Court must determine whether "the defendant is engaged in, or is about to engage in, any activity which the statute prohibits." *Burlington Northern R. Co v. Blair*, 957 F.2d 599, 602 (8th Cir. 1992).

As the Fifth Circuit held in *S.J.W.,* to demonstrate irreparable harm, the movant must show **certain** and **great** harm that is of ***such imminence*** that a clear and present need for such equitable relief exists. S.J.W., 696 F.3d at 778 (citation omitted). That standard matters here, and the Secretary has failed to make the requisite clear showing.

At the outset, the Secretary's delay in acting on the alleged violations wholly contradicts the concept of "imminence." When purported "oppressive child labor" concerns exist, zero justification exists *for waiting*: (1) *any time* other than promptly to address the concerns with PSSI, particularly where PSSI has prohibition against hiring minors and a known history of compliance with the DOL; (2) *seven weeks* to obtain and execute on warrants; and (3) *almost three months* to sue. The inexplicable delay alone should warrant denial of a PI. *See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 603 (8th Cir. 1999) (affirming district court's determination that plaintiff's delay "belies any claim of irreparable injury pending trial") (citation omitted); *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) ("Though ... delay may not warrant the denial of ultimate relief, it may, 'standing alone, … preclude the granting of preliminary injunctive relief,' because the 'failure to act sooner undercuts the sense of urgency … and suggests that there is, in fact, no irreparable injury.'") (citations omitted).

Moreover, the record lacks any competent, admissible proof of *continuing* irreparable harm. The Secretary hides behind a purported informant's privilege, refuses to provide any underlying supporting data, and makes only conclusory allegations lacking in detailed support capable of proving the assertions and being subject to cross-examination. He advances no probative, admissible evidence of an ongoing violation. He guesses there may be other violations at other locations based on alleged inconsistent birthdates and some photographic appearances.

[Filing #3-7, p.4-5, ¶¶12, 14]. But he provides not one iota of proof, and, again, "[s]peculative harm does not support a preliminary injunction." *S.J.W.*, 696 F.3d at 779 (citations omitted).

PSSI's reasonable steps to prevent unlawful employment of minors (strict hiring policy, robust procedures including use of I-9s and E-Verify), its abundantly clear commitment to follow the law, its prompt termination of minors identified by the Secretary who were in PSSI's employ, and its institution of yet further extensive efforts to prevent illegal child labor make it virtually impossible for future "certain" and "great" imminent harm to occur. There can be no "cognizable danger of recurrent violation," especially where PSSI has no prior child labor violations or failures to comply and where it promptly undertook remedial measures. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations" and the "necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility").

As for the alleged irreparable harm from PSSI's purported interference with the Secretary's investigation, as shown in this brief, that is a figment of the Secretary's imagination. The Secretary focuses in his brief on the alleged conduct of Pedro Montanez. [Filing 3, p.34] As the competent facts above show (as opposed to the Secretary's speculation regarding Mr. Montanez), Mr. Montanez did nothing wrong and indeed cooperated with the investigators.

In sum, the "irreparable harm" factor favors PSSI. The Secretary failed to establish existing violations or a likelihood that violations are about to occur. ***That ends the inquiry.*** His PI motion fails.

**B.     THE BALANCE OF HARMS: THE HARM THE INJUNCTION WOULD INFLICT ON PSSI AND THIRD PARTIES OUTWEIGHS THE SECRETARY'S CLAIMED HARM WHICH HAS BEEN ERADICATED TO THE EXTENT POSSIBLE**

Likewise, the Secretary has failed to carry his heavy burden of making a clear showing that the balance of his threatened harm outweighs the harm a PI would inflict on PSSI and other interested parties. As noted above, the issue has been mooted as it relates to the individuals the Secretary identified by name as being minors in PSSI's employ, because PSSI promptly terminated their employment. Despite that its strict prohibition against employing minors and its robust checks-and-balances more than comply with its legal duty, PSSI nevertheless instituted additional efforts (not legally required) to prevent the employment of minors. If the Secretary identifies other alleged minors by name, PSSI will promptly respond and terminate their employment as appropriate. Therefore, the Secretary's stated going forward is nothing more than speculative.

