U.S. Department of Labor

Office of Administrative Law Judges

800 K Street, NW, Suite 400-N

Washington, DC 20001-8002

(202) 693-7300

(202) 693-7365 (FAX)

Issue Date:

14 October 2011

Case Number: 2010-CLA-00005

In the Matter of:

Administrator, Wage and Hour Division, United States Department of Labor, Plaintiff,

v.

Progressive Protein, LLC, Respondent.

Appearances: Andrea Luby, Esq.
Malinda Schoeb, Esq.
U. S. Department of Labor
Counsel for Plaintiff

Randy L. Goyette, Esq.
Torrey L. Janus Gerdes, Esq.
Counsel for Respondent

Before: Stephen L. Purcell
Chief Administrative Law Judge

### *Decision and Order*

This case arises under the Fair Labor Standards Act of 1938 (FLSA), as amended, 29 U.S.C. § 216(e) , and the regulations at 29 C.F.R. Parts 579 and 580 .



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**// PAGE 1**

## I. Statement of the Case

On May 8, 2009, Miguel Herrera Soltero ("Soltero"), a seventeen year old high school student, died from injuries sustained when a forklift that he was operating as an employee of Progressive Protein, LLC ("Respondent" or "Progressive Protein") overturned. As a result of Soltero's death, the Wage and Hour Division ("WHD") of the United States Department of Labor ("DOL"), conducted an investigation into Respondent's employment practices under the Fair Labor Standards Act ("FLSA"). Following the investigation, DOL notified Respondent on **[*2]** February 2, 2010, of a civil money penalty assessment in the total amount of $100,000.00 for alleged violations of the child labor provisions of section 12 of the Act and the regulations issued thereunder. The Secretary of Labor ("Secretary") alleged that Respondent violated Hazardous Occupation Order ("H.O.") 7, 29 C.F.R. § 570.58 , by allowing a 17-year-old employee to operate a forklift and violated H.O. 10, 29 C.F.R. § 570.61 , by employing this minor in the meat packing industry. Respondent filed a timely exception to the assessed civil money penalty on February 12, 2010, causing the matter to be referred to the Office of Administrative Law Judges for hearing.

A formal hearing was held on the merits in Omaha, Nebraska on June 14, 2011. Plaintiff and Respondent appeared at the hearing, represented by counsel. All parties were afforded a full opportunity to adduce testimony, offer documentary evidence, submit oral arguments, and file post-hearing briefs. Stipulations 1 through 21 were admitted as Exhibit 1. Plaintiff's Exhibits ("PX") 1-18 and Respondent's Exhibits ("RX") 1-3 were also admitted into evidence. Posthearing briefs were received from both parties.

The findings of fact and conclusions of law contained herein are based upon my analysis of the entire record, the arguments of the parties, the applicable regulations, statutes, and case law, and my observation of the demeanor of the witnesses who testified at the hearing. Although not every exhibit in the record is discussed below, each was carefully considered in arriving at this decision.

## II. Summary of the Evidence

A. Stipulations and Admissions

At the hearing, Progressive Protein admitted that it is a rendering plant as defined by 29 C.F.R. § 570.61(b)(2) . Stipulation ("Stp.") 2. Progressive Protein stated that its gross volume of sales for fiscal year 2009 was $8,936, 950.20. Stp. 10.

Respondent admitted that it hired Miguel Soltero on March 27, 2009, requiring him to present two forms of identification to complete an I-9 form. Stp. 15. Soltero presented a school activity card for the 2008/2009 school year that showed he was a junior in high school at the time it was issued. He also submitted a Social Security card. Neither form of identification included a birth date. On his I-9 form, Soltero indicated that his birth



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

date was July 26, 1988. Stp. 16.

The parties stipulated that Soltero was hired to clean out tubs/combos at the Progressive Protein facility and that he received safety training upon being hired, which included training regarding Progressive Protein's policy related to the use of forklifts. Stp. 18, 24.

On May 8, 2009, the night of the accident, the crew working second shift included: Miguel Soltero, tub washer; Chris Davis, working the dumper; Mark Kirscheval, tub washer; Ricardo Leon Mata, maintenance; Kevin Morley, forklift driver; and Derek Janidlo, second shift lead man and cooker. Stp. 25. At approximately 10:30 p.m., Soltero attempted to drive a forklift **[\*3]** down a ramp. Stp. 29. It veered to the east side of the ramp and rolled over, crushing and ultimately killing Soltero. Stp. 30. At the time of the accident, Soltero was not wearing a seatbelt. Stp. 31.

## B. Witness Testimony

### Derek Janidlo

Derek Janidlo testified that he worked second shift at Progressive Protein as a supervisor for ten months from October 2008 to July 2009. Tr. 43. He explained that he worked with Managers Sandy Walker, Bill Ryan, and Mike Rempe, but when none of them were present, he was in charge. Tr. 44. He testified that he thought Soltero was twenty years old, which was based on what he had heard around the office. Tr. 80-81.

Janidlo explained the production process as follows: the trucks arrive with containers of animal fat, which are removed from the trucks by forklift and placed on a hopper (also called hydraulic lifts or dumpers) and weighed; the operator slowly raises the product off the hopper and feeds it onto a conveyor belt, which takes the product to be ground and cooked, and then moved to the decanter or centrifuge, which separates the animal fat into water and oil to be sold to companies for further processing; the forklift driver takes the empty containers to the wash station to be cleaned; once cleaned, the containers are placed back onto the truck by the forklift operator. Tr. 46-51; 128-132.

Janidlo testified that Kevin Morley was solely responsible for operating the forklift to unload containers from the trucks. Tr. 47. However, he explained that there were five or six people on second shift and while each person had a specific job, he had cross trained people, which management encouraged, so that they could fill in for each other if someone was out. Tr. 60. Janidlo testified that he was approached by Soltero about learning to operate the forklift a few weeks after he started work at the plant. Tr. 64. Janidlo asserted that he started training Soltero by explaining how everything worked: how the levers worked, the proper position, the breaks, and the importance of wearing a seatbelt. Tr. 66. He said that they worked together about a half dozen times in the course of two or three weeks and that he was starting to feel pretty good about Soltero's potential ability to become an operator. Tr. 67.



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**// PAGE 3**

Regarding the night of the accident, according to Janidlo, it was near the end of the shift and the crew was cleaning up and trying to figure out how to dump rancid liquid that was sitting in a vat with no rollers on it. Tr. 69-70. Janidlo testified that he asked Mata and Davis to get a bobcat (a front-end loader with a bucket on the front of it) to pour the liquid into a bucket so that they could dump the bucket into the garbage container outside. Tr. 70-71. He said that after he asked these men to dump the vat, he went back to work. Janidlo testified that shortly thereafter he heard a scream, and then he ran outside and saw the forklift on its side with Soltero under it. Tr. 72, PX 7.

### [*4] Christopher Joseph Wayne Davis

Davis testified that he worked at Progressive Protein from December of 2008 until September of 2010 on second shift as a tub washer with Soltero. Tr. 97-100. He said Soltero arrived an hour later than the rest of the crew because he was still in school. Tr. 116. Davis testified that Soltero had told him that he was twenty and he remembers joking around and telling him that soon he could get into bars and strip clubs. Tr. 123.

Davis said that he had occasionally seen Soltero train on the forklift at the end of their shifts. Tr. 114-115. Davis stated that on the night of the accident he heard a fork scrape the concrete and then turned around to see the forklift tipping over. Tr. 119.

### Ricardo Leon Mata

Ricardo Leon Mata represented himself to others as Soltero's "step-father."[1] He worked as a mechanic on second shift at Progressive Protein for about a year in 2009. Tr. 101-102. He said that he helped Soltero get a job at Progressive Protein and that he only saw Soltero operating a forklift once or twice. Tr. 103, 110. Mata testified that he thought Soltero was twenty years old based on how he looked. Tr. 108. He said that Soltero had an I.D. showing he was of legal age and that they did not have very good communication so they did not talk about personal issues. Tr. 108-109.

According to Mata, just before the accident, he had been helping with clean-up when he asked where Soltero was. Tr. 104. He testified, "at that moment I saw a light at the end of the ramp and it was down, and I noticed that the cage from the forklift had pinned [Soltero] on his back." Tr. 105. Mata said that Kevin Morley called 911 and he asked him to bring another forklift, which he used to lift up the cage to get Soltero out. By the time that happened, however, it was too late to save Soltero. *Id.*

### Henry Walker

Henry Walker, who also goes by Sandy Walker, has been the Production Manager at Progressive Protein for about three years. Tr. 126. He testified that he does safety orientation for new hires and



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

trained Soltero according to Progressive Protein's Safety Orientation Checklist. Tr. 140-141, PX 5. He confirmed that Progressive Protein had a policy in place that minors could not work at the plant. Tr. 147, PX 6. Walker testified that he hired Soltero and copied his school I.D. card and social security card for the company's records. Tr. 133-136, PX 3. Walker confirmed that although every other employee had an identification card that reflected the employee's date of birth in the company's records, neither of the identification cards that Soltero provided included his date of birth. Tr. 140, PX 4.

[*5] Walker stated that Mata, Soltero's step-father, told him that Soltero was twenty years old when they were discussing having him come to work for Progressive Protein. Tr. 164. He asserted that he never authorized Soltero to operate a forklift or gave him any training. Tr. 168. Walker explained the policy and structural changes that Progressive Protein made after Soltero's death to improve safe practices and prevent a future incident. Tr. 172.

On the First Report for Injury and Illness form filled out after Soltero's death, Progressive Protein listed Greater Omaha Packing Co., Inc. as holding its workers' compensation policy. Tr. 150. Walker testified that he has been working for Progressive Protein since it was formed in 2008. *Id.* Prior to that, he worked at Greater Omaha, a meat processing plant, for twenty-four years where he was the Plant Manager. Tr. 151. Walker stated that Henry Davis, whom he has worked with for twenty-seven years, is the President and Chief Operating Officer of Greater Omaha and owns Progressive Protein. Tr. 155. Walker testified that Davis asked him to leave Greater Omaha and help him start up Progressive Protein. *Id.* He said that before the facility housed Progressive Protein it was used as a slaughter plant for Greater Omaha. Tr. 156. He stated that in May 2009, all of the raw material came from Greater Omaha and at present about seventy-five percent of raw materials come from Greater Omaha. Tr. 157.

***Mike Rempe***

Mike Rempe is the President and Chief Executive Officer of Progressive Protein. He confirmed that according to a balance sheet dated October 30, 2010, Progressive Protein had $175,245.55 in its checking account, more than a million dollars in assets, more than $8.5 million in fixed assets, and total liabilities of $762,000. Tr. 181-182, PX 14. Rempe stated that Progressive Protein has spent over $8 million on plant equipment, which includes centrifuges, conveyors, boilers, electric, rail buildings, and forklifts, which will all depreciate over time. Tr. 203. Rempe further testified that Progressive Protein has not made any profit since operations began, since its operational costs exceed revenue from sales. Tr. 207.

Rempe confirmed that Greater Omaha was listed as the insured for Progressive Protein's workers' compensation report filled out after the accident, but alleges that this was probably an error. Tr. 185, PX 15. He also confirmed that the amount of money that Progressive Protein pays for the raw


© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

materials it receives from Greater Omaha appears on Progressive Protein's income statement as "Purchase In-House." Tr. 195. He explained that there is a distinction between Greater Omaha and other entities because they wanted to try to isolate profitability from the one known source they had from outside sources so they could analyze how they are doing. Tr. 212-213.

### [*6] *Henry Davis*

Henry Davis owns Greater Omaha Packing Company, and holds the titles of President and Chairman of the Board. Tr. 218-219, 227. He stated that Greater Omaha has 847 employees and has sales of over 900 million dollars. Tr. 219. He confirmed that Greater Omaha still owns the building where Progressive Protein is located. Tr. 222.

Davis testified that Greater Omaha is a sub-chapter S corporation and Progressive Protein is an LLC. Tr. 227. He asserted that Progressive Protein does its own payroll and accounting and has its own management team. Tr. 228. He said that other than recommending Sandy Walker for employment with Progressive Protein, he has had no involvement with its operations. Tr. 231.

### *Billy Pete Ryan, Jr.*

Billy Ryan testified that he is the General Manager at Progressive Protein and has been working in the meat industry since 1976. Tr. 306. He stated that he did not know Soltero was operating a forklift prior to the accident. Tr. 309.

### *Thomas F. Phelan*

Phelan is an Investigator with the U.S. Department of Labor, Wage and Hour Division, a position he has held for over twenty-two years. Tr. 233. He said that he investigates statutory violations of the Fair Labor Standards Act, as well as several other wage and labor laws. Tr. 234. He testified that upon investigating Progressive Protein, he determined the company had violated Hazardous Orders 10 and 7, which prohibit minors from working in a rendering facility and operating a forklift. Tr. 250, 252.

Phelan said that he made a recommendation for an assessment of a civil monetary penalty, but did not make a determination of the penalty. Tr. 265-266. Phelan testified that the report of occupational injury that he saw listed Greater Omaha for the insured's name. Tr. 238, PX 12. He said he also used Nebraska's Workers' Compensation Court's website to try to determine the owner of the policy, and when he tried to search for a policy using Progressive Protein's name and employer identification number, he could not find anything. Tr. 238-239, 241, PX 13. However, he testified that when he tried searching for a policy using the name of Greater Omaha, he found information that matched the workers' compensation policy information on the report relating to



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Soltero's injury. Tr. 241-242, PX 13.