On the other hand, the harm to PSSI if a PI issues is real and significant. The issuance of such extraordinary remedy unquestionably inflicts harm in a myriad of ways. For example, the relief as requested by the Secretary would impose an impossible standard on PSSI, because the Secretary seeks perfection, asking the Court to enjoin PSSI and its unspecified agents "from violating sections 12(c) and 15(a)(4) of the [FLSA] by employing oppressive child labor" "at each of its workplaces throughout the United States of America." [Filing #2, p.2, ¶1] There is no limitation on what would constitute an alleged violation, and a PI as requested would set PSSI up for future contempt prosecutions by the Secretary, a substantial harm that is not warranted by the evidence, including the extraordinary steps that PSSI takes to screen out minors. That risk is real, as is demonstrated by the Secretary seeking to impose liability on PSSI by asserting that it violated the law by employing minors when, by the Secretary's own statements, the Secretary himself *only* identified that some individuals were minors by extraneous third-party measures including

examining school records, speaking to school officials, interviewing parents, looking at certain government records not available to an employer, and engaging in other efforts not required by the law and outside the normal hiring process for any business employer. There is no recognition of any knew or should have known standard, even though PSSI has a strict no-minor hiring prohibition, employs robust hiring practices, and utilizes a number of audit internal (*e.g.*, Compliance Department audits) and external audit functions (*e.g.*, outside law firm audits) to ensure compliance with the law.

Additionally, a PI would damage PSSI's reputation, painting a responsible and upstanding company in a highly unfair and unfavorable light. It would jeopardize relationships with customers and employees. The harm that has already been inflicted on PSSI by the issuance of the TRO is not only palpable but undeniable, as even a cursory review of the Internet demonstrates. The TRO caught the attention of virtually every major media outlet (print, television, online, etc.), and the Secretary's staff bated the situation with unwarranted and inaccurate statements like the one made by Wage and Hour Regional Administrator Michael Lazzeri in Chicago who said, "Taking advantage of children, exposing them to workplace dangers – and interfering with a federal investigation – demonstrates Packers Sanitation Services Inc.'s ***flagrant disregard for the law and for the well-being of young workers.***" [*See, e.g.*, https://nypost.com/2022/11/12/packers-sanitation-services-accused-of-employing-children-for-graveyard-shifts/ (emphasis added)].

The "balancing of harms" factor favors PSSI, and no PI should issue based on the competent record.

4:22-cv-03246-JMG-SMB   Doc # 38   Filed: 12/02/22   Page 30 of 42 - Page ID # 543

C.     **THE RECORD FAILS TO DEMONSTRATE THE REQUISITE PROBABILITY OF PREVAILING ON THE MERITS**

"In deciding whether to grant a preliminary injunction, 'likelihood of success on the merits is most significant.'" *S.J.W.,* 696 F.3d at 776 (citations omitted). As was the case in *S.J.W.*, the likelihood of success will turn on the applicable standard. *Id.*

The Secretary relies on the supposed "strict accountability" standard in *Lenroot v. Interstate Bakeries Corp.*, 146 F.2d 325, 328 (8th Cir. 1945) [Filing #3, p.39]. But, there, the hiring occurred at the local level with the employer having no strong processes and failing to employ checks and balances; they employer had also been put on notice of the employee's ages. 146 F.2d at 326-27.[10] That situation is wholly different than the situation here. The Eighth Circuit held the employer liable for the knowing violations of its subordinate managers. That is, by definition, *respondeat superior* liability.

To establish a likelihood of success on the merits, the Secretary must demonstrate a likelihood that he will succeed on all elements of his claim.