**[*7]** *Arthur M. Kerschner, Jr.*

Arthur Kerschner is the Chief of the Wage and Hour Division Branch of Child Labor and Special Employment, and has been in this position since 1994. Tr. 270. He explained that the Genetic Information Non-Discrimination Act recently passed by Congress increased the amount of money the Department of Labor can assess for civil money penalties for violations of Child Labor Laws that cause the serious injury or death of any employee under eighteen years of age. *Id.* He testified that the penalty for such violation is $50,000, which can be doubled if the violations are determined to be willful or repeated. Tr. 271, PX 17. Kerschner testified that he gave approval for the assessment of two $50,000 penalties in this case. Tr. 271.

Kerschner referred to causation as described in Wage and Hour Division Field Assistance Bulletin No. 2010-1, which states "Causation can be found if the death or serious injury occurs when the youth is employed in a workplace that has been specifically found by the Secretary to be hazardous." He explained that the Secretary's determinations are based on such factors as "the potential for injury or death arising from such things as environmental factors, the presence of power-driven equipment, the size of the workforce, the presence of toxic materials and industry specific occupation death and injury statistics." PX 17-2. He explained that when an entire industry is banned, regardless of the reason, the Wage and Hour Division finds that the cause of the accident was that the under-aged workers were working in a completely prohibited industry. Tr. 276.

Kerschner explained that under the regulations, a penalty is assessed for each violation. He again referred to the bulletin, which states "For each child labor violation occurring after May 20, 2008 that causes the death of a minor employee, the WHD will generally assess a Child Labor Civil Money Penalty ("CL CMP") of $50,000." PX 17-4.

Kerschner testified that he considered the factors listed in 29 C.F.R. § 579.5 when he approved the penalty in this case. Tr. 279. He said that the Department considered the annual dollar volume of the business, which he thought was five million dollars at the time, and the total sales of the firm.[2] Tr. 279. He said that according to the bulletin, WHD will generally only reduce a penalty when the employer's gross annual dollar volume of sales does not exceed $1,000,000. PX 17-5. Kerschner said that the company's annual dollar volume was more than five times the amount justifying consideration of a reduction and that a five million dollar firm is not a small business. Tr. 280. He also reviewed Progressive Protein's balance sheet, which showed that their total assets are $9.6 million. *Id.* He explained that for an assessment of money penalties, Progressive Protein far exceeds the general measure and he cannot see a situation where they would ever provide a small business reduction for a company with such assets. Tr. 281. Kerschner said that WHD does not



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**// PAGE 7**

consider a company's profitability because it is not a measure of the funds moving through a company. Tr. 300. He explained that profits can be consumed by depreciation or by excessive salaries to the board and **[*8]** management. Kerschner also indicated that they do not consider the number of employees for penalty assessment unless the first threshold is met, *i.e.*, that the company's sales are below one million dollars. Tr. 282. He said that this has been WHD's process for 25 years and is explained in the WHD bulletin. *Id.* Further, he explained that the risk for youths employed in rendering plants stems directly from the fact that they have small workforces, as discussed in the Hazardous Order. Tr. 282-283.

With regard to intent, Kerschner explained that willfulness can double a penalty, but lack of intent does not justify reducing a penalty under the Act. Tr. 283. Kerschner testified that it is also irrelevant that Soltero and his step-father misled the company about Soltero's age. Tr. 283-284. He explained that the only protection a firm can have in this circumstance is if they had a properly issued age certificate, which they did not. Tr. 284. He also said that precautions to avoid future violations did not factor into the penalty assessment because none of the precautions related to age verification. Tr. 285.

### Livier Soltero Cardenas

Livier Soltero Cardenas is Soltero's mother. She testified that Soltero was born on July 26, 1991, and that he attended Omaha Street School while he worked for Progressive Protein. Tr. 27-28; PX 19. Ms. Soltero further testified that Soltero told her before his death that he might be laid off because he was not of age. Tr. 41.

### John Parsons

John Parson is the Executive Director of Omaha Street School, a school which takes students who have been unsuccessful in traditional learning environments. Tr. 88. He testified that Soltero was a student at Omaha Street School and he or his wife usually drove Soltero to his job at Progressive Protein when school finished at 2:30. Tr. 90. Parsons authenticated Soltero's application to school, a form signed by Soltero's mother allowing the school to provide records to the Department of Labor, and a copy of those records. He testified that Soltero's records indicate that he was seventeen years old. Tr. 90-91, PX 1.

### III. Summary of the Parties' Argument

*A. Plaintiff's Arguments*

Plaintiff argues that there is undisputed evidence that Progressive Protein violated Hazardous Occupation



Orders 10 and 7, which prohibit minors from working in a rendering facility and operating a forklift. Plaintiff's Brief ("Pl. Br.") at 9, 33. For H.O. 10, Plaintiff asserts that Progressive Protein admitted that it employed Soltero at its rendering plant and that his birth certificate and his mother's testimony establish that he was only seventeen years old at **[\*9]** the time of his employment. Pl. Br. at 10. Plaintiff argues that Progressive Protein's claim that it was unaware of Soltero's age provides no defense, and that Respondent fell short of its duty to inquire into the conditions prevailing at its business when it relied on Soltero's "step-father's" statement that he was twenty. *Id.* Moreover, Plaintiff asserts that Progressive Protein knew that Soltero was a junior in high school and asserts that any high school junior who claims to be twenty years old should be required to prove it. To verify Soltero's age, Plaintiff argues that Progressive Protein could have simply run an E-verify report, asked for a birth certificate, requested an age certificate, or called the high school to verify Soltero's age, but that it made no such effort. Pl. Br. at 10-12.

Regarding causation, Plaintiff asserts that under the Department's Child Labor Enhanced Penalty Program ("CLEPP"), any death occurring while a minor is engaged in a prohibited occupation, or working in an industry that the Secretary has deemed to be inherently dangerous for minors, is deemed to be "caused" by that employment for purposes of the statute. Pl. Br. at 14. Plaintiff argues that rendering plants are inherently dangerous workplaces because they have a small workforce that is cross-trained on the performance of multiple jobs. As such, although Soltero was officially assigned to clean large tanks, called "combos," he often performed other duties, such as running the dumper, and had been learning to operate a forklift for about three weeks before his death.

Concerning H.O. 7, Plaintiff argues that Progressive Protein had a non-delegable duty to prevent Soltero from operating forklifts. Pl. Br. at 31. It asserts that when Progressive Protein delegated management of the second shift to Janidlo, and he permitted Soltero to operate a forklift, Progressive Protein violated its duty. Pl. Br. at 32.

Plaintiff argues that the penalty assessed by WHD in this case should be affirmed. It asserts that the size of a business is determined by its annual dollar volume, not its profitability, and that its number of employees is only a secondary consideration. Pl. Br. at 20. Moreover, it asserts that while Progressive Protein argues that its profit was low in FY 2009, it was much higher in FY 2010 and FY 2011. Pl. Br. at 21. Additionally, Plaintiff argues that when the gravity of a violation is high, such as one resulting in death, a full penalty may be warranted even for a company experiencing financial difficulty. Pl. Br. at 26.

Plaintiff asserts that employers have a duty to protect young workers like Soltero and that even taking the minimum precaution of obtaining an age certificate would have prevented this unfortunate accident.

B. *Respondent's Arguments*

> Progressive Protein argues that it did not know Soltero was only seventeen and had no reason to believe that he was not the age he claimed to be. It asserts that long time employee Ricardo Leon Mata, who referred Soltero for employment and who identified himself as Soltero's step-father, said that Soltero was twenty years old. Respondent's Brief ("Resp. Br.") at 5. Progressive Protein argues



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

that because of their close relationship, they considered Mata an "impeccable source" on Soltero's age. *Id.* Additionally, Progressive **[*10]** Protein asserts that WHD's investigation revealed that Soltero stated to several of his coworkers that he was twenty years old. *Id.* Respondent argues that even if the Court finds that Soltero's birth date is July 26, 1991, he was mere months away from his eighteenth birthday. Resp. Br. at 6.

Concerning Soltero's operation of the forklift, Progressive Protein argues that there is no evidence that he was allowed to operate a forklift by anyone of authority. Resp. Br. at 7. Respondent asserts that Soltero was hired to clean tubs and that his operation of the forklift was not in accordance with the duties assigned to him, but rather in derogation of those duties. *Id.* Respondent argues that new employees, including Soltero, were advised that they were not to operate, or even sit on a forklift without becoming certified, trained to use it, and attending forklift training school per the company's policy. *Id.*

Regarding the penalty, Progressive Protein argues that WHD failed to consider that only one of the violations proximately caused Soltero's death. Resp. Br. at 8. It asserts that the accident was proximately caused by the operation of the forklift, and that Soltero's employment in the plant cannot be said to have proximately caused the accident. Resp. Br. at 10. Progressive Protein argues that WHD's CLEPP requires direct causation and that when a violation contributes to, but does not directly cause the death of a minor employee, WHD will generally assess the pre-CLEPP CL CMP of $11,000. *Id.* Progressive Protein further argues that WHD's policy as set forth in the bulletin should not be allowed to circumvent the legal determination of proximate cause by determining that some workplaces are more hazardous than others. Resp. Br. at 12.

Respondent also argues that WHD must consider the mitigating factors required by FLSA when determining the appropriateness of the penalty. Resp. Br. at 13. It asserts that FLSA requires that WHD consider the size of the company involved, the gravity of the violation, whether or not the company committed prior violations, and whether the violations were intentional. *Id.* Progressive Protein argues that the size of its business at the time of the violation should be considered and any evidence related to Greater Omaha Packing Co. must be disregarded as irrelevant in this case. Resp. Br. at 18. Progressive Protein asserts that WHD's Field Assistance Bulletin "arbitrarily dictates the circumstances under which the WHD will consider a reduction in the amount of the civil money penalty and in complete derogation of the law." Resp. Br. at 19. Respondent argues that the law does not say to consider the size of the business only if its gross volume of sales is less than $1,000,000. *Id.* Progressive Protein contends that it only had sixteen employees and that it is a start-up business. Resp. Br. at 20-21. It further asserts that its income statements show that it is not profitable and that the $100,000 fine far exceeds the company's profitability for the 2009 fiscal year. Resp. Br. at 20. Progressive Protein further asserts that it has no history of any prior violations, its violations were not willful, it employed no minors other than Soltero (whom it reasonably believed was not a minor) and it has taken many steps to ensure future compliance and provide a safer workplace for all employees. Resp. Br. at 22-23, 26.

## [*11] IV. Discussion

The contested issues presented in this case are:

(1) Whether Respondent committed a violation of the FLSA by employing a minor between 16 and 18 years of age in violation of H.O. 7 and/or H.O 10?

(2) If so, whether the Administrator's assessment of a $50,000 civil money penalty for each such violation should be affirmed in whole or in part?

### A. Child Labor Violations of the FLSA

The child labor provisions of the FLSA were enacted to protect working children from physical harm and to limit their working hours to prevent interference with their education. *Administrator, Wage and Hour Division v. Thirsty's Inc.*, ARB No. 96-143 , ALJ No. *94-CLA-65* , slip op. at 2 (ARB May 14, 1997). Section 12(c) of the FLSA expressly provides that "[n]o employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in any enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 212(c ) . Under the statute, the Secretary of Labor has been delegated the authority to define conditions which constitute "oppressive child labor" which is described in the statute as

a condition of employment under which . . . any employee between the ages of sixteen and eighteen years is employed by an employer in an any occupation which the Secretary of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health and well-being.

*Ibid.*

Pursuant to the FLSA, the Secretary has promulgated various Hazardous Occupation Orders (H.O.'s) which prohibit or strictly regulate certain hazardous activities involving minors under the age of 18. *See* 29 C.F.R. Part 570, Subpart E ("Occupations Particularly Hazardous for the Employment of Minors Between 16 and 18 Years of Age or Detrimental to Their Health or Well-Being"). Subpart E of Part 570 includes a list of several occupations found particularly hazardous for the employment of minors between 16 and 18 years of age, two of which (H.O. 7 and H.O. 10) are relevant to this proceeding.

According to H.O. 7, all occupations involving the operation of a power-driven hoisting apparatus are particularly hazardous for minors between 16 and 18 years of age. 29 C.F.R. § 570.58 . Prohibited work under H.O. 7 specifically includes operating, tending, riding upon, working from, repairing, servicing, or disassembling a hoist, or high-lift truck. It goes on to state that the term high-lift truck includes forklifts, fork trucks, and forklift trucks.



**[\*12]** According to H.O. 10, occupations in or about slaughtering and meat packing establishments, rendering plants, or wholesale, retail or service establishments are particularly hazardous for the employment of minors between 16 and 18 years of age or detrimental to their health or well-being. 29 C.F.R. § 570.61 . This expressly includes all occupations involved in the rendering of animal offal, animal fats, scrap meats, blood, and bones into stock feeds, tallow, inedible greases, fertilizer ingredients, and similar products.

Progressive Protein has stipulated that it is a rendering plant as that term is defined by 29 C.F.R. § 570.61.(b)(2) and that Miguel Soltero was killed on May 8, 2009 at approximately 10:30 p.m. while attempting to drive a forklift down a ramp at Respondent's plant. Stips. 2, 29-30. The question thus becomes, did Progressive Protein know, or should it have known, that Miguel Soltero was younger than 18 years of age?