The relevant inquiry is whether the "employer either had knowledge that minors were illegally in his employ, or else had 'the opportunity through reasonable diligence to acquire knowledge.'" *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 512 (5th Cir. 1969) (citations and quotations omitted). Even *Lenroot* acknowledges the concept of knowledge, noting that the "duty rests on the employer to inquire into the conditions" and that there can be occasions (albeit rare) where the consequences of prohibited work being done can be avoided. 146 F.2d at 328. And, the DOL's own ALJs apply the same knowledge requirement for FLSA child-labor violations. The ALJs have repeatedly held that an employer cannot be held liable unless it knew or should have

---

[10] The employer in *Lenroot* did not even contest the violations but only argued no injunction should issue. 146 F.2d at 326-27.

30

known the minor's status including where the employer reasonably relied on presumably false documentation submitted by the employee. *See, e.g.,* ALJ's Decision and Order, *Progressive Protein*, *LLC,* Docket No. 2010-CLA-5 (Dep't of Labor 2011) (emphasis added) (employer liable because it knew or should have known employee was a minor, **noting had employer "conducted even a cursory investigation – something as simple as checking [the employee's] Social Security number in the E-Verification system \* \* \* – it would have known he was underage and never would have hired him"**)[11]; ALJ's Decision and Order, *Southern Rock & Lime, Inc., et al.*, Docket Nos. 2007-CLA-24 & 2007-CLE-25 (Dep't of Labor 2010) (employer cannot be charged with child labor violations where it reasonably relied on presumably false identification documents provided by employee); ALJ's Decision & Order, *Root's Restaurant, Inc.*, ALJ Nos. 78-CL-403, 23 WH Cases 1260 (Dep't of Labor 1978) (citing *Lenroot*; employer "had or through reasonable diligence could have acquired knowledge" that minors were employed); ALJ's Decision & Order, *Winchell's Donut House,* Docket Nos. 78-CL-347, 23 WH Cases 1250 (Dep't of Labor 1978) (employer "knew or through reasonable diligence could have acquired knowledge that minors under the age of 18 were employed").[12]

In further demonstration of PSSI's compliance with best practices to verify the identification of employees, as well as its lack of knowledge of violations, the Court should look to the *Progressive Protein, LLC* administrative enforcement matter. In that case, an ALJ found a Nebraska meat-packing employer violated the child-labor provisions because it "had reason to believe that [the employee] was younger than 18 and it should have undertaken further efforts to determine his actual age." 2010-CLA-5, at \*12. The ALJ found the employer relied on the

---

[11] In fact, it was the Secretary who argued that the employer should have "run an E-Verify report." 2010-CLA-5 at Page 13.

[12] All ALJ decisions are provided for the Court with this submission as Exhibit 12.

employee's claimed age and did not require him to produce identification showing his age. Notably, the Secretary argued the employer should have "run an E-Verify report" to verify the employee's age. *Here, PSSI has a strict no-minor hiring policy, mandates the individual's "18 or over" attestation, requires age identification of age, and "runs an E-Verify report" for every single employee exactly as the Secretary suggests in Progressive Protein.* PSSI clearly acted with reasonable diligence to investigate the age of its employees.

The Secretary should not and will not prevail absent proof that PSSI knew or should have known that it was illegally employing minors. That proof does not exist. The Secretary has not even pled this required element of the claim. The "merits" factor weighs in PSSI's favor.

**D.** **PUBLIC INTEREST FAVORS FUNDAMENTAL FAIRNESS AND DUE PROCESS, PARTICULARLY WHERE THE RECORD SHOWS THE PUBLIC INTEREST IN PROTECTING CHILDREN AND PREVENTING OPPRESSIVE CHILD LABOR IS BEING SERVED**

The record shows that the public interest in preventing child labor is being served. The Secretary identified 10 employees by name and PSSI promptly terminated the employment of the minors that were identified and working at a PSSI facility. PSSI prohibits the employment of minors, and, as said *ad nauseum* above, it uses reasonable efforts including government-sanctioned procedures and systems to enforce its prohibition. Although not required under the law, PSSI even recently instituted additional efforts in an attempt to further preclude the employment of minors. The Secretary established no ongoing violation. The public interest regarding child labor is served.