Progressive Protein does not deny that Plaintiff has established Soltero was only 17 years of age during the six weeks he worked for Respondent before his death on May 8, 2009. Instead, as noted above, it argues that "Progressive Protein did not know and had no reason to believe that Mr. Soltero was not the age he claimed to be." Resp. Br. at 4. According to Respondent, it reasonably relied on Soltero's employment paperwork on which he listed his date of birth as July 26, 1988, the statement of Soltero's "step-father" that Soltero was 20 years old, Soltero's statements to co-workers saying he was 20 years of age, and the school I.D. card and Social Security card produced by Soltero as identification at the time he was hired. Id. at 4-5. According to Progressive Protein, " [t]he law does not support the argument that an employer who has no reason to believe that an employee is underage, is strictly liable for a violation of the FLSA if that employee turns out to be under age." *Id.* at 3. In support of its position, Respondent relies on *Administrator v. Castillo*, *2007-CLA-24* and *2007-CLA-25* (ALJ Aug. 30, 2010). I am not persuaded by Progressive Protein's argument.

Both the FLSA and the Department's regulations provide a means by which employers may protect themselves from unwitting violations of the minimum age requirements of the FLSA, *i.e.*, an employer may obtain a "certificate of age" issued by Federal or State authorities authorized by the Administrator of the Wage and Hour Division to issue such certificates. 29 C.F.R. § 570.5 .3 The regulation specifically cautions prospective employers that they should obtain a certificate "if there is any reason to believe that the minor's age may be below the applicable minimum for the occupation in which he is to be employed." 29 C.F.R. § 570(c) . The regulation goes on to state:

> Such certificate should always be obtained where the minor claims to be only 1 or 2 years above the applicable minimum age for the occupation in which he is to be employed.

**[\*13]** *Ibid*. As explained below, I find under the facts of this case that Progressive Protein had reason to believe that Miguel Soltero was younger than 18 years of age and that it should have undertaken further efforts to determine his actual age before hiring him.

Unlike the facts presented in *Administrator v. Castillo*, *supra* ,4 the only two forms of identification presented by Soltero when he was hired were a Social Security card and a school activity card for the 2008/2009 school



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**// PAGE 12**

year showing he was a junior in high school. *Neither* form of identification reflected a date of birth for Soltero. In fact, Sandy Walker, Progressive Protein's Plant Manger to whom Soltero provided the identification cards, never even read them. Tr. 135-36. Thus, the only "proof" of Soltero's age in Progressive Protein's possession when it made the decision to hire him was the statements of Miguel Soltero and Ricardo Mata, his "stepfather," both of whom could reasonably be viewed as having a motive to provide whatever information they believed was necessary to ensure that Soltero was hired.[5] There is no doubt in this case that Progressive Protein believed Soltero was a junior in high school when he began working — it allowed him to start work an hour after his work shift began so he could finish classes. This fact, and the information supplied by Soltero and Mata that Soltero was 20, *i.e.*, only two years above the minimum age, should have *compelled* a further inquiry. As Plaintiff suggests, Respondent could easily "have run an E-Verify report, asked for a birth certificate, or called the high school to verify Miguel's claim to be 20 years old." Pl. Br. at 10-11. Indeed, the Departments regulations warn prospective employers that if they have *any* reason to believe the applicant may be younger than the minimum age they should obtain a certificate of age, and they should *always* do so when the applicant claims, as Soltero did in this case, to be only 1 or 2 years above the applicable minimum age. 29 C.F.R. § 570.5(c) .

Had Progressive Protein conducted even a cursory investigation — something as simple as checking Soltero's Social Security number in the E-Verification system to determine his date of birth or asking him to obtain a certificate of age from the school he attended[6] — it would have known he was underage and never would have hired him. Regrettably, however, it did not, and the consequences of its failure to investigate further was the tragic death of Miguel Soltero only six weeks after he began working for Respondent.

**[\*14]** Progressive Protein also argues that Plaintiff has failed to establish that "Respondent knew or should have known that Miguel Soltero was operating a forklift" alleging that he was hired solely to clean tubs at Progressive Protein's rendering plant and his operation of the forklift he was driving when he was killed was contrary to his assigned duties. Resp. Br. at 6-7. Again, I am not persuaded by Respondent's argument.

Sandy Walker, Progressive Protein's Production Manager, testified that Derek Janidlo was the "gang leader" on the second shift. Tr. 128. He also testified it was the responsibility of Progressive Protein's night supervisor to train new employees on certain safety procedures including "lock-out" and "tag-out" procedures. Tr. 144. Walker instructed Soltero when he was hired that he was not to operate a forklift until he was "trained." Tr. 167. Walker trained employees in the "basics" of operating forklifts before Progressive Protein sent them to school at Nebraska Machine where they would be certified. Tr. 167-168. He never told Janidlo or anybody else that they should teach Soltero how to operate a forklift. Tr. 169.

Derek Janidlo testified that he worked at Progressive Protein with Soltero on the second shift, which began at 2:30 p.m. and ended at 11:00 p.m. Tr. 43. According to Janidlo, Sandy Walker, Bill Ryan and Mike Rempe were the only managers at Progressive Protein and after they left work (between 4:00 p.m. and 5:00 p.m. daily) he was the most senior person at Progressive Protein and responsible for seeing that the work was completed. Tr. 44. There were only five other workers on the second shift, Tr. 46, and he had been encouraged by Bill



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**// PAGE 13**

Ryan, the General Manager, to cross-train workers on the shift to perform other jobs.[7] Tr. 59-60. Janidlo, who was a certified forklift operator, was approached by Soltero a few weeks after he started work about learning how to operate a forklift, and Janidlo would allow him to move pallets around the plant with the forklift under his "close supervision." Tr. 64. Soltero "showed a vigorous interest in learning other jobs," and was "willing to do just about anything that was asked and actually did do anything that was asked." Tr. 64-65. Janidlo provided forklift training to Soltero approximately six times in the course of two or three weeks. Tr. 67. Janidlo believed Soltero was trying to help his "step-father," Mata, finish cleaning up at the plant on the night of his death. Tr. 84. No one directed him to use the forklift, and as far as Janidlo knew, there was no reason for him to be on the forklift that night to accomplish his assigned duties. *Ibid.*

Chris Davis testified that he worked as a combo washer on the second shift at Progressive Protein and Derek Janidlo was his supervisor. Tr. 99-100. He also testified that combo washers, like him and Soltero, would perform other jobs so they could "get a little more on-the-job training for a couple of the other jobs." Tr. 113. Davis had shown Soltero how to run the dumpers, and seen him operate a forklift at the end of shifts "kind of like a training style." Tr. 113-14. Davis understood "cross-training" to mean you were trained on multiple jobs, and both he and Soltero had been cross-trained on the dumper, tub washing and cleaning up, and Soltero "had shown a little interest in running a forklift." Tr. 114-15. He testified Soltero would operate **[*15]** the forklift "usually at the end of the night or when one of our machines broke down and we just had some dead time." Tr. 115. Kevin Morley, who was Davis' brother-in-law and also worked at Progressive Protein, had given Davis permission to operate forklifts, but Davis did not like driving them because they were "squirrely." Tr. 116.

Before the night of Soltero's death, Ricardo Mata observed Soltero operating a forklift one time "putting combos on the dumper." Tr. 103. On the night Soltero died, Mata was using a bobcat to remove waste material from the plant and deposit it in a dumpster at approximately 10:40 p.m. Tr. 104. After he had finished dumping the waste in the trash, Mata asked where Soltero was and "at that moment . . . saw a light at the end of the ramp and [the forklift Soltero was operating] was down, and . . . the cage from the forklift had pinned him on his back." Tr. 104-05. Mata testified that Soltero's job at Progressive Protein was "generally" to wash out combos, but "they had him do several things." Tr. 109. He told WHD's investigator that he had seen Soltero operate a forklift two times before the accident, and he did not know whether the company had sent him for training. Tr. 110.

A key was required to operate the forklifts at Progressive Protein's plant. Tr. 85. Keys were kept in the forklifts, and they would only be removed if the forklift was scheduled for maintenance or "there was a problem with it, where it was not to be used." *Ibid.*

As the evidence of record clearly shows, Progressive Protein's night supervisor, Derek Janidlo, not only knew Soltero was operating a forklift while employed there but was providing him basic training in the operation of the forklift. The record further shows that Janidlo had been encouraged to cross-train all the employees on his shift to perform multiple jobs, and Soltero routinely performed jobs other than washing out tubs. Although Walker testified that he never authorized Janidlo to train Soltero to use a forklift, he acknowledged that it was



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. <u>Terms of Service</u>

common practice to provide "basic" forklift training to employees before they were sent to school to obtain a certificate, and Walker had no reason to prohibit Janidlo from providing such training to Soltero if, as Walker testified, he believed Soltero was 20 years old. On the Friday night of the accident, Janidlo's team was finishing up work in anticipation of the weekend and were all working together so they could leave. Soltero, as he had been trained to do, was performing various jobs. He was assigned a task which he believed required the use of a forklift, started up the forklift that was readily available to him in the plant and was ultimately crushed underneath that forklift when it tipped over going down a ramp as he drove it outside. Even if no one at Progressive Protein specifically instructed Soltero to operate the forklift that night, it reasonably should have known that, having been given basic instructions on how to operate a forklift, he might utilize one to perform an assigned task if he believed the task called for the use of a forklift.

Inasmuch as he was seventeen years of age on May 8, 2009, Soltero's operation of a forklift at *any* time while working for Respondent was expressly prohibited by H.O. 7. Soltero's operation of Progressive Protein's forklift on that night violated H.O.7, and his operation of the forklift resulted in the minor's death.

**[*16] B. Appropriateness of Assessed Civil Money Penalties**

The FLSA and applicable regulations provide that any person found to have violated section 12 or 13(c) of the FLSA "shall be subject to a civil penalty not to exceed $50,000 with regard to each such violation that causes the death or serious injury of any employee under the age of 18 years, which penalty may be doubled where the violation is a repeated or willful violation."[8] 29 U.S.C. § 216(e)(1)(A)(ii) ; 29 C.F.R. § 579.5(a) . If the violation had been repeated or willful, the maximum penalty would have been $100,000 for each violation. 29 U.S.C. § 216(e)(1)(A)(ii) ; 29 C.F.R. 579.5(a) .

Section 16(e) of the FLSA provides that in determining the amount of a civil money penalty, "the appropriateness of such penalty to the size of the business of the person charged and the gravity of the violation shall be considered." 29 U.S.C. § 216(e)(3) . The Secretary's FLSA regulations list several factors to be taken into account in weighing the appropriateness of an assessed penalty in relation to the size of the business and gravity of the violation. The regulations state, in relevant part:

> (b) In determining the amount of such penalty there shall be considered the appropriateness of such penalty to the size of the business of the person charged with the violation or violations, taking into account the number of employees employed by that person . . . , dollar volume of sales or business done, amount of capital investment and financial resources, and such other information as may be available relative to the size of the business of such person.

> (c) In determining the amount of such penalty there shall be considered the appropriateness of such penalty to the gravity of the violation or violations, taking into account, among other things, any history of prior violations; any evidence of willfulness or failure to take reasonable precautions to avoid violations; the number of minors illegally employed; the age of minors so employed and records of the required proof of age; the occupations in which the minors were so employed;



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

exposure of such minors to hazards and any resultant injury to such minors; the duration of such illegal employment; and, as appropriate, the hours of the day in which it occurred and whether such employment was during or outside school hours.

29 C.F.R. § 579.5(b) and (c) .

**[\*17]** According to WHD Field Assistance Bulletin No. 2010-1, WHD will generally not reduce a penalty for a small businesses where the violation resulted in a death.[9] In relevant part, the Bulletin states:

For each child labor violation occurring after May 20, 2008 that causes the death of a minor employee, the WHD will generally assess a CL CMP of $50,000. Although WHD will typically conclude that a penalty reduction based on the size of the business or any other factor listed in 29 C.F.R. § 579.5 is not appropriate where a violation resulted in a youth's death, WHD will consider the facts of each individual case before making such a determination.

PX 17 at 4. The Bulletin further notes that "CLEPP requires direct causation." *Ibid.* Elsewhere in the Bulletin, it states that "[c]ausation can be found if the death or serious injury occurs when the youth is employed in a workplace that has been specifically found by the Secretary to be hazardous" noting that "[s]uch workplaces tend to involve multiple hazards and potential sources of injuries for all workers, routinely requiring a heightened level of safety-consciousness that, because of their youth and inexperience, young workers are generally unable to maintain." *Id.* at 2. Examples of deaths being "caused" by a violation which are described in the Bulletin specifically include the death of a minor killed by a forklift while working in a plant manufacturing explosives. The Bulletin further notes that "WHD would assert that two violations 'caused' his or her death — HO 7 [operating a forklift] and HO 1 (employment in a plant manufacturing explosives)." *Ibid.*

Any challenge by an employer to a penalty assessed under the FLSA by the Administrator is referred to the Office of Administrative Law Judges for a formal hearing. 29 C.F.R. § 580.6 . Any decision by the assigned judge is "limited to a determination of whether the respondent has committed a violation of section 12, . . . and the appropriateness of the penalty assessed by the Administrator." 29 C.F.R. § 580.12(b) In determining whether a penalty in any given case is appropriate, the presiding judge "may affirm, deny, reverse, or modify, in whole or in part, the determination of the Administrator." 29 C.F.R. § 580.12(c) .

As noted previously, the Wage and Hour Division assessed a total civil money penalty of $100,000.00 against the Respondent in this case. This amount included two penalties of $50,000; one each for Respondent's violations of H.O. 7 and H.O. 10.

According to Progressive Protein, it is only a small company and the $100,000 fine assessed by WHD far exceeds the company's profitability for the 2009 fiscal year. The financial records of Respondent do not



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

support Progressive Protein's argument for a reduction based on size.