But there is an important public interest that is only served if the Secretary's PI motion is denied, and that is the public's constitutional interest in ensuring due process and fundamental fairness control these proceedings. An issuance of a PI on the Secretary's thin and incompetent record, when the Secretary refuses to provide underlying data and PSSI is being deprived of its *constitutional right to due process* and to fairly and adequately meet the substance of the

allegations, should frighten any member of the public and certainly every responsible employer in the country.

The "public interest" factor weighs in PSSI's favor.

**E.**     **THE INFORMANT'S PRIVILEGE CANNOT BE USED AS A SHIELD AND A SWORD: THE CLAIMED EVIDENCE CANNOT BE CONSIDERED**

The Secretary asserts an "informant's privilege" as a basis for refusing to provide any underlying data that supports the bald assertions in his declarations. [Filing #14, p.5] The Secretary's counsel refused to provide any supporting data, even data not covered by the informant's privilege. [Dalin Decl., Ex. C ("[W]e will not provide any underlying documentation about any of the minors"] Rather than submit supporting evidence, the Secretary claims it is privileged but then uses it against PSSI through the investigators' hearsay descriptions of the alleged evidence. The Secretary simply cannot withhold evidence and rely on a conclusory summary of it. He cannot use the informant's privilege as both a sword and a shield. *See Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1213 (8th Cir. 1973) (discussing informant's privilege); *see also Benson v. City of Lincoln,* Case No. 4:18CV3127, 2022 WL 426563, at *5 (D. Neb. Feb. 11, 2022) (party cannot use attorney client privilege "as both a shield and a sword" by claiming in his defense that it relied on counsel's advice while claiming that advice is privileged).

Moreover, the informant's privilege protects nothing more than the informant's identity and the documents that would tend to reveal the informant's identity. *Roviaro v. United States*, 353 U.S. 53, 60 (1957) ("The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged."). In other words, the Secretary cannot invoke the informant's privilege as a comprehensive protection against producing any underlying data behind

his conclusory allegations. His blanket invocation of the privilege in support of his abject failure to produce any supporting documentation is misguided and wrong.

The Secretary is trying to do here what he was admonished for doing in another district court just a year ago. In *MedStaffers*, the Secretary filed a Complaint alleging violations of the FLSA. 2021 WL 5505825, at *1. At the same time, the Secretary filed a TRO and PI motion to enjoin the employer from retaliating against employees and interfering with the Secretary's investigation. *Id.* He claimed an informant's privilege to keep the witnesses anonymous. *Id.* at *4-5. The district court correctly observed the Secretary cannot "wield" the privilege in this manner, noting:

> Secretary Walsh cannot have his cake and eat it too. The Department has a choice when it comes to the informer's privilege: it can invoke the privilege and keep the information to itself, *forgoing reliance on that evidence to meet its burden of proof*, or it can waive the privilege and enter the information into evidence … *What the Department cannot do is pursue the extraordinary remedy of a preliminary injunction by relying on evidence it refuses to disclose to defendants*. Accordingly, we will not consider the materials submitted to the court *in camera* in our preliminary injunction ruling.

*Id*. at *5 (emphasis supplied).