**[*18]** In fiscal year 2009, Progressive Protein's annual dollar volume (gross sales) was $8,936,950.20. PX 15 at 3.[10] Respondent's "capital investment and financial resources," as reflected on its balance sheet further establish that its total assets were valued at over $9.6 million. PX 14; Tr. 280. In addition, as Child Labor Branch Chief Kerschner noted in his testimony, the regulations at 29 C.F.R. § 579.5 focus on the annual dollar volume of sales, capital investment and financial resources, not the company's profitability. Kerschner explained that WHD does not consider a company's profitability as an accurate measure of the funds moving through a company since it can be easily consumed in a variety of ways such as depreciation or excessive salaries to the employer's board of directors and management.[11] Kerschner further testified that WHD generally only approves penalty reductions for size when the annual dollar volume of sales is less than one million dollars as stated in WHD's Bulletin. Tr. 279. Kerschner noted that Progressive Protein's annual dollar volume of sales in FY 2009 far exceeds one million dollars. He further noted regarding the number of Progressive Protein's employees that, although its total workforce consisted of only sixteen people, WHD does not consider the number of employees for penalty assessment unless the first threshold is met, *i.e.*, the company's sales are below one million dollars. Further, according to Kerschner, the risk for minors employed in rendering plants stems directly from the fact that they have small workforces, as discussed in H.O. 10.[12]

While I agree with Respondent that Greater Omaha's size should not be a considered in determining Progressive Protein's penalty despite the close relationship between the two businesses,[13] I find, based on an independent consideration of the factors identified in § 579.5(b), that Progressive Protein is not eligible for a reduction based on its business size. As noted **[*19]** above, the evidence shows an annual dollar volume of sales of more than $8.9 million.[14] In addition, according to its balance sheet, Progressive Protein had $175,245.55 in its checking account, more than a million dollars in assets, more than $8.5 million in fixed assets, and total liabilities of $762,000. Tr. 181-182, PX 14. As far as the size of its workforce, while Progressive Protein might generally be considered "small," inasmuch as it had only 16 employees at the time of the violations, Tr. 18, the small workforce in this case, as Kerschner testified and H.O. 10 confirms, aggravates rather than mitigates a violation involving a rendering plant since workers in these plants are typically cross-trained in various jobs and any minors employed in violation of the Hazardous Order are thus exposed to increased hazards. A penalty reduction based on company size in this case is thus not warranted.

With regard to evaluating the gravity of the violations committed by Progressive Protein under § 579.5(c), there is no evidence of any prior child labor violations by Respondent, and there is no evidence that the violations in this case were willful. Nor is there any evidence that Progressive Protein employed minors during school hours or in excess of permitted hours on school days, and Miguel Soltero, who was seventeen years old, was the only minor Progressive Protein employed. With regard to the duration of the illegal employment, Soltero had been employed by Respondent for less than two months at the time of his accident. However, the occurrence of Soltero's death only six weeks after he started his employment is dramatic evidence of just how dangerous it can be for an employer to hire a seventeen year-old minor to work in a rendering plant such as the one owned and operated by Progressive Protein. As noted above, I have found that Respondent failed to take reasonable precautions to determine Soltero's correct age and their records of proof of age were deficient. Had it obtained



adequate proof of age, Respondent would have avoided any violation of the FLSA and its applicable regulations. Because of Progressive Protein's failure to do so, Miguel Soltero lost his life. Given that the result of Respondent's violations in this case was the most grave consequence imaginable — the minor's death — I find that a reduction based on gravity is not warranted.

Nor do I give any significant weight to Respondent's argument that WHD "failed to consider that only one of the violations proximately caused the death [of Miguel Soltero] . . . ." Resp. Br. at 8. As noted above, the FLSA expressly provides that employers "shall be subject to a civil penalty not to exceed $50,000 with regard to *each* such violation that causes the death or serious injury of any employee under the age of 18 years . . . ," 29 U.S.C. §§ 216(e)(1)(A)(ii) , and the Secretary's regulations replicate that requirement. 29 C.F.R. § 579.5(a) . The Administrator has interpreted the statute and regulation to mean that if the employment of a minor results in two violations of the child labor provisions of the FLSA, such as operating a forklift while working in a prohibited occupation, and the minor is killed during the course of that employment, *both* violations "caused" the death. PX 17 at 2. That interpretation is entitled **[\*20]** to deference if it is shown to be reasonable. As the Supreme Court noted in *Skidmore v. Swift & Co.*:

> [T]he rulings, interpretations and opinions of the Administrator under the [FLSA], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case shall depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Administrative Review Board has similarly noted that: "The Secretary has the power to resolve any ambiguities in her own regulations implementing the FLSA and her interpretation is controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Administrator v. Halsey*, ARB No. 04-061 , ALJ No. *2003-CLA-00005* , slip op. at 7 (ARB Sept. 29, 2005); *see also* Administrator v. Thirsty's, Inc., *supra*., slip op. at 4, and cases cited therein.[15]

The current guidelines employed by WHD in imposing civil money penalties for violations of the child labor provisions of the FLSA, as the Administrator's Bulletin makes clear, are based in large part on the process WHD has developed over the past 25 years, and they are consistent with the language of the statute which requires the imposition of a penalty for *each* violation established by the evidence. Furthermore, the Administrator has logically concluded that multiple violations of the FLSA committed by an employer may independently "cause" the death or serious injury of an underage minor engaged in prohibited work. WHD's interpretation of the FLSA and regulations requiring the imposition of civil money penalties for multiple violations by an employer is also consistent with Congress' intent that the Secretary protect minors from engaging in oppressive child labor by identifying hazardous jobs and workplaces and penalizing employers when they violate the law.



There is simply no question in this case that Soltero was killed while operating a forklift in violation of H.O. 7. Similarly, there is no legitimate question that, at the time of his death, he was working in a rendering plant in violation of H.O. 10. Clearly, Soltero was at risk of serious injury or death as a result of *both* violations. The fact that he died while operating a forklift in **[*21]** violation of H.O. 7 *instead* of being killed by, for example, the rotating drum in the "prebreaker" used by Progressive Protein to crush and grind animal waste, does not, and cannot, diminish the gravity of the separate violation under H.O. 10. Soltero, because of his employment by Progressive Protein, was at risk from a multitude of hazards while working in Respondent's rendering plant, including the hazards associated with operating a forklift.16 Had Progressive Protein undertaken reasonable efforts to establish his correct age before it hired him, Soltero never would have been exposed to the hazards presented by working in a rendering plant, including the risk that he would operate one of Progressive Protein's forklifts while performing his job. I find that WHD's interpretation of the statute and regulations is based on many years of experience enforcing the FLSA, and that it is reasonable and consistent with its past practices. It is thus entitled to deference consistent with *Skidmore*. WHD's application of the guidelines set forth in the Bulletin in this case was therefore justified.

Finally, I note that a reduction in civil money penalties may be appropriate in some cases if either of two alternatives under the regulations are satisfied. According to 29 C.F.R. § 579.5(d) :

> Based on all the evidence available, including the investigation history of the person so charged and the degree of willfulness involved in the violation, it shall further be determined where appropriate, (1) Whether the evidence shows that the violation is "de minimis" and that the person so charged has given credible assurance of future compliance, and whether a civil penalty in the circumstances is necessary to achieve the objectives of the Act; or (2) Whether the evidence shows that the person so charged had no previous history of child labor violations, that the violations themselves involved no intentional or heedless exposure of any minor to any obvious hazard or detriment to health or well being and were inadvertent, and that the person so charged has given credible assurance of future compliance, and whether a civil penalty in the circumstances is necessary to achieve the objectives of the act.

29 C.F.R. § 579.5(d) . I find that a reduction of the penalties imposed in this case under either alternative is not appropriate.

The Secretary of Labor has previously noted that "de minimis" is shorthand for the maxim "the law does not care for, or take notice of, very small or trifling matters." *Echaveste v. Horizon Publishers and Distributors*, *90-CLA-29* , Sec'y Decision (May 11, 1994), aff'd on recon. (July 21, 1994) (quoting BLACK'S LAW DICTIONARY, at 388 (5th ed. 1979). However, Soltero's death is hardly "small or trifling." The fact that the minor died as a result of the violations in this case thus precludes any reduction under § 579.5(d)(1)

As for a reduction under § 579.5(d)(2), I simply cannot find that the violations here "involved no intentional or *heedless* exposure of a minor to an obvious hazard." Soltero was **[*22]** hired to work in a meat rendering plant,



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

a facility which the Secretary has deemed to be a hazardous occupation under H.O. 10. Because the nature of his employment was inherently dangerous, he was clearly exposed to obvious hazards on a daily basis. Had Progressive Protein made any reasonable effort to determine Soltero's correct date of birth, which it failed to do,[17] he would not have been hired and would not have been working on May 8, 2009 at the time of his fatal accident. I thus find that Progressive Protein's employment of Soltero in its rendering plant involved a heedless exposure of a minor to an obvious hazard and that no reduction in penalties is warranted under §579.5(d)(2).

## Order

In light of the foregoing, the decision of the Administrator is AFFIRMED. The Respondent is found to have violated section 12 of the FLSA and it is ORDERED to pay the Secretary the sum of $100,000.00 as a civil money penalty for its violations of 29 C.F.R. §§ 570.58 and 570.61 .

**SO ORDERED.**

STEPHEN L. PURCELL
Chief Administrative Law Judge

Washington, DC

**NOTICE OF APPEAL RIGHTS**: If you are dissatisfied with the administrative law judge's decision, you may file an appeal with the Administrative Review Board ("Board"). To be timely, your appeal must be filed with the Board within thirty (30) days of the date of issuance of the administrative law judge's decision. *See* 29 C.F.R. § 580.13 . The address for the Board is: Administrative Review Board, U.S. Department of Labor, Suite S-5220, 200 Constitution Avenue, NW, Washington, DC 20210. *See* Secretary's Order 1-2002, 67 Fed. Reg. 64272 (2002). Once an appeal is filed, all inquiries and correspondence should be directed to the Board.

At the time you file the appeal with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8001. *See* 29 C.F.R. § 580.13 .

**[*23]** If no appeal is timely filed, then the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. § 580.12(e) .

---

fn
1 Soltero's mother, Livier Soltero Cardenas, testified that Mata has been her partner for three years and that he was living with her and Soltero at the time of the accident. Tr. 37. She said Mata and her son often referred to each other as "step-father" and "step-son."



fn

2 At the time of Kerschner's investigation, he estimated Progressive Protein's ADV for FY 2009 to be around $5 million. It was actually over $8 million.

fn

3 29 U.S.C. § 203(l) provides in relevant part that "oppressive child labor shall not be deemed to exist by virtue of the employment in any occupation of any person with respect to whom the employer shall have on file an unexpired certificate issued and held pursuant to regulations of the Secretary of Labor certifying that such person is above the oppressive child-labor age."

fn

4 An allegedly seventeen year-old worker was killed when the dump truck he was driving overturned while working in an open-pit quarry mine. The employee had provided a Resident Alien card and Social Security card, later determined to belong to another individual, as identification when he was hired, and the person who hired him testified that the youth looked his stated age of twenty-one and he saw no reason to question him about it. The only evidence offered by WHD at the hearing before the ALJ to establish that the deceased individual was seventeen was a death certificate which the WHD investigator acknowledged had been altered. The judge found no violation of the Child Labor provisions of the FLSA based on WHD's failure to offer credible evidence that the deceased employee was under the age of eighteen. *Administrator v. Castillo*, slip op. at 7.

fn

5 Ricardo Mata testified that Miguel Soltero had asked him if there was any work available at Progressive Protein where Mata worked. Tr. 103. Soltero said he wanted to work so he could buy school supplies. *Ibid.* Mata and Livier Soltero, Miguel's mother, were living together but not married "yet," *ibid.*, and Mata naturally wanted to do whatever he could to help her son.

fn

6 Child Labor Branch Chief Art Kerschner testified that Progressive Protein was aware of the E-Verification system and could have easily run Soltero's Social Security number through it to determine his age. Tr. 285. He similarly testified that schools in the State of Nebraska, where Soltero worked, are authorized to issue certificates of age at the request of a student. Tr. 284.

fn

7 Bill Ryan testified as Respondent's only witness at the hearing. Tr. 304-09. He acknowledged that he was Progressive Protein's General Manager and was responsible for its day-to-day operations. Tr. 306-07. He testified that Progressive Protein had a video system installed outside the plant for security and that workers operating forklifts were visible on the video at the "dock door" but further testified that you could "see the person on it, but you can't really identify the individual." Tr. 308-09. He testified he never knew before May 8, 2009 that Miguel Soltero was operating a forklift, Tr. 309, but he was never questioned about Janidlo's testimony that he encouraged crosstraining of workers at the plant.

fn

8 The Genetic Information Non-Discrimination Act (GINA) amended FLSA on May 21, 2008, by increasing the amount of money the Department of Labor can assess for civil money penalties for violations of Child

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Bloomberg Law®

Labor Laws that cause the serious injury or death of any employee under eighteen from $11,000 to $50,000. It provides that such penalties may be doubled for repeated or willful violations.