The Secretary has chosen to rely on a narrow privilege to withhold all of his evidence and, therefore, his motion fails. He cannot through non-disclosure and concealment of evidence fail to provide the necessary identification of all the alleged minors and underlying documents and information that enable PSSI to mount a meaningful defense to the allegations asserted in support of the Secretary's PI motion. *See, e.g., Brennan v. Engineered Prod., Inc.,* 506 F.2d 299, 302 (8th Cir. 1974) ("the privilege is a qualified one" which "must give way when the defendant's need for the information outweighs the government's interest in protecting the source and in gathering the information"); *Tumey,* 27 F.4th at 666 (8th Cir. 2022) (although defendant had opportunity to participate in adversarial hearing in sense that it could cross-examine plaintiff's witnesses and

present its own evidence, the government hampered its ability to mount a defense by the non-disclosure and concealment of evidence, eradicating "a meaningful opportunity to defend against that evidence prior to the issuance of a preliminary injunction"); *MedStaffers*, 2021 WL 5505825, at *5 (M.D. Pa. Nov. 24, 2021) ("serious fairness concerns" exist when the Secretary blocks defendant from discovering information necessary to respond to a motion for PI based on the assertion of an informant's privilege).

The Secretary also fails to make the fundamental and required showing to invoke the informant's privilege. To assert a governmental privilege, the Secretary must follow the U.S. Supreme Court's edict. Specifically, "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual consideration by the officer." *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953); *see also Martin v. Albany Business Journal, Inc.* 780 F. Supp. 927 (N.D.N.Y. 1992) (collecting cases). The Secretary must lodge the formal privilege claim through an affidavit or declaration: (1) made by the high-level agency official having the requisite authority; (2) containing a description of the privileged material sufficient enough to permit determination as to whether the privilege is properly asserted; (3) stating the reasons why disclosure of the materials would cause harm; and (4) verifying the privilege invocation is based on delegated official's personal consideration. *See* 71 Fed. Reg. 67024 "Secretary's Order 16-2006; Invoking Governmental Privileges" (setting forth the requirements). Having failed to this, the Secretary has waived the privilege, and none of his evidence may be used to support his motion. *MedStaffers*, 2021 WL 5505825, at *5.

Furthermore, because the asserted privilege is not applied the same in every jurisdiction in the country,[13] a nationwide injunction cannot issue as this Circuit's law cannot be extended to other circuits; indeed, to do so would violate comity and encourage improper forum shopping and the other serious concerns. *See United States v. AMC Entertainment, Inc.*, 549 F.3d 760, 770, 773 (9th Cir. 2008) (citations omitted) ("Courts ordinarily should not award injunctive relief that would cause substantial interference with another court's sovereignty[;]" discussing principles of comity and that tensions between circuits encourages forum shopping).

Not only does the above analysis require the Court to essentially disregard all of the Secretary's declarations, but also, this Court should reject the declarations where they relate to "controverted factual issues" and require the Secretary to present "oral testimony which may be subjected to the test of cross-examination." *See Wounded Knee Legal Defense/Offense Committee v. FBI*, 507 F.2d 1281, 1287 (8th Cir. 1974) (citation omitted). Due process and fundamental fairness cry out for the Secretary's provision of discovery (including depositions of his declarants) and an evidentiary PI hearing with the Secretary's live presentation of his witnesses for PSSI's cross-examination.

In short, when the Court strips the Secretary's record accordingly, at best, only thin allegations remain that fail to establish the Secretary's heavy burden to obtain such extraordinary and drastic relief as that sought here on a nationwide basis.

---

[13] *See* E. Wohl, *Confidential Informants in Private Litigation: Balancing Interests in Anonymity and Disclosure*, 12 Fordham J. Corp. & Fin. Law 551, 560-61 (2007) (discussing different circuit applications).