fn

9 The Bulletin notes that the guidelines it contains "draw heavily on the child labor civil money penalty . . . process WHD has developed over the past 25 years." PX 17 at 1. It further notes that "'[c]ertain guidelines are being adopted so that the assessment process incorporates interpretations provided to WHD by the Secretary of Labor's Administrative Review Board" and "[a]ll these guidelines comport with Regulations, 29 CFR Parts 579 and 580 ." *Ibid.*

fn

10 Progressive Protein's ADV increased to $11,952,519.75 for FY 2010 and $11,440,722.17 for FY 2011.

fn

11 Even if I were to consider Progressive Protein's profitability, I note that, while Progressive Protein's net profit was low in FY 2009 ($4,052.97), it was substantially higher in FYs 2010 and 2011 ($86,448.52 and $217,639.85, respectively). Furthermore, in *Administrator v. Halsey*, *supra* , the Board upheld the assessment of the maximum penalty for a violation of the FLSA resulting in the death of a minor, even though the assessed penalty equaled the employer's total annual earnings. Indeed, the Board has upheld a substantial penalty for a violation which resulted from a work-related accident which severed the right arm of a minor despite the fact that the employer had filed for Chapter 13 bankruptcy and the imposition of a large judgment could have forced it out of business. *Administrator v. Elderkin*, ARB No. 99-033 , 99-048 , ALJ No. *1995-CLA-00031* , slip op. at 12 (ARB June 30, 2000). According to the Board: "Although the Elderkin Farm is small, and the evidence indicates serious financial difficulties, those facts, when weighed (as they must be) against the gravity of the violations, support a civil money penalty of $71,100." *Id.* at 13.

fn

12 Kerschner explained: "As our Field Advisory Bulletin shows and, again, this has been our process for 25 years, if . . . total sales and services, the annual dollar volume, are below the million dollars, then we would look at a reduction based on the size of the employees. . . . But in this situation, because part of the risk involved for youth, in their employment at rendering plants, stems directly from the fact that they have small workforces and, as stated in the study that accompanied the issuance of the original Hazardous Order, it would be at cross-purposes for Wage and Hour to reduce the penalty [based] on the sizes of the employees, because it's part of the hazard, the identified hazard for this industry." Tr. 282-83.

fn

13 As noted in Plaintiff's brief, Henry Davis owns both Greater Omaha Packing Company and Progressive Protein, LLC in full. Pl. Br. at 23; Tr. 218, 224-225. As Plaintiff also noted, Greater Omaha sold the materials left over from its meat processing operation to Progressive Protein, and "profitability" of Progressive Protein could be easily manipulated since the price at which Greater Omaha was willing to sell and the price at which Progressive Protein was willing to buy were set by companies owned by the same individual. *Ibid.*

fn

14 In *Administrator v. Fisherman's Fleet, Inc.*, ARB No. 03-025 , ALJ No *2001-CLA-00034* (ARB June 30,



2004), the Board found a closely-held business with only 10 to 12 full-time employees which owned a retail shop, a processing plant, business offices, four trucks, a forklift and assorted processing equipment a "medium-sized" business. According to the Board: "Given its yearly multimillion dollar sales [of $3.5 million] and its ample facilities and equipment, [Fisherman's] is clearly a medium-sized company. Because workforce size is only one of the factors to be considered, the relatively small [Fisherman's] workforce does not compel a different conclusion. The Field Operations Handbook instructs Wage and Hour investigators not to reduce the assessed penalty for a company 'if the employer's gross annual dollar volume of sales . . . exceeds $800,000 . . . even if the employer has fewer than 100 employees.'" *Id.*, slip op. at 6.

fn

15 In *Thirsty's*, the ARB upheld WHD's penalty assessment procedures regarding child labor violations under the FLSA which, at that time, employed a Child Labor Money Penalty Report (Form WH-266) to determine the appropriate civil money penalty through the use of predetermined dollar values associated with various categories of violations. The Board noted that the Department's regulations at 29 C.F.R. § 579.5 listed various factors to be taken into consideration in determining the appropriateness of a penalty, but were ambiguous with regard to the utilization of those factors inasmuch as there was "no guidance as to the weight or import of any particular factor, nor do the regulations prescribe any numerical or percentage factor to guide an increase in the assessment for an aggravated violation or a mitigation of the assessment where appropriate." *Id.* at 4. Rejecting the ALJ's determination that use of the form violated the employer's due process rights, the ARB stated: "The grid and matrix schedule incorporated in form WH-266 is an appropriate tool to be used by a field Compliance Officer to recommend penalties through the enumeration and determination of the gravity of factual violations." *Id.* at 5. Although the WH-266 form did not reference each and every criterion of the guidelines set forth in § 579.5, the Board concluded that it was a "reasonable interpretation of those guidelines and within the broad authority granted an agency charged with implementing those regulations." *Id.* at 4.

fn

16 As Plaintiff accurately noted in its closing brief: "Various witnesses who had observed the plant described multiple hazards in the workplace, including augers, grinders, 'a cylinder that has teeth on it . . . and anything it comes in contact with it shreds, rotating drums, centrifuges that spin "at an extreme high rate of speed,' slippery floors, high pressured hoses, one-ton combos, noise and an environment in which 'you never know if you're going to bump your head or something is going to fall.'" Pl. Br. at 16-17.

fn

17 As noted above, every other employee at Progressive Protein produced at least one form of identification when hired that showed the employee's date of birth. However, neither form of identification produced by Soltero when he was hired reflected a date of birth, and Progressive Protein made absolutely no effort to conduct any further investigation into his actual age, choosing instead to accept at face value Soltero's and Mata's self-serving statements that he was 20 years old.

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

# General Information

| | |
|---|---|
| **Case Name** | Administrator, Wage & Hour Div., U.S. Dept. of Labor v. Progressive Protein, LLC |
| **Date Filed** | Fri Oct 14 00:00:00 EDT 2011 |
| **Citation** | ALJ No. 2010-CLA-00005; ALJ No. 2010-CLA-5; DK:BLDP_561665_V2; 2010-CLA-00005; 2010-CLA-5 |
| **Parties** | Administrator, Wage and Hour Division, United States Department of Labor; Progressive Protein, LLC |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

U.S. Department of Labor

MARSHALL, etc. v. ROOT'S RESTAURANT, INC., doing business as ROOT'S RESTAURANT and as TRIANGLE LAKE, et al.

No. 78-CL-403

December 20, 1978

Linda Leasure, U.S. Department of Labor, for plaintiff. Robert F. Weaver, Jr., and Susan J. Insley (Vorys, Sater, Seymour & Pease), Columbus, Ohio, for respondents.

MAHONY

***Full Text of Decision***

MAHONY, Administrative Law Judge: -- Pursuant to an investigation conducted by the U.S. Department of Labor, Employment Standards Administration, the Respondents were charged with violations of the Child Labor provisions of the Fair Labor Standards Act, 29 U.S.C. 201 et seq., hereinafter referred to as the Act. [1] By letter dated February 24, 1977, Respondents were advised of the assessment of civil money penalties totalling $3,120.00. Respondents filed a timely exception to the penalty assessment on May 3, 1977.

By Order of Reference dated December 21, 1977 the Administrator submitted this case to the Chief Administrative Law Judge for hearing for final determination of whether the child labor violations for which civil money penalties occurred, and also to determine the appropriateness and reasonableness of the penalty imposed. 29 C.F.R. § 580.3 .

A Notice of Hearing and Pre-Hearing Order was issued by the Chief Administrative Law Judge on January 25, 1978 establishing March 15, 1978 as the hearing date in this case. At the request of the Respondents the hearing date was changed to April 10, 1978 due to the illness of Respondent Pfaff. Subsequently, on March 30, 1978 a joint motion of the parties to continue the case was granted, and the hearing was re-scheduled for May 2, 1978.

On May 2, 1978 a hearing was held in Columbus, Ohio at which time the parties were afforded an opportunity to examine witnesses, introduce documentary evidence and present oral argument. The record was kept open for thirty (30) days to permit the Department of Labor to sumit a summary of certain documentary evidence of



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

the dates and times of the alleged violations introduced during the hearing as well as for both parties to file briefs. The summary evidence was submitted in a timely manner and is admitted in evidence as Plaintiff's Exhibit 7. Upon motion of the Respondents to which the Department of Labor interposed no objection the record was left open until June 30, 1978 for the submission of briefs, which were timely filed. The Department of Labor has also filed proposed findings of fact and conclusions of law.

## Issues

1. Whether Respondents employed ten (10) minors in willful violation of the child labor provisions of Section 12 of the Fair Labor Standards Act, and regulations issued thereunder.

2. Whether the assessed penalty is appropriate and reasonable.

## Stipulations of Fact

Plaintiff and Respondents, through their respective counsel, hereby stipulate as follows:

1. That Root's Restaurant, Inc., is an Ohio corporation having places of business at 1260 North Memorial Drive and 3015 Lithopolis Road, N.W. in Lancaster, Ohio.

2. That Root's Restaurant, Inc., engages at its North Memorial Drive facility in Lancaster, Ohio in the purchase preparation and retail sale of food and beverages to cusmers at that facility.

3. That Root's Restaurant, Inc., engages at its Lithopolis Road facility in Lancaster, Ohio in the purchase, preparation and retail sale of food and beverages to customers at that facility, and in the rental of fishing privileges and in the sale of fish bait at that facility.

4. That Orlow D. Pfaff was president and treasurer of Root's Restaurant, Inc., for at least the time period between June 1, 1974 and February 1, 1976.

5. That the time cards marked for identification as Plaintiff's Exhibits 1A through 1G are both authentic and accurate and may be received into evidence and that copies may be substituted therefor in the record.

6. That the time cards marked for identification as Plaintiff's Exhibits 2A through 2D are both authentic and accurate and may be received into evidence and that copies may be substituted therefor in the record.

7. That Orlow Pfaff employed the following individuals at Root's Restaurant located at 1260 North Memorial Drive for the following designated time periods:Pamela Sue Azbell 6/21/74 - 11/21/74 Daniel Baughman 6/21/74 - 12/1/74 Herman Thomas Seymour 7/7/75 - 10/9/75 Nancy Susan Beery 8/28/74 - 10/13/74 Victoria Ann Braddock 6/25/74 - 7/19/74 Daniel Paul Hock 6/19/75 - 7/6/75 Cindy Kay Nutter 6/4/74 - 8/15/74



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

8. That Orlow Pfaff employed the following individuals at Triangle Lake located at 3015 Lithopolis Road, N.W., in Lancaster, Ohio, for the following designated time periods:Pamela Sue Azbell 4/24/75 - 5/4/75 Ned Williams Mathias 3/29/75 - 1/26/76 Gary Eugene Murdock 4/10/75 - 7/27/75 Terry Lee Smith 6/8/74 - 10/10/74

9. That at the time of their respective employment by Orlow Pfaff, Pamela Sue Azbell was fifteen years of age; Daniel Baughman was fifteen years of age; Herman Seymour was fourteen years of age; Nancy Beery was fifteen years of age; Victoria Braddock was fifteen years of age; Daniel Hock was fifteen years of age; Cindy Nutter was fifteen years of age; Ned Mathias was fifteen years of age; Gary Murdock was thirteen years of age; and Terry Smith was fifteen years of age.

10. That the Income Statements marked for identification as Respondents' Exhibits A, B and C are authentic, are accurate insofar as the information thereon is relevant to these proceedings, and may be received into evidence.

11. The Respondent business establishments constitute an enterprise engaged in commerce within the meaning of Section 3(s)(1) of the Act.

## Statement of the Case

The investigation in this case, covering approximately a two year period, uncovered alleged violations of the child labor provisions of the Act in the employment of 10 minors who worked for the Respondents. The investigation consisted principally of examining time and attendance records of the employees. In general, the types of violations include working excessive hours on both school and non-school days, and working excessive hours during both school and non-school weeks. There is one alleged violation of having a minor engage in a prohibited occupation involving the use of a power lawn mower and also working as a cook. There is also one alleged violation of employing a minor under the statutory minimum of 14 years of age.

A summary of the alleged violations and penalty assessed is attached as Appendix A to this Decision and Order.

Thr Respondents' defenses to the alleged violations and assessments are, in substance:

(1) The violations, if any, were de minimis and the assessment of civil money penalties as not necessary to achieve compliance with the Act;

(2) The civil money penalties were not assessed in accordance with the applicable laws and regulations;

(3) Any violations involving the employment of minors were not willful.

Based upon the entire record in this case, including the proposed findings of fact, conclusions of law and briefs of the parties, I make the following:



## Findings of Fact

1. Root's Restaurant, Inc. is an Ohio corporation which maintains two establishments in or near Lancaster, Ohio.

2. One establishment, known as Root's Restaurant during the relevant time period (June, 1974-June, 1976) was operated as a restaurant.

3. The other establishment, known as Triangle Lake, during the same period, was operated as a recreational area, being comprised of a four acre lake, picnic areas, bait shop, small restaurant and party house.

4. During the period June 1974-June 1976, Root's Restaurant, Inc. employed approximately 46 people.

5. Respondent, Orlow Pfaff is the sole shareholder and president of Root's Restaurant, Inc. and was the president and treasurer of Root's Restaurant, Inc. for at least the time period, June 1, 1974-February 1, 1976.

6. That Orlow Pfaff employed the following individuals at Root's Restaurant located at 1260 North Memorial Drive for the following designated time periods within which the violations set out in Appendix A are alleged to have occurred:Pamela Sue Azbell 6/21/74 - 11/21/74 Daniel Baughman 6/21/74 - 12/1/74 Herman Thomas Seymour 7/7/75 - 10/9/75 Nancy Susan Beery 8/28/74 - 10/13/74 Victoria Ann Braddock 6/25/74 - 7/19/74 Daniel Paul Hock 6/19/75 - 7/6/75 Cindy Kay Nutter 6/6/74 - 8/15/74

7. That Orlow Pfaff employed the following individuals at Triangle Lake located at 3015 Lithopolis Road, N.W., in Lancaster, Ohio, for the following designated time period within which the violations set out in in Appendix A are alleged to have occurred:Pamela Sue Azbell 4/24/75 - 5/4/75 Ned Williams Mathias 3/29/75 - 1/26/76 Gary Eugene Murdock 4/10/75 - 7/27/75 Terry Lee Smith 6/8/74 - 10/6/74

8. That at the time of their respective employment by Orlow Pfaff, Pamela Sue Azbell was 15 years of age; Daniel Baughman was 15 years of age; Herman Seymour was 14 years of age; Nancy Beery was 15 years of age; Victoria Braddock was 15 years of age; Daniel Hock was 15 years of age; Cindy Nutter was 15 years of age; Ned Methias was 15 years of age; Gary Murdock was 13 years of age; and Terry Smith was 15 years of age.