F.       **THE RECORD DOES NOT WARRANT THE REQUESTED ORDER**

     *1.     The Court Cannot Enter a PI Order regarding PSSI's Alleged Interference, Because that Claim is Not Part of The Secretary's Complaint and Further, the Evidence Belies Such Assertion*

At the outset, the Secretary's Complaint controls this lawsuit and he brought only *one* cause of action for alleged violation of the FLSA's child labor provisions. [Filing #1, p.6, ¶¶25-26] He never alleged facts regarding any claimed interference and never asserted a cause of action under Section 11(a) of the FLSA. The Court cannot enter a PI regarding PSSI's alleged interference, because that matter is outside the issue in the Compliant. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally. The injunction in question is not of this character. It is not an injunction in the cause, and it deals with a matter lying wholly outside the issues in the suit.") In point of fact and law, the Secretary can neither seek nor obtain the requested relief in paragraphs 2 and 3 of his motion. [Filing #2, p.2, ¶¶2-3]

Moreover, and as an independent reason for denial of PI relief regarding alleged interference, the Secretary has failed to make "a ***clear showing*** that [he] is entitled to such relief." *See Winter,* 555 U.S. at 22 (emphasis added) (burden to make clear showing). Indeed, the Secretary unequivocally admitted that "in fact, no PSSI employee denied access to any such records[,]" and his very declarations are replete with examples of tours being readily conducted, answers being provided, documents being examined, copied, and even removed from the premises, interviews being conducted, and 225 GBs of data consisting of the functional equivalent of 100 million pages being furnished.

The claimed interference is nothing more than isolated instances of human nature and not unexpected initial reactions from lower-level employees who are uncertain what to do when the

government shows up after midnight and disrupts business operations. It is far from representative of PSSI's response as a whole. The two alleged instances of information purportedly being deleted amount to rank speculation unsubstantiated by any forensic examination proffered by the Secretary but wholly controverted by PSSI's expert forensic declaration. The employee whom DOL insinuates deleted WhatsApp messages swears that she did no such thing. [Decl. of Ayala, ¶10] Moreover, as she attests, the Secretary's investigator confiscated her phone. *Id.* at ¶¶ 8-9. If the Secretary had any evidence that she deleted anything, the Secretary should put the forensic evidence before the Court. The employee whom the Secretary insinuates "deleted" items from his laptop computer did no such thing. [*See* Doc. 3-13 ¶9; Kalat Decl. ¶23] Again, it is telling that the Secretary's investigators accessed and copied the laptop (*Id.*), but he puts no forensic evidence before the Court to show that any files were deleted. In fact, no files were deleted from the computer, as a third-party independent forensic examination of the computer proves. [Kalat Decl. ¶23] The Secretary's investigators also seized other phones and copied other computers. [Rodriguez Decl. ¶13; Ramirez Decl. ¶7] PSSI did not block the Secretary from obtaining these electronics. And, undeniably, both in response to the warrants and thereafter including post-suit, PSSI has continued to cooperate. The Secretary's insinuation to the contrary is abject speculation[14] failing to support the issuance of a PI order.

It is likewise worth noting that the Secretary's request to enjoin PSSI from "refusing to provide information to the Department of Labor in aid in its investigation" [Filing #2, p.2, ¶2] is out of line. The claimed refusal inaccurately attributed to PSSI is wholly controverted by: (1) PSSI's provision of significant information pursuant to the warrants – not the least of which were

---

[14] An example of overt speculation advanced by the Secretary is his admission that investigators could not hear the cafeteria discussions but his insinuation that something nefarious transpired. That is the definition of rank speculation.

225 GBs of electronic data from the headquarters, never mind all the information and documents (*e.g.*, hard copies of binders PSSI let the Secretary take from the worksites) obtained from the three worksite warrants; and (2) significantly, PSSI's stated willingness to continue to cooperate and its voluntary provision of additional information. But separate and apart from that, when the Secretary initiated suit, the Federal Rules of Civil Procedure control and they prescribe the proper procedures for gathering additional information. The Court cannot permit the Secretary to circumvent longstanding and governing discovery rules by securing an order that forfeits PSSI's rights to object under the law and the rules and proceed as provided by them. Moreover, Fed. R. Civ. P. 26 fails to contain the discovery standard the Secretary seeks, namely any information that he deems would "aid" him.