9. That Pamela Azbell's date of birth was 5/5/59; that Daniel Baughman's date of birth was 12/2/58; that Herman Seymour's date of birth was 9/12/60; that Nancy Beery's date of birth was 10/14/58; that Victoria Braddock's date of birth was 5/14/59; that Daniel Hock's date of birth was 1/20/60; that Cindy Nutter's date of birth was 4/6/59; that Ned Mathias' date of birth was 1/27/60; that Gary Murdock's date of birth was 10/12/61; and that Terry Smith's date of birth was 12/5/58.

10. That for employees Pamela S. Azbell, Nancy Susan Beery, Daniel P. Hock, Ned Williams Mathias, Gary Eugene Murdock, and Cindy Kay Nutter, Orlow Pfaff maintained job applications that reflected either the employee's age or date of birth.

11. That for the designated years, Root's Restaurant maintained the following gross sales volumes:1974 $467, 132.78 1975 $468,810.87 1976 $472,391.74 1977 $483,018.99



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

12. That for the designated years, Triangle Lake maintained the following sales volumes:1974 $58,511.42 1975 $120,760.79 1976 $127,539.93 1977 $117,861.01

13. Either Respondent Pfaff or his manager personally interviewed or hired minors at both Respondent business establishments.

14. The United States Department of Labor, Wage and Hour Division, conducted an investigation of the Respondents from June through September, 1976.

15. By letter dated February 24, 1977, the United States Department of Labor, Employment Standards Administration, advised Respondent Pfaff, inter alia of alleged child labor violations at the Respondent business establishments and proposed civil penalties totalling $3,120.00.

16. By letters dated March 3, 1977 and March 8, 1977 the Respondents, by counsel, noted exceptions to the alleged violations.

17. By Order of Reference dated December 21, 1977 the Administrator, Employment Standards Administration, submitted this matter for a final determination of the alleged violations for which the penalty was imposed.

18. The types and numbers of the alleged violations and the penalty imposed in each case are set out in Appendix A to this decision and order.

19. Respondent, Root's Restaurant, Inc. during the relevant period, employed between 45 and 50 employees.

20. Respondent Pfaff failed to personally review time and attendance records to ensure that the teenagers employed at the Respondent business establishments were not working excessive hours, or engaged in other prohibited conduct.

21. Mr. George Kastor, the Department of Labor investigator, considered the size of the business including the annual dollar volume, the number of employees and the recurring character of the alleged violations to determine a recommended civil penalty.

## Conclusions of Law

1. At all times material hereto Respondent Root's Restaurant, Inc. d/b/a Root's Restaurant and Triangle Lake are enterprises within the meaning of Sections 3(r) and 3(s) (1) of the Fair Labor Standards Act ( 29 U.S.C. 203(r) and 203(s)(1)).

2. The Respondent Orlow D. Pfaff was the sole owner and operator of Respondent business establishments at all times material hereto.

3. The Respondents during the period June 1974 through and including January 1976, violated the child labor



provisions of Section 12 of the Act in the manner and times more fully described in Appendix A to this decision and order.

4. The responsibility for compliance with the provisions of the Act is on the *Respondents. Lenroot v. Interstate Bakeries Corp,* 146 F.2d 325 , 4 WH Cases 966 (C.A. 8, 1945). The Respondent Pfaff had or through reasonable diligence could have acquired knowledge from his Managers that minors between 13 and 15 years of age were employed at the Respondent business establishments, and that they were employed at hours and in ways which violated the child labor provisions of the Act. See *Mitchell v. Hausman,* 261 F.2d 778 , 780, 14 WH Cases 9 (C.A. 5, 1958). See also *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508 , 18 WH Cases 751 (C.A. 5, 1969).

5. The Respondent willfully employed ten minors in violation of the child labor provisions of the Act. The courts have held that violations are "willfull" if the employer was aware of the possible applicability of the Fair Labor Standards Act ( *Hodgson v. Jiffy June Farms, Inc.,* 458 F.2d 1139 , 20 WH Cases 321 (C.A. 5, 1971), *cert. denied*, 409 U.S. 948 , 20 WH Cases 937 (1972 )). The Respondents knew or should have known that the Act was applicable to these employees. It is not necessary to show bad purpose or evil intent on the part of the Respondent to demonstrate that his violations were "willful" ( Hodgson v. Jiffy June Farms, Inc., supra, at 1142). See also *Brennan v. J.M. Fields*, 488 F.2d 443 , 21 WH Cases 409 (C.A. 5, 1973)).

6. The civil money penalty for each of the ten minors employed in violation of the child labor provisions of the Act is reasonable and appropriate under all the circumstances in this case, and in accordance with the standards required by Section 16(e) of the Act and 29 C.F.R. Part 579.

## Order

Based on these findings of fact and conclusions of law, I hereby affirm the determination by the Administrator of the occurrence of the violations of the child labor provisions of the Act for which the civil penalty involved herein was imposed against the Respondents. Further, I hereby order the Respondents to pay forthwith, in accordance with the regulations, the penalty in the amount originally assessed ( $3,120.00), as contained in the notice of penalty dated February 24, 1977.

---

fn 1

Section 12(c) of the Act provides: No employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in any enterprise engaged in commerce or in the production of goods for commerce.



# General Information

| | |
|---|---|
| **Case Name** | MARSHALL v. ROOT'S RESTAURANT, INC. |
| **Date Filed** | Wed Dec 20 00:00:00 EST 1978 |
| **Citation** | ALJ No. 78-CL-00403; ALJ No. 78-CL-403; 23 WH Cases 1260; DK:BNA a0a8n3t2y5 |
| **Parties** | MARSHALL, etc. v. ROOT'S RESTAURANT, INC., doing business as ROOT'S RESTAURANT and as TRIANGLE LAKE, et al. |
| **Topic(s)** | Employment Law |

**U.S. Department of Labor**

Office of Administrative Law Judges
5100 Village Walk, Suite 200
Covington, LA 70433-2846

(985) 809-5173
(985) 893-7351 (Fax)



**Issue Date: 13 August 2010**

CASE NOS.: 2007-CLA-24
                2007-CLA-25

IN THE MATTER OF

ADMINISTRATOR, WAGE AND HOUR
DIVISION, U.S. DEPARTMENT OF LABOR
             Plaintiff

      v.

SOUTHERN ROCK & LIME, INC.
and JAMES CLEMONS, Individually

       and

FULGENCIO CASTILLO
            Respondents


APPEARANCES:

TREMELLE HOWARD-FISHBURN, ESQ.
       On behalf of Plaintiff

LEE KNOWLES, ESQ.
       On behalf of Respondent Fulgencio Castillo

ABNER R. POWELL, ESQ.
       On behalf of Respondent Southern Rock and Lime, Inc.
       and James Clemons, Individually

BEFORE:   C. RICHARD AVERY
            Administrative Law Judge

**DECISION AND ORDER**

These consolidated cases arise under the Fair Labor Standards Act of 1938, as amended 29 U.S.C. § 201 *et. seq.* (the Act), and the regulations promulgated thereunder at 29 C.F.R. Parts 570, 578, and 579. On January 25, 2006, and February 13, 2006, pursuant to Section 16(e) of the Act, the Deputy Director, Employment Standards Administration, Wage and Hour Division, United States Department of Labor imposed civil money penalties in the amount of $22,302.00 against each of the Respondents as the result of alleged violations of two hazardous occupation violations (29 C.F.R. § 570.52 and 29 C.F.R. § 570.60) and the records-keeping provision of the Act.

Respondents timely filed a request for a hearing to contest the propriety of the civil money penalties issued by the Prosecuting Party, and for a re-determination of such penalties. A formal hearing was held on April 27, 2010, in Geneva, Alabama, with all parties being afforded full opportunity to present evidence. The parties were also granted time to file post-hearing briefs. This decision is based on the entire record.[1]

**<u>Stipulations</u>**

Prior to the hearing, the parties agreed to the following stipulations of fact (ALJX-4, pp. 5-7):

1.      Southern Rock & Lime, Inc., operated an open-pit gravel mine.

2.      James Clemons was the sole owner of Southern Rock & Lime, Inc., on November 4, 2005.

3.      Southern Rock & Lime, Inc., and James Clemons employed Primitivo Cuaquuaha as a laborer.

4.      On November 4, 2005, Primitivo Cuaquuaha was operating a tractor at the mine.

5.      On November 4, 2005, Primitivo Cuaquuaha was fatally injured while operating this tractor.

6.      As a result of this fatality, the Mine Safety and Health Administration issued citations to the mine.

---

[1]  The following abbreviations will be used throughout this decision when citing evidence of record: Administrative Law Judge Exhibits (ALJX-__, p. __); Prosecuting Party Exhibits (PX-__, p. __); and Respondents Exhibits (RX-__, p. __).

7.     As a result of this fatality, the Wage and Hour Division conducted an investigation of the mine and its operations.

8.     Southern Rock & Lime, Inc., and James Clemons had a business agreement with Fulgencio Castillo wherein Mr. Castillo provided workers to the mine.

9.     The terms of the agreement among Respondents required Mr. Castillo to pay the workers directly and provide worker's compensation insurance for the workers.

10.    Southern Rock & Lime, Inc., paid Mr. Castillo, who then paid the workers.

11.    Mr. Castillo set the rate of pay for the workers.

12.    Mr. Castillo provided a work van to the workers that allowed them to get to Southern Rock & Lime, Inc.

13.    Mr. Castillo had the authority to discipline the workers that were provided to Southern Rock & Lime, Inc.

14.    Mr. Clemons also had the authority to discipline these workers.

15.    Mr. Clemons supervised and controlled the employees' work schedules.

16.    Mr. Castillo controlled the employees' work conditions.

17.    Southern Rock & Lime, Inc., maintained copies of the workers' identification records.

18.    Mr. Castillo maintained employment records for the workers, including forms I-9 and W-4.

## Issues

It his post-hearing brief, the Administrator identified the following five issues for adjudication:

1.     Whether Fulgencio Castillo and Southern Rock & Lime, Inc., and James Clemons, individually, are employers under the Act;

2.     Whether Respondents violated 29 C.F.R. § 570.60 by allowing Primitivo Cuaquuaha to work at the mine;

3.     Whether Respondents violated 29 C.F.R. § 570.52 by allowing Primitivo Cuaquuaha to operate a vehicle in or about the mine;

4.    Whether Respondents violated the records-keeping provision of the Act; and

5.    Whether the civil money penalties issued in this case are appropriate.

## **Findings of Fact**

Based upon my observation of the appearance and demeanor of the witnesses who testified at the hearing, and upon a thorough analysis of the entire record in this case, with due consideration accorded to the arguments of the parties, and applicable statutory provisions, regulations, and relevant case law, I hereby make the following findings of fact:

Mr. Castillo provided labor to Southern Rock & Lime, Inc., and Mr. Clemons. Mr. Castillo hired these workers, paid their wages, and furnished worker's compensation insurance for them.  Mr. Clemons used these laborers for work in an open-pit quarry mine and had control over their actions.  One of these laborers, Primitivo Cuaquuaha, was killed when the dump truck he was driving overturned.

The deceased had furnished to Mr. Castillo his Resident Alien card and Social Security card as proof of his stated age of twenty-one.  (PX-4).  Mr. Castillo thought the deceased looked his stated age and saw no reason to question this.  The documentation relied upon by Mr. Castillo was also provided to Mr. Clemons.

Following Primitivo Cuaquuaha's death, the Department of Labor opened an investigation into the operations at the mine and acquired the deceased's death certificate, which had been issued by the State of Alabama.  (PX-3).  The birth date on that document placed the deceased at age seventeen at the time of his death.  However, the document appeared to have been altered, and a different font was used in the birth date section.

Based solely upon the altered death certificate, the Department of Labor sought penalties from each of the Respondents.  None of the Respondents had any prior violations, and they all cooperated in the investigation and pledged future diligence. Nevertheless, each Respondent was charged $22,302.00 in civil penalties for alleged hazardous occupations and records-keeping violations.

Mr. Anthony Jacobs, the investigator assigned to this case, testified this was his first investigation involving a resident alien.  Relying only on the death certificate provided by the State of Alabama, he determined the deceased's age to be seventeen at the time of his death.  He acknowledged the Resident Alien card and Social Security card provided to Respondents by the deceased; however, he stated someone with the

Department of Labor had discovered these cards were invalid because they had been issued to another individual. Mr. Jacobs also acknowledged a Resident Alien Employment Verification Form completed by the deceased. (PX-5; RX-1).

Mr. Jacobs decided none of the documents offered by Respondents as proof of the deceased's age were "legal documents," and assessed maximum fines against Respondents, which were calculated with the aid of computer software. His supervisor reviewed these assessments and agreed maximum penalties should be levied because Respondents had not shown due diligence. Mr. Jacobs opined Respondents should have required a driver's license, state identification card, or some other form of identification specifically mentioned in 29 C.F.R. § 570.5 as proof of age.

On cross-examination, Mr. Jacobs agreed the death certificate was the only evidence he had relied upon in drawing his conclusions. He agreed if the certificate had been altered, that could lead to a different result. He also agreed immigration law requires different documentation than that required by the Department of Labor, and that, with respect to immigration law, Respondents had done everything required of them. Mr. Jacobs also agreed due diligence is not necessary if one does not suspect an employee is underage or that his identification is invalid.