2.      ***The Court Cannot Enter a Nationwide PI Order When the Secretary's Evidence is Sparse at Best and The Assertion of a Nationwide Alleged Problem Involves Pure Conjecture***

In addition to the fact that the Secretary failed to carry his heavy burden to establish the four factors for "nationwide" injunctive relief, overarching considerations also bar the requested remedy.

First, the Secretary requests unwarranted relief. Even if, despite the Secretary's failure to provide the underlying, supporting document, the Court could consider the declarations claiming PSSI employs minors at locations in Nebraska and Minnesota, that purported evidence applies to three locations out of over 400 locations, hardly a basis for a nationwide injunction. Moreover, the Secretary's silence on its Sedalia warrant investigation supports the only reasonable conclusion that no alleged child labor violations were found at that location. Further, the Secretary admits having just begun a "cursory review" of the headquarter records and only speculates – without providing a lick of underlying evidentiary proof – that PSSI may be employing minors at other

locations based on alleged inconsistent birthdates and some photographic appearances. [Filing #3-7, p.4-5, ¶¶12, 14]. Despite getting negotiated information for 50 locations, the Secretary never supplemented the record with evidence of any alleged problem at any of the 47 remaining locations. The Secretary's stated nationwide concerns rest on pure conjecture and fails to meet his **heavy** burden of making a ***clear showing*** necessary to obtain drastic and extraordinary nationwide relief. *See AMC Entertainment, Inc.*, 549 F.3d at 770 (warning against injunctive relief that would substantially interfere with another court's sovereignty).

Despite the apparent perfection the Secretary seems to seek, the law does not require PSSI to be infallible. PSSI is doing everything it reasonably can to comply with the law, and, under the circumstances, the Secretary's request for nationwide relief is absurd.

## **CONCLUSION**

The Secretary's ill-advised motion fails as a matter of law and must be denied in its entirety. It is time for the Secretary to focus his efforts on helping a well-intentioned company, desirous of working with the Secretary to eradicate any remaining alleged child-labor problems. The Court must deny the Secretary's motion in its entirety and lift the TRO.

Respectfully submitted,

/s/ J. Randall Coffey
J. Randall Coffey
**FISHER & PHILLIPS LLP**
46 Penn Centre
4622 Pennsylvania Avenue, Suite 910
Kansas City, MO 64112
Phone: (816) 842.8770
Facsimile: (816) 842.8767
Email: rcoffey@fisherphillips.com

Patrick M. Dalin
**FISHER & PHILLIPS LLP**
Two Logan Square
100 N. 18th Street, 12th Floor
Philadelphia, PA 19103
Phone: (610) 230-6112
Facsimile: (610) 230-2151
Email: pdalin@fisherphillips.com
*Admitted Pro Hac Vice*


And

Gillian G. O'Hara # 22414
**KUTAK ROCK LLP**
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
Phone: 402.346.6000
Facsimile: 402.346.1148
Email: gigi.ohara@kutakrock.com

ATTORNEYS FOR DEFENDANT
PACKERS SANITATION SERVICES,
LLC.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with NE Civ. R. 7.1(d)(3) and further certify that the function was applied to all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft Word for Office 365 and contains 12,157 words.

*/s/ J. Randall Coffey*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 2nd day of December, 2022, the foregoing was filed via the Court's Electronic Filing System and service made via the same, to:

Ambriel Renn-Scanlan
Traci Martin
Laura O'Reilly
U.S. Department of Labor
Office of the Secretary
2300 Main Street, Suite 10100
Kansas City, Missouri 64108
Phone: 816.285.7260
Email: renn-scanlan.ambriel@dol.gov
Email: martin.traci.e@dol.gov
Email: oreilly.laura.m@dol.gov

Counsel for Plaintiff

*/s/ J. Randall Coffey*
Counsel for Defendant