John Bates, Director of Enforcement for the Wage and Hour Division (Southeast Region), did not participate in the investigation of this case, but he agreed the results of the investigation were premised on the assumption the deceased was a minor at the time of his death.

Mr. Castillo testified he had examined the identification offered by the deceased and saw no need to investigate further because the deceased appeared to be his stated age of twenty-one. Mrs. Castillo verified she signed the resident alien employment verification form completed by the deceased. (PX-5; RX-1).

## Conclusions of Law

## Whether Respondents are Employers

Under the Act, an "employer" is anyone who "suffers or permits" an individual to work, including, "any person acting directly or indirectly in the interest of an employer." 29 U.S.C. § 203. The evidence in this case demonstrates each of the Respondents "employed" Primitivo Cuaquuaha for purposes of the Act.

Southern Rock & Lime, Inc., and James Clemons, individually, have stipulated they employed Primitivo Cuaquuaha as a laborer. Therefore, I find they were "employers" under the Act. Mr. Castillo has stipulated he had control over the worker he provided to Southern Rock & Lime, Inc., determined their rate of pay, provided them with transportation, and maintained employment records. Based on this evidence, I find Mr. Castillo was also an "employer" for purposes of the Act.

## Alleged Hazardous Occupations Violations

The Administrator contends Respondents violated both 29 C.F.R. § 570.52 and 29 C.F.R. § 570.60 by permitting Primitivo Cuaquuaha to work at the mine and to operate a motor vehicle on its premises. Based on the stipulations, there is no doubt Respondents allowed Primitivo Cuaquuaha to perform these activities. However, Respondents contend they have not violated these provisions because there is no reliable proof Primitivo Cuaquuaha was a minor at the time.

The Administrator relies upon the death certificate issued by the State of Alabama as proof Primitivo Cuaquuaha was only seventeen at the time of his death. (PX-3). However, as noted above, that document appears to have been altered because the deceased's birth date appears to have been "whited-out" and then re-typed in a different font from the rest of the document. Therefore, I find the death certificate to be unreliable.

The Administrator further argues Respondents only defense against an unwitting violation of these provisions would have been to procure a certificate of age from Primitivo Cuaquuaha, as provided in 29 C.F.R. § 570.5, which states in relevant part, "[c]ertificates issued and effective pursuant to this subpart furnish an employer with proof of the age of a minor employee upon which he *may* rely in determining whether the minor is at least the minimum age for the occupation in which he is to be employed." 29 C.F.R. § 570.5(a) (emphasis added). However, that provision goes on to state that such a certificate need only be obtained by an employer who has "any reason to believe the minor's age may be below the applicable minimum for the occupation in which he is to be employed." 29 C.F.R. § 570.5(c).

In this case, Respondents relied upon the Resident Alien and Social Security cards provided to them by Primitivo Cuaquuaha as proof of his age as twenty-one.[2] (PX-4). Although these forms of identification are not specifically listed in the above-cited federal regulations as certificates of age, the permissive language of 29 C.F.R. § 570.5(a)

---

[2] Although Investigator Jacobs suggested these cards were invalid at the hearing, he could not recall who had given him this information. Moreover, the Administrator has offered no evidence of their invalidity.

suggests employers may also rely on other forms of identification. Moreover, Mr. Castillo testified he had no reason to believe Primitivo Cuaquuaha was under the age of twenty-one. Therefore, according to 29 C.F.R. § 570.5(c) he was under no obligation to obtain a certificate of age.

Based on this, I find there is a lack of evidence to indicate Respondents violated the hazardous occupation provisions for which they have been charged. The Administrator's sole basis for assessing these charges was the date of birth listed on Primitivo Cuaquuaha's death certificate, which I found unreliable, and Respondents reasonably relied on the identification provided them. Therefore, I find Respondents cannot be charged with these violations.

## Alleged Records-Keeping Violations

Each Respondent was also assessed a civil money penalty for allegedly violating the records-keeping provision of the Act. This provision requires, among other things, that Employers maintain records of each employee's date of birth if under the age of nineteen. 29 C.F.R. § 516.2(a)(3). In this case, each Respondent maintained on file employment records for Primitivo Cuaquuaha, including his Resident Alien and Social Security cards. (PX-4). Again, the Administrator's sole piece of evidence against Respondents is the unreliable death certificate issued by the State of Alabama. Therefore, I find Respondents did not violate this provision of the Act.

## ORDER

Based on the foregoing, I find the Respondents have not violated either the hazardous occupation or records-keeping provisions of the Act. Therefore, the imposition of civil money penalties in this case is inappropriate.

**So ORDERED** this 13th day of August, 2010, at Covington, Louisiana.

A

**C. RICHARD AVERY**
**Administrative Law Judge**

**NOTICE OF APPEAL RIGHTS**: If you are dissatisfied with the administrative law judge's decision, you may file an appeal with the Administrative Review Board ("Board"). To be timely, your appeal must be filed with the Board within thirty (30) days of the date of issuance of the administrative law judge's decision. *See* 29 C.F.R. § 580.13. The address for the Board is: Administrative Review Board, U.S. Department of Labor, Suite S-5220, 200 Constitution Avenue, NW, Washington, DC 20210. *See* Secretary's Order 1-2002, 67 Fed. Reg. 64272 (2002). Once an appeal is filed, all inquiries and correspondence should be directed to the Board.

At the time you file the appeal with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8001. *See* 29 C.F.R. § 580.13.

If no appeal is timely filed, then the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. § 580.12(e).

U.S. Department of Labor

MARSHALL, etc. v. WINCHELL'S DONUT HOUSE

No. 78-CL-347

December 21, 1978

Elizabeth S. Bonfils and Robert S. Bass, U.S. Department of Labor, for plaintiff. Thomas W. Power and R. Lance Elliott, Washington, D.C., and Jeffrey A. Marshall, LaMirada, Calif., for respondent.

SCALZO

***Full Text of Decision***

SCALZO, Administrative Law Judge: --

### Statement of the Case

This proceeding involves a child labor civil penalty assessed under Section 16(e) [1] of the Fair Labor Standards Act of 1938, as amended ( 29 U.S.C. § 216(e) , hereinafter referred to as the Act), and Parts 579 and 580 of Title 29 of the Code of Federal Regulations (hereinaftr referred to as the regulations).

A civil penalty in the amount of $3,100 was assessed against the Respondent herein under Section 16(e) of the Act as a result of the employment of six minors under 18 years of age at its establishment located at 1205 West Pawnee, Wichita, Kansas, contrary to the child labor provisions of the Act [2] and the regulations issued thereunder.

Respondent, after receipt of notice of the civil penalty assessment, filed an exception thereto. [3] Upon determination that said exception was considered to have been timely filed, the Administrator of the Wage and Hour Division, by Order of Reference dated April 18, 1978, referred this matter, in accordance with *29 CFR § 579.7* , for final determination as to whether the child labor violations for which civil penalties were assessed did in fact occur. A hearing was held on July 20, 1978, in Kansas City, Missouri. The record was held open



until October 13, 1978, for distribution of the transcript of record and exchange of briefs and supplemental data from the parties. These documents now having been received, the record is hereby closed. It should be noted that both parties were represented by skillful attorneys, and that briefs filed by counsel proved to be helpful. This Decision and Order adopts in substantial measure, a proposed Decision and Order filed by the Office of the Solicitor.

Upon the basis of the entire record, including my observation of the witnesses and their demeanor, and the stipulation of facts entered into the record, I make the following findings of fact, conclusions of law and Order:

## Findings of Fact

1. The Respondent, Winchell's Donut House, at all times relevant herein, was a division of Denny's Inc., a corporation engaged in the establishment, management, and operation of approximately 850 establishments known as "Winchell's Donut House." The firm has approximately 8,500 employees. About 4,000 of this total are minors. For the most part, Winchell's Donut Houses are located in the western half of the United States. Denny's, Inc., has its home office at 16424 Valley View Avenue, LaMirada, California 90637.

2. The activities of the Respondent with respect to the approximately 850 Winchell's Donut Houses are related and performed through unified operation or common control for a common business purpose. The annual gross volume of sales of all the Winchell's Donut Houses exceeded $250,000 in each year hereinafter referred to.

3. Winchell's Donut House in Kansas City, Missouri, an establishment owned and operated by the Respondent, was investigated by the Wage and Hour Division, Employment Standards Administration, United States Department of Labor in 1974. This investigation disclosed the employment of two minors under the age of 18 years in an occupation involving the operation of a vertical dough mixer called a Hobart A-200. This machine was used to make dough and batter for donuts at that establishment. The employment of these two minors was considered to be a violation of Hazardous Occupations Order No. 11, 29 CFR § 570.62 (hereinafter referred to as Order No. 11). ⁴A Wage and Hour Division notice of child labor violations, known as Form WH-103, was given to the Respondent's Division Manager, Mr. Hank Brant, on August 16, 1974.

4. In November, 1976 Compliance Officer Ms. Kathy Jo Rogers of the Wage and Hour Division, conducted an investigation of Respondent's establishment, Winchell's Donut House at 1205 West Pawnee, Wichita, Kansas, under the child labor provisions of the Act. This investigation, covering the period from October 1975 to December 1976, disclosed that five minors under 16 years of age had been employed before 7 a.m. and after 7 p.m. during the school year, and that one of these minors had worked the 11 p.m. to 7 a.m. shift. It also disclosed that two minors under 16 years of age had been employed in an occupation involving the operation of a power-driven bakery-type machine. It further disclosed that three minors under 18 years of age had been employed in an occupation involving the operation of a vertical dough mixer or batter mixer. These facts relate to the employment of six individuals. During the investigation the compliance officer met with the manager of the establishment, the area manager of the four Winchell establishments in Wichita, and conferred with the



division manager of Winchell's in Kansas City, Missouri, Mr. Hank Brant. The child labor provisions were explained to all these officials of the Respondent. The Form, WH-103, notice to employer of violations of the child labor provisions of the Act, was sent to Mr. Brant at the close of the investigation and a copy was sent to the firm's home office in California. Among other things, this form listed the name, date of birth, child labor standard violated, and the periods of illegal employment. It also identified each minor as No. 1 through No. 6. This numerical identification of the minors was used on a "Child Labor Civil Penalty Report-Nonagriculture," known as Form WH-265, and will be followed herein.

5. Winchell's Donut Houses make and sell donuts for consumption on the premises, or carry out. The Hobart A-200 mixer is an electric mixer used in the Respondent's establishments to mix dough for raised donuts, batter for cake donuts, and icing, glazes and cream filling for donuts. It is a table model with single spindle and bowl and is ordinarily used without a cover. The bowl holds 20 quarts liquid measure. There are a number of attachments for this mixer and those used particularly in the Respondent's establishments are the dough hook or arm for mixing dough, the batter attachment for mixing batter and recommended by Respondent for icing, and the wire whip attachment for mixing icing and fillings and such. The Hobart A-200 mixer is used primarily by a baker who works the "graveyard" shift to prepare most of the donuts required for the next day. The mixer is sometimes used by the manager, who works some portion of the 24 hours the establishment is open, to make more donuts when needed. However, in the absence of the manager, counter employees, most of whom are under 18 years of age and some of whom are under 16 years of age, when they become aware that the supply of donuts is about to run out, operate the Hobart A-200 mixer to mix dough or batter for donuts and to mix icing for donuts.

6. The compliance officer determined that six minors under 18 years of age were employed in violation of the child labor provisions of the Act. The violations, more than one with respect to some of the minors, involved the employment of five minors for hours and during periods prohibited by Child Labor Regulation No. 3 (hereinafter referred to as Reg. 3); [5] the employment of two minors, 14 and 15 years of age, in occupations involving the operation of power-driven bakery-type machines in violation of the occupational restrictions of Reg.3; the employment of three minors, two of them 16 years of age and one 14 years of age, in occupations involving the operation of a vertical dough mixer in violation of Order No. 11. [6]

7. Civil penalties amounting to $3,100 were recommended by Compliance Officer Rogers and adopted by the Assistant Regional Administrator. The penalties for the violations regarding each of the minors were: No. 1, $450; No.2, $500; No.3, $350; No.4, $600; No.5, $350; and No.6, $850. In arriving at these penalties Compliance Officer Rogers utilized the "Child Labor Civil Money Penalty Report -- Nonagriculture," identified as Form WH-265. With respect to the violations involving the six minors, the compliance officer considered the gravity of the violations and the size of the employer. The fact that the violations with respect to 16-year-old minors Nos. 2 and 4 involved the operation of hazardous machines; with respect to 14-year-old minor No. 6 involved the operation of hazardous machines; with respect to minor No. 1 involved the operation of prohibited power-driven machines; [7] and with respect to minor Nos. 1, 3, 4, 5, and 6 involved employment before 7 a.m. and after 7 p.m. during the school year, resulted in an initial penalty of $1,600. However, the compliance officer took into account the results of the prior child labor investigation of Respondent's establishment in Kansas City, and determined that the violations in Respondent's establishment in Wichita were recurring and, therefore added $250 with respect to each of the six minors employed. The compliance officer, in determining these

violations to be grave, also considered the size of Respondent's national corporation to be quite large, and concluded there was no basis upon which to reduce the penalty.

8. On December 21, 1976, Assistant Regional Administrator Rex L. Wayman sent the Respondent a notice of the assessment of $3,100 as civil money penalties resulting from the employment of six minors in violation of the child labor provisions of the Act.

9. The parties stipulated, and I accept as true, all facts alleged in Plaintiff's Exhibit 7, which exhibit is hereby incorporated herein by reference. (Tr.8).

## Issues

The parties stipulated, and I accept as stipulated, ⁶that the issues to be determined are:

(a) Whether the operation or cleaning of a Hobart A-200 mixer is within the purview of Order No. 11 ( 29 CFR § 570.62 ), and thus, in fact, a hazardous occupation.

(b) Whether or not the operation of the Hobart A-200 mixer in a restaurant or retail establishment is within the purview of Order No. 11.

(c) Whether 29 USC § 216(e)(3) , which reads in part "sums collected as penalties pursuant to this section shall be applied toward reimbursement of the cost of determining the violation and assessing and collecting such penalties," is unconstitutional as violative of the due process clause of the United States Constitution.

(d) Whether the alleged violations are willful or recurring (Tr. 182-183).

## Conclusions of Law

1. Winchell's Donut House is an enterprise within the meaning of Section 3(r) of the Act, is engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the Act, and is an employer subject to the child labor provisions of the Act.

2. Section 12(c) of the Act prohibits an employer from employing "any oppressive child labor." "Oppressive child labor" is defined in Section 3(1) of the Act to mean generally the employment of a minor under 16 years of age in any occupation, and to mean, *inter alia,* "a condition of employment under which * * * (2) any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Secretary of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being * * *." Pursuant to this authority the Secretary issued Child Labor Hazardous Occupations Order No. 11 ( 29 CFR § 570.62 ) which finds and declares occupations involving the operation of power-driven bakery machines, including the operation and



cleaning of vertical dough mixers and batter mixers, to be particularly hazardous for the employment of minors between 16 and 18 years of age. (See footnote 6 supra.) Section 3(1) authorizes the Secretary to provide for the permissible employment of minors "between the ages of fourteen and sixteen years in occupations other than manufacturing and mining * * * if and to the extent that the Secretary of Labor determines that such employment is confined to periods which will not interfere with their schooling and to conditions which will not interfere with their health and well-being." Pursuant to this authority the Secretary issued Child Labor Regulation No. 3 ( 29 CFR § 570.31 , et seq.). (See footnote 5, supra).

3. Respondent's employment (as stipulated) of five minors between 14 and 16 years of age for hours and at times other than those permitted for minors of such ages by Reg. 3 constituted the employment of "oppressive child labor" within the meaning of the Act.

4. Respondent's employment of two minors between 14 and 16 years of age in an occupation involving the operation of a power-driven bakery-type machine, i.e., the Hobart A-200 mixer with wire whip attachment to make icing for donuts, was not permitted for minors of such age by Reg. 3 and constituted the employment of "oppressive child labor" within the meaning of the Act.

5. Respondent's employment of three minors, two of whom were 16 years of age and one of whom was 14 years of age, in an occupation involving the operation and cleaning of a vertical dough mixer or batter mixer, i.e., the Hobart A-200 mixer with dough hook or batter attachment to make dough or batter for donuts, was in violation of Order No. 11 and constituted the employment of "oppressive child labor" within the meaning of the Act.

6. The Administrator of the Wage and Hour Division has taken the position that the operation of an icing machine is not within the purview of Order No. 11, and thus an occupation involving the operation of an icing machine is permissible for minors 16 and 17 years of age. Such an occupation, however, would not be be permissible for 14 and 15 year old minors under Reg. 3 as this Regulation prohibits the employment of such minors in occupations involving the operation of a power-driven bakery-type machine. This position is based on reported findings supporting the issuance of Order No. 11, entitled "Occupational Hazards to Young Workers, Report No. 11, Hazards in Operating Bakery Machines." This report specifically substantiates the Administrator's opinion that the operation and cleaning of "small vertical spindle mixers" as well as "batter-mixing machines" are within the purview of the Order. Thus, the occupation of operating and cleaning a Hobart A-200 mixer with the wire whip attachment to make icing is not within the purview of Order No. 11. On the other hand, however, the occupation of operating and cleaning a Hobart A-200 mixer with the dough hook or batter attachments is within the purview of Order No. 11. Furthermore, Order No. 11 applies to the occupations listed therein wherever performed. Order No. 11 is a regulation explicitly authorized under the Act and as such is binding on the courts as if it had been directly enacted by *Congress. Fanelli v. United States Gypsum Co.,* 141 F.2d 216 ,4 WH Cases 202 (2d Cir. 1944); *Sun Publishing Co. v. Walling,* 140 F.2d 445 , 4 WH Cases 126 (6th Cir. 1944 ), *cert. denied*, 322 U.S. 728 , 4 WH Cases 403 (1944); *Walling v. Yeakley,* 140 F.2d 830 , 4 WH Cases 93 (10th Cir. 1944); *Walling v. Panther Creek Mines,* 148 F.2d 604 , 5 WH Cases 155 (7th Cir. 1945).

7. The violations in this case were recurring. The notice to employer of violations of the child labor provisions of the Act sent by the Wage and Hour Division in 1974 to a managerial official of the Respondent corporation,

Division Manager Hank Brant, was notice to the Respondent of the occurrence of such violations. Respondent established and directed the procedures for operation of the Winchell's establishment. It admitted that at least half of its employees at such establishments were under 18 years of age. It further admitted the lack of employee supervision in a 24-hour operation with only one manager. The Respondent thus knew or through reasonable diligence could have acquired knowledge that minors under 18 years of age were employed at most of the 850 establishments and that some were employed at ages, in occupations, and at hours which violated the child labor provisions of the Act. Such a showing of knowledge is sufficient under the *Act. Mitchell, v. Hausman,* 261 F.2d 778 , 780, 14 WH Cases 9 (5th Cir. 1958); *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508 , 18 WH Cases 751 (5th Cir. 1969).

8. The responsibility for compliance with the provisions of the Act is on the Respondent. It is settled law that an employer "must be held strictly accountable for the child labor violations of subordinates." *Lenroot v. Interstate Bakeries Corporation,* 146 F.2d 325 , 4 WH Cases 966 (8th Cir. 1945 ); Gulf King Shrimp Company, v. Wirtz, supra. The Respondent cannot delegate away this responsibility. In Lenroot v. Interstate Bakeries Corporation, supra, at 328, the court made it clear that:

> [T ]he mandate of the statute is directed to the employer and "he may not escape it by delegating it to others." The "duty rests on the employer to inquire into the conditions prevailing in his business. He does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. He must then stand or fall with those whom he selects to act for him. * * * the duty must be held personal, or we nullify the statute * * *." "The cases must be rare where prohibited work can be done within the plant, and knowledge or the consequences of knowledge avoided."

9. The parties stipulated to the issue of constitutionality of Section 16(e) of the Act in order to preserve the issue for presentation to a Federal Court by the Respondent. I do not have any jurisdiction to consider this issue since administrative agencies do not have the power to determine the constitutionality of legislation. *Engineers Public Service Co., v. SEC,* 138 F.2d 936 , (D.C. Cir. 1943 ), dismissed as moot 332 U.S. 788 (1947); *Panitz v. District of Columbia,* 112 F.2d 39 (D.C. Cir. 1940); *Todd v. SEC,* 137 F2d 475 (6th Cir. 1943 ); Central Nebraska Public Power and *Irr. Dist. v. FPC,* 160 F.2d 782 (8th Cir. 1947 ), *cert. denied* 332 U.S. 765 (1947).

10. The civil money penalty of $3,100 assessed in this case for the employment of six minors in violation of the child labor provisions of the Act is reasonable and appropriate under all the circumstances in this case, and in accordance with the standards required by Section 16(e) of the Act and 29 CFR Part 579.

## Order

Based on these findings of fact and conclusions of law, I hereby affirm the determination by the Administrator of the occurrence of the violations of the child labor provisions of the Act for which the civil money penalty involved herein was imposed against the Respondent. Further, I hereby order the Respondent to pay forthwith,



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

in accordance with the Act and regulations, the penalty in the total amount of $3,100 as originally assessed in the notice of penalty of December 21, 1976.

---

fn 1

Section 16(e) provides that:

(e) Any person who violates the provisions of section 12, relating to child labor, or any regulation issued under that section, shall be subject to a civil penalty of not to exceed $1,000 for each such violation. In determining the amount of such penalty, In determining the amount of such penalty, the appropriateness of such penalty to the size of the business of the person charged and the gravity of the violation shall be considered. The amount of such penalty, when finally determined, may be --

(1) deducted from any sums owing by the United States to the person charged;

(2) recovered in a civil action brought by the Secretary in any court of competent jurisdiction, in which litigation the Secretary shall be represented by the solicitor of Labor; or

(3) ordered by the court, in an action brought for a violation of section 15(a)(4), to be paid to the Secretary.

Any administrative determination by the Secretary of the amount of such penalty shall be final, unless within fifteen days after receipt of notice thereof by certified mail the person charged with the violation takes exception to the determination that the violations for which the penalty is imposed occurred, in which event final determination of the penalty shall be made in an administrative proceeding after opportunity for hearing in accordance with section 554 of title 5, United States Code, and regulations to be promulgated by the Secretary. Sums collected as penalties pursuant to this section shall be applied toward reimbursement of the costs of determining the violations and assessing and collecting such penalties, in accordance with the provisions of section 2 of an Act entitled "An Act to authorize The Department of Labor to make special statistical studies upon payment of the cost thereof, and for other purposes" ( 29 U.S.C. 9a ).

fn 2

Section 12(c) of the Act provides that:

(c) No employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in any enterprise engaged in commerce or in the production of goods for commerce.

"Oppressive child labor" is defined in Section 3(1) of the Act, *inter alia,* to mean:

(1) "Oppressive child labor" means a condition of employment under which (1) any employee



under the age of sixteen years is employed by an employer * * * in any occupation, or (2) any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Secretary of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being; * * *. The Secretary of Labor shall provide by regulation or by order that the employment of employees between the ages of fourteen and sixteen years in occupations other than manufacturing and mining shall not be deemed to constitute oppressive child labor if and to the extent that the Secretary of Labor determines that such employment is confined to periods which will not interfere with their schooling and to conditions which will not interfere with their health and well-being.

fn 3

*29 CFR § 579.6* .

fn 4

See footnote 6, infra.

fn 5

Pertinent provisions of this regulation are set forth below:

SUBPART C-EMPLOYMENT OF MINORS BETWEEN 14 AND 16 YEARS OF AGE (CHILD LABOR REG. 3)

Authority: Sec. 3, 52 Stat. 1060 , as amended; 29 U.S.C. 203

§ 570.31 *Determination.*

The employment of minors between 14 and 16 years of age in the occupations, for the periods, and under the conditions hereafter specified does not interfere with their schooling or with their health and well-being and shall not be deemed to be oppressive child labor.

§ 570.32 *Effect of this subpart.*

In all occupations convered by this subpart the employment (including suffering or permitting to work) by an employer of minor employees between 14 and 16 years of age for the periods and under the conditions specified in § 570.35 shall not be deemed to be oppressive child labor within the meaning of the Fair Labor Standards Act of 1938.

* * *

§ 570.34 *Occupations in retail, food service, and gasoline service establishments.*

(a) This subpart shall apply to the following permitted occupations for minors between the ages



of 14 and 16 employed by retail, food service, and gasoline service establishments;

* * *

(b) Paragraph (a) of this section shall not be construed to permit the application of this subpart to any of the following occupations in retail, food service, and gasoline service establishments;

* * *

(6) Occupations which involve operating, setting up, adjusting, cleaning, oiling, or repairing power-driven food slicers and grinders, food choppers, and cutters, and bakery-type mixers;

* * *

§ 570.35 *Periods and conditions of employment.*

(a) Except as provided in paragraph (b) of this section, employment in any of the occupations to which this subpart is applicable shall be confined to the following periods:

(1) Outside school hours;

(2) Not more than 40 hours in any 1 week when school is not in session;

(3) Not more than 18 hours in any 1 week when school is in session;

(4) Not more than 8 hours in any 1 day when school is not in session;

(5) Not more than 3 hours in any 1 day when school is in session;

(6) Between 7 a.m. and 7 p.m. in any 1 day, except during the summer (June 1 through Labor Day) when the evening hour will be 9 p.m.

* * *

fn 6

This order provides:

§ 570.62 *Occupations involved in the operation of bakery machines (Order 11).*

(a) *Finding and declaration of fact.* The following occupations involved in the operation of power-driven bakery machines are particularly hazardous for the employment of minors between 16 and 18 years of age;

(1) The occupations of operating, assisting to operate, or setting up, adjusting, repairing, oiling, or cleaning any horizontal or vertical dough mixer; batter mixer; bread dividing, rounding, or molding machine; dough brake; dough sheeter; combination bread slicing and wrapping



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

machine; or cake cutting band saw.

(2) The occupation of setting up or adjusting a cooky or cracker machine.

fn 7

Minor No. 4 was employed in violation of the occupational restriction of Reg. 3 and in violation of Order No. 11. However, only one penalty factor, the larger one for violation of Order No. 11, was applied with respect to the occupational violation.

fn 8

Joint Exhibit 1, a prepared stipulation reflecting issues to be determined was amended during the hearing. (Tr. 182-183).

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

# General Information

| | |
|---|---|
| **Case Name** | MARSHALL v. WINCHELL'S DOUNT H0USE |
| **Date Filed** | Thu Dec 21 00:00:00 EST 1978 |
| **Citation** | ALJ No. 78-CL-00347; ALJ No. 78-CL-347; 23 WH Cases 1250; DK:BNA a0a8n3t2e2 |
| **Parties** | MARSHALL, etc. v. WINCHELL'S DONUT HOUSE |
| **Topic(s)** | Employment Law |